Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiff*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF KESSLER, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VERISIGN, INC., a Delaware corporation, and INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit corporation.<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE CASE ....1

II. PARTIES ....13

A. Plaintiff ....13

B. Defendants ....14

III. JURISDICTION AND VENUE ....14

IV. FACTUAL BACKGROUND ....16

A. The Domain Name System and its Governance ....16

B. The Agreements and Competitive Safeguards Governing .Com. ....18

C. Verisign's Acquisition and Entrenchment of the .com Monopoly. ....23

1. Verisign's campaign of coercion against ICANN ....24

2. ICANN's capitulation and the division of monopoly profits. ....32

D. Since 2010, Verisign Has Maintained and Entrenched Its Monopoly ....42

1. The 2012 renewal ....43

2. The 2016 extension ....45

3. The 2018 amendment ....49

4. The 2020 ICANN agreement ....52

5. The 2024 renewal ....67

E. The Government Has Expressly Preserved Defendants' Private Antitrust Liability ....73

F. Verisign's Prices are Supracompetitive. ....76

1. Comparable registries charge less than Verisign. ....78

2. Registry costs have fallen while Verisign's prices have risen. ....86

3. Verisign has overcharged consumers by billions of dollars and harmed competition. ....89

V. RELEVANT MARKET ....93

A. Registrants Are Locked in to .Com ....93

B. New gTLDs Have Not Created Competition ....96

C. The Market Treats .Com as Irreplaceable ....103

D. Verisign's Pricing Confirms Its Monopoly Power ....104

VI. ANTITRUST INJURY ....106

A. Inflated wholesale prices are passed on to consumer purchasers of .com domain names ....107

1. ICANN's own experts have confirmed near-complete passthrough in the domain name industry ....108

2. Publicly available evidence shows passthrough across registrars. ....112

VII. CONTINUOUS ACCRUAL ....118

VIII. CLASS ACTION ALLEGATIONS ....119

IX. CAUSES OF ACTION ....122

FIRST CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE (ON BEHALF OF THE NATIONWIDE INJUNCTIVE RELIEF CLASS) (AGAINST VERISIGN AND ICANN) ....122

SECOND CLAIM FOR RELIEF VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 MONOPOLIZATION OF THE .COM REGISTRY SERVICES MARKET (ON BEHALF OF THE NATIONWIDE INJUNCTIVE RELIEF CLASS) (AGAINST VERISIGN) ....124

THIRD CLAIM FOR RELIEF VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 CONSPIRACY TO MONOPOLIZE OF THE .COM REGISTRY SERVICES MARKET (ON BEHALF OF THE NATIONWIDE INJUNCTIVE RELIEF CLASS) (AGAINST VERISIGN AND ICANN) ....125

FOURTH CLAIM FOR RELIEF VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§ 16700, ET SEQ. RESTRAINT OF TRADE (ON BEHALF OF THE CALIFORNIA CLASS) (AGAINST VERISIGN AND ICANN) ....128

FIFTH CLAIM FOR RELIEF VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§ 16700, ET SEQ. CONSPIRACY TO MONOPOLIZE (ON BEHALF OF THE CALIFORNIA CLASS) (AGAINST VERISIGN AND ICANN) ....128

SIXTH CLAIM FOR RELIEF VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.

RESTRAINT OF TRADE (ON BEHALF OF THE CALIFORNIA CLASS) (AGAINST VERISIGN AND ICANN) ....129

SEVENTH CLAIM FOR RELIEF VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, ET SEQ. MONOPOLIZATION (ON BEHALF OF THE CALIFORNIA CLASS) (AGAINST VERISIGN) ....130

EIGHTH CLAIM FOR RELIEF VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, ET SEQ. CONSPIRACY TO MONOPOLIZE (ON BEHALF OF THE CALIFORNIA CLASS) (AGAINST VERISIGN AND ICANN) ....130

PRAYER FOR RELIEF ....131

Plaintiff brings this action on behalf of himself individually and on behalf of a class consisting of all persons and entities who paid for the renewal of one or more .com internet domain name registrations processed through the .com registry operated by Verisign, Inc. ("Verisign") from at least September 4, 2022 until the present (Class Period).

## I. NATURE OF THE CASE

1. This is a case about a company that acquired a monopoly and then ensured no competitive process would ever threaten it. Defendant Verisign, Inc. ("Verisign") purchased control of the .com registry, the authoritative database that makes every .com website and email address on the internet functional, coerced the organization responsible for overseeing it into a contract that eliminated every competitive safeguard, and now charges supracompetitive prices to consumers who have no alternative. This action challenges both Verisign's monopoly and the written contract that makes its extraction possible: the .com Registry Agreement between Verisign and Defendant Internet Corporation for Assigned Names and Numbers ("ICANN")[1], a private California nonprofit organization created in 1998 at the direction of the United States government to promote competition in the domain name marketplace.

2. As the sole operator of the .com registry, Verisign charges every domain registrar (the retail companies, like GoDaddy and Namecheap, through which

---

[1] .com Registry Agreement between ICANN and VeriSign, Inc. dated Dec. 1, 2024 (hereinafter "2024 Registry Agreement"), https://www.icann.org/en/registry-agreements/details/com. The current agreement is the most recent in a series of .com registry agreements between ICANN and Verisign. The anticompetitive terms challenged herein, including the presumptive renewal provision (§ 4.2) and the pricing structure (§ 7.3), originated in the 2006 .com Registry Agreement, which was the product of the coercive campaign described *infra*. Those terms have been carried forward in substantially identical form through each subsequent renewal through the present. *See* .com Registry Agreement between ICANN and VeriSign, Inc. dated March 1, 2006, https://www.sec.gov/Archives/edgar/data/1014473/000119312507154202/dex1026.htm ("2006 Registry Agreement").

consumers actually purchase domain names) an annual fee, currently $10.26, for each .com domain registration and renewal.[2] .com is the internet's most widely used top-level domain ("TLD"[3]), with over 166 million active registrations.[4] When a business owner registers "mybakery.com" through GoDaddy and renews that domain name for $22.99, $10.26 per year goes to Verisign, a cost no registrar can avoid. It is these end users, the millions of individuals and businesses that pay the retail price for .com domain names, on whose behalf this action is brought.

3. Verisign's monopoly generates over $1.6 billion in annual revenue from its captive customer base.[5] Its SEC filings indicate an approximate per-domain cost of $3.09[6], which means that, at the current wholesale price of $10.26, Verisign's markup is approximately 232% over cost. The company's operating margins exceed 67%, higher than Apple, Microsoft, or Alphabet[7], and more than five times the S&P 500

---

[2] Verisign, Inc., Annual Report (Form 10-K), at 3-4, 27 (Feb. 5, 2026) ("2025 10-K"), https://investor.verisign.com/sec-filings/sec-filing/10-k/0001014473-26-000006.

[3] A "top-level domain" is the suffix at the end of a website address, such as .com, .org, or .net. Each top-level domain is operated by a single "registry," like Verisign, that maintains the authoritative database of all domain names registered under it.

[4] Domain Name Industry Brief: Quarterly Report Q2 2026 (July 2026), https://www.dnib.com/articles/the-domain-name-industry-brief-q2-2026 ("DNIB Q2 2026"). The Domain Name Industry Brief is a quarterly report providing statistical data and analysis of the global Domain Name System (DNS) industry. It is sponsored by Verisign.

[5] 2025 10-K, *supra* note 2, at 27 (reporting revenues of $1.656 billion for fiscal year 2025).

[6] In 2025, Verisign reported operating expenses of $535.6 million on a domain name base of 173.5 million .com and .net registrations. 2025 10-K, *supra* note 2, at 25, 38, 50. Dividing total operating expenses by total reported domains produces an approximate per-domain cost of $3.09. This figure is likely conservative because it includes all reported operating expenses, including $244 million in compensation and $69 million in stock-based compensation. At Verisign's current wholesale price of $10.26, its per-domain operating profit is approximately $7.17.

[7] For the most recent fiscal year, Apple's operating margin was approximately 32%, Microsoft's was 46%, and Alphabet's was 32%. *See* Apple Inc., Annual Report (Form 10-K), at 22, 29 (filed Oct. 31, 2025), https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=18880179 (reporting net sales of $416.2 billion

average.[8] Wall Street analysts have described Verisign as an "internet toll-road" and "a contractual monopoly" with a "golden goose in their registry business" that "has virtually no competition" and whose "financial statements … would look dramatically different with sustained competition."[9] Meanwhile, Verisign spends just six cents of every revenue dollar on research and development.[10] In 2024, its CEO received $14 million in compensation[11] for overseeing a workforce of approximately 930 employees.[12] In 2025, the company returned over $1 billion to shareholders through buybacks and its first-ever dividends.[13] These results would be impossible in a competitive market.

---

and operating income of $133.1 billion); Microsoft Corp., Annual Report (Form 10-K), at 37 (filed July 29, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/789019/000119312526323660/msft-20260630.htm (reporting revenues of $331.8 billion and operating income of $155.2 billion); Alphabet Inc., Annual Report (Form 10-K), at 32, 49 (filed Feb. 4, 2026), https://s206.q4cdn.com/479360582/files/doc_financials/2025/q4/GOOG-10-K-2025.pdf (reporting revenues of $402.8 billion and operating income of $129.0 billion for fiscal year ended December 31, 2025).

[8] *See S&P 500 Operating Margin*, https://www.gurufocus.com/economic_indicators/4226/sp-500-operating-margin (reporting average S&P 500 operating margin of 13.1% as of December 31, 2025); *see also* Britney Nguyen, *Nvidia is hot. But 4 companies in the S&P 500 are on an even hotter streak*, QUARTZ (Aug. 6, 2024), https://qz.com/nvidia-outperformed-profitability-other-companies-sp500-1851575139 (reporting Verisign had third-highest net profit margin in S&P in 2024).

[9] Matt Brice, *Verisign: The Golden Yardstick*, HEDGE FUND ALPHA (Mar. 13, 2020), https://hedgefundalpha.com/stocks/verisign-the-golden-yardstick/?srsltid=AfmBOorcMR5rVVasbEgWE93crEZ-QlHMUWTBWGIkjdNzK_HMJY9XTJfD.

[10] *See* 2025 10-K, supra note 2, at 26, 28 (reporting R&D spending of $103.6 million, or 6.3% of revenues).

[11] Verisign, Inc., 2025 Proxy Statement, at 35 (Apr. 11, 2025), https://investor.verisign.com/static-files/45f924ed-a195-4cf0-9006-955d3a09c81f (reporting total compensation for D. James Bidzos of $14,055,378 for fiscal year 2024).

[12] 2025 10-K, *supra* note 2, at 7 (noting Verisign had 928 employees as of December 31, 2025).

[13] 2025 10-K, *supra* note 2, at 25, 30, 49 (noting Verisign "initiated a quarterly cash dividend in April 2025").

4. Verisign did not build .com. It acquired control of the .com registry in 2000 by purchasing Network Solutions, Inc., the pre-existing registry operator, for approximately $21 billion. NSI's counterparty was Defendant ICANN, whose founding board chair told Congress that "our primary mission was to break the monopoly of Network Solutions."[14] ICANN was given the authority to open the .com contract to competitive bidding, enforce wholesale price caps, and hold registry operators accountable.[15] The government's founding directive for ICANN was explicit: "the pressure of competition is likely to be the most effective means of discouraging registries from acting monopolistically."[16]

5. Verisign's first .com Registry Agreement, entered into with ICANN in 2001, included two critical competitive safeguards: a wholesale price cap of $6.00 per domain, tethered to actual costs, and a provision for competitive rebidding at the end of each contract term. If Verisign charged too much or failed to meet its obligations, a competitor could replace it.[17] As the Ninth Circuit later recognized, this rebidding mechanism was the central competitive constraint on a registry operator: because only one entity can operate a given registry at any time, "the only viable competition can take place in connection with obtaining a new contract after expiration of the old one."[18] Indeed, when ICANN competitively bid the .net registry in 2005, Verisign cut

---

[14] Statement of Esther Dyson, Founding Chair of ICANN, *ICANN's Expansion of Top-Level Domains: Hearing before the S. Comm. on Commerce, Science, and Transp.*, 112th Congress, S. Hrg. 112-394 (Dec. 8, 2011), https://www.govinfo.gov/content/pkg/CHRG-112shrg74251/html/CHRG-112shrg74251.htm.

[15] *See infra* § IV.B-C.

[16] Statement of Policy, *Management of Internet Names and Addresses*, 63 Fed. Reg. 31,741-46 (June 10, 1998), https://www.govinfo.gov/content/pkg/FR-1998-06-10/pdf/98-15392.pdf ("White Paper").

[17] *See infra* § IV.C.

[18] *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 499, 502 (9th Cir. 2010) ("*CFIT*") (explaining that because "there can only be one operator for each domain name registry at any one time" the "only viable competition can take

its wholesale price from $6.00 to $4.25 to win the contract.[19] No comparable process has ever been conducted for .com.

6. Having acquired the monopoly, Verisign set about ensuring it would never be subject to competition. Over a multi-year campaign beginning shortly after the acquisition, Verisign waged a systematic assault on ICANN's capacity to exercise its oversight role. As alleged in a subsequent antitrust action, Verisign drained ICANN through vexatious litigation, orchestrated covert astroturfing campaigns to undermine ICANN's legitimacy, threatened to withhold the fee payments on which ICANN's budget depended, and directed threats at ICANN.[20] The Ninth Circuit later held that this conduct gave rise to viable claims under the Sherman Act.

7. In 2006, ICANN capitulated. It entered into a new Registry Agreement that replaced every safeguard the 2001 agreement had contained. Under the old agreement, Verisign's wholesale price was capped at $6.00 per domain and tethered to its actual costs. Under the new one, Verisign could raise prices by up to 7% per year in four of every six years, regardless of whether its costs had changed at all. Under the old agreement, ICANN could open the contract to competing bids if Verisign failed to meet its obligations. Under the new one, Verisign held a presumptive right of renewal, subject only to an exception both parties understood would never be triggered. And the new agreement went further: it prohibited ICANN's own governance processes

---

place in connection with obtaining a new contract after expiration of the old one," and finding that "[t]he allegation in this case regarding the elimination of competitive bidding at the expiration of each successive registry agreement means that any other potential registry operator is excluded from competition[.]").

[19] *See infra* ¶¶ 70, 167. As discussed below, Verisign operates the .net registry in addition to .com.

[20] *See infra* § IV.C.1; *see CFIT*, 611 F.3d 495 (reversing dismissal of Sherman Act §§ 1 and 2 claims challenging the .com agreement's pricing and renewal provisions as anticompetitive restraints obtained through predatory coercion of ICANN); Fourth Amended Complaint, *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, No. 05-CV-04826 RMW, Dkt. No. 299 (N.D. Cal. Feb. 22, 2011) (hereafter "CFIT Complaint").

from ever "prescrib[ing] or limit[ing] the price of Registry Services."[21] In exchange, Verisign agreed to pay ICANN substantially increased fees, giving ICANN a direct financial stake in the monopoly it was supposed to be overseeing.[22]

8. The ICANN Board approved the agreement by a vote of 9 to 5, over extraordinary internal opposition. One Board member warned of "the spectre of substantial institutional self-dealing, carried out with a particular litigious registry," urging: "We should avoid the appearance of carrying out special deals that shore up our treasury at the expense of our accountability to that community." Another called it "absolutely unacceptable" to approve "a 7% annual rise on rates not justified by costs," particularly given that Verisign had "offered a $US 3 rate on its recent bid" to operate .net, a different registry.[23] The agreement drew congressional scrutiny as well. At a House hearing titled "Contracting the Internet: Does ICANN Create a Barrier to Small Business," Representative Sue Kelly asked: "If your costs are going down, why are you increasing the cost to people?"[24]

9. In the two decades since, no safeguard has been restored, and Verisign has raised prices at every opportunity. In every subsequent renewal or amendment of the Registry Agreement (in 2012, 2016, 2020, and 2024), ICANN has reauthorized or expanded Verisign's pricing authority without competitive bidding, without commissioning an independent pricing study, and without requiring Verisign to justify a single increase.[25] The only external check, a pricing restriction in the separate Cooperative Agreement between Verisign and the Department of Commerce, was

---

[21] *See* 2006 Registry Agreement, *supra* note 1, § 3.1.

[22] *See infra* § IV.C.2.

[23] *See Individual Statements from Board Members Relating to February 28, 2006 Special Board Meeting* (March 2, 2006) ("2006 ICANN Board Statements"), https://archive.icann.org/en/topics/vrsn-settlement/board-statements-section2.html.

[24] *Contracting the Internet: Does ICANN Create a Barrier to Small Business?: Hearing Before the H. Comm. on Small Business*, 109th Cong. (2006), https://www.congress.gov/event/109th-congress/house-event/LC12813/text.

[25] *See infra* § IV.D.1-4.

removed in 2018. And with each renewal, ICANN's financial dependence on Verisign has deepened: by 2020, Verisign's .com-related payments to ICANN accounted for nearly 30% of ICANN's total revenue.[26] In the meantime, Verisign has worked to silence its critics. In 2016, after think tank scholars published a white paper discussing potential antitrust liability for ICANN and Verisign, Verisign's general counsel sent them a threatening letter the day before their scheduled Senate testimony, leading Senator Ted Cruz to state Verisign's conduct "could only be designed to have a chilling effect on witness participation."[27]

10. A 2020 amendment to the Registry Agreement laid bare what the relationship had become. Verisign and ICANN negotiated a rewrite of the Agreement's pricing provision, authorizing wholesale increases of up to 7% in four of every six years, without first seeking input from registrars or the public. When the amendment was put out for public comment, over 9,000 people responded; of those, only seven were in favor. A small business owner in a developing country wrote: "The increase can seriously hurt our business. We are based in a third world country where the minimum wage is 100 dollars per month." A high school student wrote that "cheap '.com' domains have allowed me to scale my business with no upfront capital." An economist whom ICANN itself had previously retained concluded "that there is no economic rationale for Verisign to increase prices for .COM and that price increases for .COM will harm consumers."[28]

11. ICANN approved the amendment less than twenty-four hours after acknowledging the "nearly unanimous" opposition, on a Friday during the first weeks

---

[26] *See infra* § IV.D.4.

[27] Protecting Internet Freedom: Implications of Ending U.S. Oversight of the Internet: Hearing Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts, at 2:55:33 (Sept. 14, 2016), https://www.judiciary.senate.gov/committee-activity/hearings/protecting-internet-freedom-implications-of-ending-us-oversight-of-the-internet; *see infra* § IV.D.2.

[28] *See infra* § IV.D.4.

of the COVID-19 pandemic, without a single modification.[29] Contemporaneously, Verisign agreed to pay ICANN an additional $20 million. A former senior Verisign employee wrote that the payment created "the widespread perception that ICANN has engaged in a quid pro quo by trading approval of .COM price increases for $20 million," describing Verisign as a company "with a reputation for behaving as an entitled monopolist" and "thin-skinned and aggressive tendencies, including an itchy trigger finger when it comes to the creative and anti-competitive use of legal counsel."[30]

12. Despite near-unanimous opposition, this pattern has continued. Most recently, in November 2024, ICANN again renewed the Registry Agreement, extending it through 2030 without competitive bidding, without an independent pricing study, and without any concession to its objectors. The renewed agreement authorizes up to four additional 7% price increases over its term. Verisign has already announced the next one: a wholesale increase from $10.26 to $10.97 per domain, effective November 1, 2026, its fifth consecutive maximum increase. Since 2021, the wholesale price has risen from $7.85 to $10.26, a cumulative increase of more than 30%. If Verisign continues to exercise every permitted increase, as it has done without exception, wholesale prices will reach approximately $13.44 per domain by 2030.[31]

13. These prices bear no relationship to what a competitive market produces. Comparable domain registries around the world that face competitive or cost-based discipline charge wholesale fees ranging from approximately $2 to $8 per domain per year, with most clustering between $5 and $6, all while operating at a fraction of .com's scale:

---

[29] *See infra* § IV.D.4.

[30] Comment of Greg Thomas dated Feb. 14, 2020, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/ZRLC3B3IFSD3NM2MXVSE3ABORC5WKFVU/.

[31] *See infra* § IV.D.5. This assumes three more 7% increases in addition to the already-announced November 2026 increase ($\$10.97 \times 1.07^3 = \$13.44$).

**Wholesale Registry Fees for Comparable Domain Registries**

| Registry | Registrations[32] | Wholesale Fee (approx.)[33] |
|---|---|---|
| .de (Germany) | 18 million | ~$2.54 |
| .uk (United Kingdom) | 10.5 million | $5.25 |
| .nl (Netherlands) | 6.1 million | $5.05 |
| .br (Brazil) | 5.8 million | $7.78 |
| .fr (France) | 4.5 million | $5.85 |
| .au (Australia) | 4.4 million | $6.09 |
| .in (India) | 4.1 million | $5.26 |
| .eu (European Union) | 3.7 million | $5.30 |
| .it (Italy) | 3.5 million | $3.81 |
| **Comparators combined** | **60.6 million** | **~$5.21 (average)** |
| **.com (Verisign)** | **166.6 million** | **$10.26** |

14. As the Ninth Circuit has credited, when competitive bidding was last contemplated for .com, potential competitors stated they could offer registry services at or below $3.00 per domain; Verisign itself bid $3.50 to win the comparable .net registry in 2005. Adjusted for inflation, both figures fall in the range of $5 to $6 in today's dollars.[34] And at a benchmark of $5 per domain, Verisign would still earn an operating margin of approximately 38%, nearly triple the S&P 500 average. Instead, insulated from competition, it earns 67%. Whether measured against Verisign's own costs or the fees that comparable registries actually charge, the annual overcharge to .com's 166 million registrants is nearly $1 billion and growing.[35]

15. Verisign can sustain these prices and reap these supracompetitive profits because .com registrants have no competitive alternative. A business that has built an

[32] All registration figures are from the DNIB Q2 2026, *supra* note 4, with the exception of Italy. *See* Domain Opinion Trends, REGISTRO.IT, https://www.nic.it/sites/default/files/documenti/2026/Summary%20table_DOT_1_2026.pdf (last visited Sept. 1, 2026) (recording 3.5 million .it domains through the end of April 2026).

[33] *See infra* § IV.F.1 (compiling fees charged by various other registries). Currency conversions based on exchange rates as of August 4, 2026.

[34] *See infra* § IV.F.1.

[35] *See infra* §§ IV.D.5, IV.F.3.

online identity around a .com domain cannot switch to a different top-level domain without abandoning the search visibility, customer recognition, inbound links, and email infrastructure it has spent years building, costs that dwarf the registration fee many times over.[36] Despite over 1,200 new top-level domains entering the market since 2012[37], and wholesale price increases exceeding 30%, .com's renewal rate has remained at approximately 75%, and its share of global domain registrations has held essentially steady.[38] The Department of Justice found in 2008 that Verisign "possesses significant market power as the operator of the .com registry" and urged that ICANN "require competitive bidding for renewals" rather than "granting the incumbent operator a perpetual right to renew without competition."[39] Twelve years later, an economist whom ICANN itself had previously retained to study this question reached the same conclusion: .com "does not face meaningful competition from other TLDs" (that is, other domain name endings like .net, .org, .shop, or .ai) and Verisign's pricing behavior is "consistent with a firm holding market power."[40]

---

[36] *See infra* § V.B.

[37] *ICANN Opens Application Window for New Generic Top-Level Domains* (Apr. 30, 2026), https://www.icann.org/en/announcements/details/icann-opens-application-window-for-new-generic-top-level-domains-30-04-2026-en (noting "introduction of more than 1,200 new gTLDs" since 2012).

[38] *See infra* § V.B.

[39] Letter from Acting Assistant Attorney General Deborah A. Garza, Antitrust Division, DOJ, to Acting Ass't Sec'y Meredith A. Baker, NTIA (Dec. 3, 2008) at 2, 7-8, https://www.icann.org/en/system/files/files/baker-to-dengate-thrush-18dec08-en.pdf ("Garza Letter").

[40] *See* Greg Rafert, Ph.D., Response to Proposed Amendment 3 to the .COM Registry Agreement at 22, (Feb. 14, 2020), https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/PDDK4KERTT6OBXOJHIBS3IN3WMLRS7IA/ ("Rafert Response"). Specifically, Rafert previously "worked, as an independent consultant, on behalf of ICANN to analyze topics related to ICANN and the TLD marketplace" on several occasions, including "[a]n assessment, conducted from 2015 through 2016, of the competitive effects associated with the new gTLD program for ICANN" that "examined changes in market prices, share, and power for domain registries and registrars as a result of the program." *Id.* at 3.

16. The overcharge flows directly to the individuals, families, small businesses, and nonprofits that pay for .com domain names. When Verisign raises its wholesale price, every registrar's costs increase identically; no registrar can avoid the increase, because none can obtain .com registry services elsewhere, and none can sustainably absorb it, because every competitor faces the identical cost.[41] Two separate economists, each retained by ICANN itself, have reached the same conclusion: wholesale .com price increases are passed through to end-user registrants almost dollar for dollar.[42] Registrars confirm this in their own words and pricing.[43]

17. The Ninth Circuit has already held that Sherman Act claims challenging these very terms state viable claims. In *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010) ("*CFIT*"), a nonprofit organization composed of participants in the domain name system brought claims under Sections 1 and 2 of the Sherman Act, alleging that Verisign had coerced ICANN into the 2006 agreement and that its terms constituted an unreasonable restraint of trade and unlawful monopolization. The court reversed dismissal of Section 1 and Section 2 claims, crediting the allegation that "the elimination of competitive bidding at the expiration of each successive registry agreement means that any other potential registry operator is excluded from competition" and concluding that the plaintiffs had "adequately alleged that the pricing provision in VeriSign and ICANN's 2006 .com Agreement unlawfully restrains trade."[44] That case subsequently settled, without any adjudication on the merits. This action is brought by actual .com domain registrants who have paid Verisign's monopoly overcharge and who have standing to recover.

18. Verisign's pricing has meanwhile created bipartisan alarm. In 2024, Republican committee chairs wrote that "[m]onopolistic elements and excessive

---

[41] *See infra* § VI.A.

[42] *See infra* § VI.A.1.

[43] *See infra* § VI.A.2.

[44] *CFIT*, 611 F.3d at 502, 504.

domain name price increases stifle the ability of potential .com registrants to conduct business online."[45] Senator Elizabeth Warren and Representative Jerrold Nadler warned of a "collusive relationship" between Verisign and ICANN and urged the Department of Justice to investigate.[46] And the National Telecommunications and Information Administration, which maintains a separate Cooperative Agreement with Verisign on behalf of the Department of Commerce, has stated that it "believes a reduction in .com prices would be in the best interest of the public" while conceding that it "does not have authority to set .com domain prices."[47] The government has concluded that prices should come down and made clear it cannot make that happen.

19. Every relevant actor has also confirmed that the antitrust laws apply and that no immunity attaches to Verisign's conduct. The Department of Commerce specifically considered and rejected antitrust immunity when it privatized the domain name system. The Cooperative Agreement between Verisign and the Department of Commerce has provided for more than two decades that the government's approval "is not intended to confer antitrust immunity on VeriSign with respect to the registry agreements." Verisign's own SEC filings repeat that language.[48]

---

[45] Letter from Cathy McMorris Rodgers, Chair, Energy and Commerce Committee, Robert E. Latta, Chair, Subcommittee on Communications and Technology, and H. Morgan Griffith, Chair, Subcommittee on Oversight & Investigations, to Alan Davidson, Assistant Secretary of Commerce for Communications and Information, NTIA, at 2 (July 25, 2024) https://d1dth6e84htgma.cloudfront.net/07_25_2024_NTIA_re_com_Registry_Agreements_c218231930.pdf ("Rogers Letter").

[46] Letter from Sen. Elizabeth Warren & Rep. Jerrold Nadler to NTIA, at 2, 4 (November 2024), https://www.warren.senate.gov/imo/media/doc/letter_to_ntia_and_doj_re_verisigns_comwebsiteprices.pdf ("Warren-Nadler Letter").

[47] *The .com Cooperative Agreement: Ensuring Internet Stability and Security* (Nov. 29, 2024), https://www.ntia.gov/blog/2024/com-cooperative-agreement-ensuring-internet-stability-and-security.

[48] *See infra* § IV.E.

20. Every check on Verisign's monopoly has been eliminated, relinquished, or co-opted. The antitrust laws are what is left, and the people who have been paying the monopoly price are entitled to invoke them.

## II. PARTIES

### A. Plaintiff

21. Plaintiff Jeff Kessler is a resident of California. Since 2019, he has owned six .com domains for personal and other purposes. Plaintiff Kessler has owned trailpeaches.com since 2019, where he posts content from his hiking adventures and outdoor gear reviews. He has also owned fiplog.com since 2020, a site he created containing resources to support cat owners treating feline infectious peritonitis (a disease afflicting cats). Plaintiff Kessler has also owned JeffandAllie.com since 2021, which is a wedding website he created for himself and his wife that he plans to repurpose for content related to their house. For all three domains, Plaintiff Kessler used Google Domains and then Squarespace[49] as a registrar; he has paid a renewal fee of $12 per domain each year. In 2025, that renewal fee increased to $15 per year, 25% more than before.

22. Additionally, Plaintiff Kessler owns three .com domains whose sole purpose is to redirect traffic to his .org domains. He did so after observing that users would default to .com for a domain, not realizing that his sites were .org domains. One is TowerBridgeSection.com, which redirects to TowerBridgeSection.org, a site for a professional engineers' union he is a part of. Squarespace charges a fee of $20 per year for that .com domain, which he has had since 2025. Another of Plaintiff Kessler's domains is joinpecg.com, which redirects to joinpecg.org, a registration form for the union. Through the registrar IONOS, joinpecg.com carried an annual renewal fee of $17. Plaintiff Kessler paid $10 for the first year after a promotional discount. When

[49] Google Domains transferred its domains to Squarespace when it discontinued its domain service.

the domain renewed in 2025, the annual fee had increased to $20, with no discount applied. The third domain Plaintiff Kessler uses as a redirect is vacancyfee.com. That domain redirects to vacancyfee.org, a site for a grassroots housing policy nonprofit he runs. Plaintiff Kessler acquired vacancyfee.com through IONOS in 2026 at an annual fee of $20. Plaintiff Kessler paid $10 for the first year after a promotional discount; the domain will renew at $20 with no discount applied.

**B. Defendants**

23. Defendant VeriSign, Inc. is a Delaware corporation with its principal place of business at 12061 Bluemont Way, Reston, Virginia 20190. Verisign is the sole operator of the .com and .net domain name registries. Verisign is publicly traded on the NASDAQ exchange under the ticker symbol VRSN.

24. Verisign transacts substantial business in this District through its agreements with ICANN, which is headquartered in Los Angeles, California.

25. Defendant Internet Corporation for Assigned Names and Numbers ("ICANN") is a California nonprofit public benefit corporation headquartered at 12025 Waterfront Drive, Suite 300, Los Angeles, California 90094.

## III. JURISDICTION AND VENUE

26. Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act. Plaintiff also brings these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest costs, and attorneys' fees for the injury caused by Defendants' conduct. Plaintiff seeks damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

27. This Court also has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §

1711, et seq., which vest original jurisdiction in the district courts of the United States for any class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The $5 million amount-in controversy and diverse citizenship requirements of CAFA are satisfied in this case.

28. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or can be found in this District.

29. Defendant ICANN is a California nonprofit public benefit corporation headquartered in Los Angeles, California, within this District. Defendant Verisign transacts substantial and continuous business in this District through the .com Registry Agreement with ICANN, which is administered by ICANN from its headquarters in this District. Verisign has purposefully directed its activities toward this District through its ongoing performance under the Registry Agreement, including registry-level fee payments to ICANN.[50] A substantial part of the events giving rise to Plaintiff's claims occurred in this District, where the anticompetitive Registry Agreement was approved by ICANN, where each renewal and amendment of the agreement has been administered, and where the public comment processes described herein were conducted.

30. This Court has personal jurisdiction over each Defendant. ICANN is headquartered in this District. Verisign is subject to specific personal jurisdiction because Plaintiff's claims arise directly from Verisign's contractual relationship with ICANN, headquartered in this District. Verisign has purposefully directed its activities toward this District through its ongoing performance under the Registry Agreement, including quarterly registry-level fee payments to ICANN. The Registry Agreement

[50] As discussed above, Verisign "pay[s] ICANN on a quarterly basis $0.2575 for each annual domain name registration." 2025 10-K, *supra* note 2, at 4.

itself provides that "[i]n any litigation involving ICANN concerning this Agreement, jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles County, California."[51]

## IV. FACTUAL BACKGROUND

### A. The Domain Name System and its Governance

31. The internet's domain name system ("DNS") translates human-readable website addresses into numerical IP addresses. Every domain name ends with a so-called "top-level domain" (or "TLD"), such as .com, .net, .org, or a country-code TLD like .uk or .de.

32. Each TLD is operated by a single registry operator that maintains the authoritative database of all domain names under that TLD. When any internet user types a .com address into a browser, the query is resolved through Verisign's registry infrastructure.

33. A "registry" and a "registrar" perform fundamentally different functions. The registry is the wholesale operator: it maintains the master database of every domain name registered under a given TLD and processes registration transactions submitted by registrars. There is exactly one registry operator for each TLD. For .com, that operator is Verisign. No other entity can perform this function for .com, and no registrar can bypass Verisign or obtain .com registry services from anyone else.

34. In practical terms, when a registrar submits a new .com registration, Verisign records the domain name in its database. When an internet user enters a .com address in a browser, Verisign's servers retrieve that record and return the information necessary to locate the domain on the internet. That is the registry function. Verisign does not design, host, or manage websites; provide email or any other service to the domain name holder; or interact with the consumer who registered the domain. From

[51] 2024 Registry Agreement, *supra* note 1, §5.1(b).

Verisign's perspective, all .com registrations are functionally identical: the same entry in the same database, processed through the same system, at the same wholesale price.

35. A registrar, by contrast, is a retail intermediary. Registrars are the companies (such as GoDaddy, Namecheap, Cloudflare, and many others[52]) through which consumers actually purchase and renew domain names. When a small business owner decides to register "mycompany.com," she does so through a registrar's website, not Verisign. The registrar collects the retail price, submits the registration to Verisign's registry system, and pays Verisign the wholesale fee. The registrar may also sell the customer additional services such as web hosting, email, or website-building tools. But the core transaction—adding "mycompany.com" to the authoritative .com database so that others may access the site on the internet—can only be performed by Verisign.

36. The relationship between a registry and its registrars is thus analogous to the relationship between a monopoly wholesaler and competing retailers. The registrars compete vigorously with one another for customers (for example, on price, services, or customer support) but every registrar must purchase the identical wholesale input from the same sole supplier. A registrar cannot shop around for a lower .com wholesale price, because there is only one .com registry. As discussed in more detail below, this market structure means (according to ICANN's own expert in a prior dispute) that when Verisign raises its wholesale price, every registrar's costs increase by the same amount, and the increase flows through to consumers, plaintiffs here, regardless of which registrar they use.[53]

---

[52] *See* List of Accredited Registrars, https://www.icann.org/en/contracted-parties/accredited-registrars/list-of-accredited-registrars (last visited Sept. 1, 2026).

[53] *See* Expert Report of Dennis W. Carlton, Ph.D., *Namecheap, Inc. v. Internet Corp. for Assigned Names & Numbers*, ICDR Case No. 01-20-0000-6787, ¶¶ 8-9, 17-20, 34 (Jan. 14, 2022) (hereafter "2022 Carlton Report"), https://www.icann.org/en/system/files/files/irp-namecheap-expert-report-carlton-redacted-14jan22-en.pdf (explaining that registries "cannot discriminate when setting prices charged to

**B. The Agreements and Competitive Safeguards Governing .Com.**

37. Verisign's operation of the .com registry is governed by two separate agreements with different counterparties.

38. The first is the Cooperative Agreement between Verisign and the United States Department of Commerce, acting through the National Telecommunications and Information Administration ("NTIA"). The Cooperative Agreement is a bilateral contract between Verisign and the Department of Commerce through which the DOC has historically retained approval authority over certain terms of Verisign's operation of the .com registry.[54]

39. The Cooperative Agreement originated as an agreement with the National Science Foundation and has been amended over thirty years to reflect the evolving relationship between the government and the .com registry operator. At various times, the Cooperative Agreement has included restrictions on the wholesale price that Verisign and ICANN may agree to in the Registry Agreement, functioning as a ceiling on what the private parties could negotiate. As described below, those restrictions have been progressively relaxed and are now effectively gone; NTIA has meanwhile repeatedly explained that neither the Cooperative Agreement nor successive amendments to it are "intended to confer federal antitrust immunity on Verisign."[55]

40. The second is the .com Registry Agreement between Verisign and ICANN. The Registry Agreement is a private contract that establishes the terms on

---

registrars," documenting "hundreds of current registrar competitors, each facing the same wholesale registry pricing," and concluding that "economic theory predicts that firms in competitive markets, when faced with common increases in input costs—such as those that Namecheap and other registrants would face from increased registry prices—will pass through the input cost increases to consumers").

[54] *See* NTIA, Verisign Cooperative Agreement, available at https://www.ntia.gov/program/verisign-cooperative-agreement (describing history and evolution of Cooperative Agreement).

[55] NTIA, *The .com Cooperative Agreement: Ensuring Internet Stability and Security*, *supra* note 47; *see infra* §§ IV.D.3, IV.E.

which Verisign operates the .com registry, including the wholesale price that every ICANN-accredited registrar must pay for each .com domain registration and renewal. It is the Registry Agreement and its anticompetitive terms that Plaintiff challenges in this action.

41. Both agreements trace their origins to a single government contract from the early days of the commercial internet. In 1993, the National Science Foundation entered into what is now the Cooperative Agreement with the company Network Solutions, Inc. ("NSI") to provide registration services across the internet.[56] At the time, NSI performed the function of both registry and registrar: it maintained the registry databases and sold domain names directly to the public. There was no separation between the wholesale and retail functions, and NSI was the only entity through which a consumer could register a .com domain name. Notably, the original agreement was structured as a cost-plus-fixed-fee arrangement with a total estimated value of approximately $4.2 million, and expressly provided that "in no case shall any user based fee structure be imposed or changed without the express direction/approval of the NSF Program Official."[57]

42. The agreements governing .com were designed to operate within a competitive framework that the United States government established when it privatized the domain name system ("DNS"). In 1998, the United States Department of Commerce issued a "White Paper" calling for privatization of the DNS.[58] The White Paper emphasized that privatization should promote competition, stating that "[w]here possible, market mechanisms that support competition and consumer choice

---

[56] Cooperative Agreement No. NCR-9218742 between National Science Foundation and Network Solutions, Incorporated, Article 1 (Jan. 1, 1993), https://archive.icann.org/en/nsi/coopagmt-01jan93.htm ("Original Cooperative Agreement").

[57] Original Cooperative Agreement, *supra* note 56.

[58] White Paper, *supra* note 16.

should drive the management of the Internet because they will lower costs, promote innovation, encourage diversity, and enhance user choice and satisfaction."[59]

43. The government reached this conclusion with full knowledge of the monopoly risks. During the rulemaking process, commenters cautioned that top-level domain registries "will tend to function as 'natural monopolies'" and that "lack of portability in the naming systems would create lock-in and switching costs, making competition unsustainable in the long run." The DOC recognized that "[b]oth sides of this argument have considerable merit," but determined that "the pressure of competition is likely to be the most effective means of discouraging registries from acting monopolistically" and entrusted the development of appropriate safeguards to the new corporation that would become ICANN.[60]

44. The DOC also specifically rejected certain commenters' "suggest[ion] that the U.S. Government should provide full antitrust immunity or indemnification for the new corporation," explaining that "[a]pplicable antitrust law will provide accountability to and protection for the international internet community. Legal challenges and lawsuits can be expected within the normal course of business for any enterprise and the new corporation should anticipate this reality."[61] It further emphasized that the "[t]he new corporation does not need any special grant of immunity from the antitrust laws so long as its policies and practices are reasonably based on, and no broader than necessary to promote the legitimate coordinating objectives of the new corporation."[62]

45. ICANN was incorporated in 1998 in California as a nonprofit organization for this purpose. The original Memorandum of Understanding between the Department of Commerce and ICANN stated that ICANN's governing principles

---

[59] *Id.* at 31,746, 31,749.

[60] *Id.* at 31,745-46.

[61] *Id.* at 31,747.

[62] *Id.* at 31,750.

included "competition," that the agreement was intended to "promote[] the management of the [domain name system] in a manner that will permit market mechanisms to support competition and consumer choice" (including by "lower[ing] costs"), and that "ICANN has declared its commitment to these principles in its Bylaws."[63] The MOU did not just list principles: it expressly charged ICANN with "the design, development, and testing of a plan for [the] introduction of competition in domain name registration services[.]"[64] ICANN's own leadership has consistently confirmed this understanding. Its founding board chair, Esther Dyson, told Congress that ICANN's "primary mission was to break the monopoly of Network Solutions," which was the sole operator of the .com registry before Verisign acquired NSI.[65]

46. A central mechanism for promoting competition was the separation of the registry function from the registrar function. Between 1998 and 1999, the monopoly wholesale function (operating the registry database) was separated from the competitive retail function (selling domain names to the public).[66] This separation was intended to bring competition to the registration of domain names, thus "creating two market-driven businesses, registration of second level domain names and the management of gTLD registries."[67]

47. Periodic competitive bidding for TLD registry agreements was the other critical safeguard. As the Ninth Circuit recognized, the threat of competitive rebidding is the central competitive constraint on a TLD registry operator: because only one

---

[63] Memorandum of Understanding Between the U.S. Department of Commerce and Internet Corporation for Assigned Names and Numbers (Nov. 25, 1998), https://www.ntia.gov/other-publication/memorandum-understanding-between-us-department-commerce-and-internet-corporation (last visited Sept. 1, 2026).

[64] *Id.*

[65] Statement of Esther Dyson, *supra* note 14.

[66] Registrar Accreditation: History of the Shared Registry System, https://www.icann.org/en/contracted-parties/accredited-registrars/resources/history (last visited Sept. 1, 2026).

[67] White Paper, *supra* note 16, at 31,745.

entity can operate a given registry at any time, "the only viable competition can take place in connection with obtaining a new contract after expiration of the old one."[68] The Department of Justice Antitrust Division independently confirmed this, finding in a 2008 letter to NTIA that "competitive bidding has resulted in lower domain prices and higher operating specifications than what ICANN has achieved through non-competitive negotiations" and urging ICANN to abandon perpetual renewal in favor of periodic rebidding, explaining: "Such a mechanism would both assist in disciplining the conduct of the incumbent during the initial term insofar as the incumbent would want to maximize the likelihood of renewal, and ensure the benefits of competition[.]"[69] As discussed in more detail below, when ICANN conducted competitive bidding for the .net registry in 2005, competition forced Verisign (which also administers the .net TLD) to lower .net registration fees substantially.

48. ICANN was given authority to enter into Registry Agreements with TLD operators and to accredit domain registrars. Today, Verisign operates the .com registry at wholesale, and over 2,400 ICANN-accredited registrars compete at retail.

49. When a consumer registers or renews a .com domain through any registrar, the registrar must pay Verisign a wholesale registry fee. The .com Registry Agreement requires Verisign to charge the same price to all ICANN-accredited registrars.[70] In practice, every registrar pays the same base wholesale fee, currently

---

[68] *CFIT*, 611 F.3d at 499, 502 (explaining that because "there can only be one operator for each domain name registry at any one time" the "only viable competition can take place in connection with obtaining a new contract after expiration of the old one," and finding that "[t]he allegation in this case regarding the elimination of competitive bidding at the expiration of each successive registry agreement means that any other potential registry operator is excluded from competition[.]").

[69] Garza Letter, *supra* note 39, at 7-8.

[70] 2024 Registry Agreement, *supra* note 1, § 7.3(e) (requiring Verisign to "charge the same price for Registry Services . . . to all ICANN-accredited registrars," while providing that "volume discounts and marketing support and incentive programs may be made if the same opportunities to qualify for those discounts and . . . programs is available to all ICANN-accredited registrars").

$10.26 per domain per year, and no registrar can obtain .com registry services from any alternative supplier. The registrar then charges the consumer a retail price that includes this fee plus the registrar's own markup.

**C. Verisign's Acquisition and Entrenchment of the .com Monopoly.**

50. Verisign, Inc. was founded in 1995 as a spin-off of RSA Data Security, Inc. The company's original business was providing "PKI certificate services," which were the credentials that enabled secure online transactions during the early growth of electronic commerce.[71] Verisign went public in 1998.

51. In March 2000, at the height of the dot-com bubble, Verisign announced the acquisition of NSI, which was then still the operator of the .com registry, in an all-stock transaction valued at approximately $21 billion.[72] That acquisition gave Verisign control of .com. In other words, Verisign acquired .com not by building it, but by buying the company that held the government contract.

52. When Verisign took over, the agreements governing .com still included two critical competitive safeguards: a wholesale price cap, and a credible path to competitive rebidding.[73] Specifically, in 2001, Verisign entered into two separate agreements with ICANN, one related to the operation of .com and the other related to the operation of .net. These agreements superseded ICANN's previous agreements with NSI. They (a) imposed a price cap of $6 per year for registration, renewal, or extension of any domain name and (b) contained a renewal provision that allowed

---

[71] *See Verisign History*, https://www.verisign.com/about-us/verisign-history/ (last visited Sept. 1, 2026).

[72] *See Verisign to Buy Network Solutions for $21B*, COMPUTERWORLD (Mar. 7, 2000), https://www.computerworld.com/article/1368800/verisign-to-buy-network-solutions-for-21b.html.

[73] *CFIT*, 611 F.3d at 499–500 (describing pre-2006 regulatory framework).

ICANN to trigger competitive rebidding if Verisign proposed prices exceeding the cap or otherwise failed to meet specified renewal conditions.[74]

53. After acquiring NSI, Verisign operated both the .com registry and a retail registrar business that competed with other registrars for end-user customers. In 2003, Verisign sold its registrar business, retaining only the monopoly registry operation.[75]

54. Having acquired the .com monopoly and shed its competitive registrar business, Verisign turned to the task of making the monopoly permanent.

**1. Verisign's campaign of coercion against ICANN**

55. Verisign's goal was to ensure that its hold on the .com contract could never be challenged, and its pricing never meaningfully constrained, by eliminating the conditions under which ICANN could trigger competitive bidding and replacing the fixed price cap with open-ended authority to raise prices. The obstacle was ICANN, which held the contractual power to decline renewal and trigger competitive bidding.

56. Verisign's strategy, executed over a multi-year campaign beginning shortly after its acquisition of the .com registry, was to destroy ICANN's institutional capacity to exercise that power. As the Ninth Circuit recounted in its 2010 *CFIT* decision, and as alleged by the *CFIT* plaintiffs in their underlying complaint, the purpose of this campaign was to "get ICANN to agree to the terms VeriSign desired" by "coercing ICANN to perpetuate VeriSign's role as exclusive regulator of the .com

[74] *Id.* at 500; *see* .com Registry Agreement between ICANN and VeriSign, Inc. dated May 25, 2001 ("2001 Registry Agreement") § 25 & Appendix G, available at https://www.icann.org/en/registry-agreements/com/com-registry-agreement-25-5-2001-en.

[75] *VeriSign Sells Network Solutions Registrar Business*, OUT-LAW NEWS (Oct. 17, 2003), https://www.pinsentmasons.com/out-law/news/verisign-sells-network-solutions-registrar-business.

domain name market by awarding VeriSign the 2006 .com Agreement without any competitive bidding, and by agreeing to the terms that favored Verisign."[76]

57. Two provisions of the 2001 Registry Agreement stood between Verisign and permanent monopoly. First, Section 25(D) provided that if ICANN declined to renew, "ICANN shall call for competitive proposals," meaning the contract could be rebid at the end of its term if ICANN declined to renew. Second, Appendix G capped the wholesale price at $6.00 per domain per year, and ICANN could decline renewal if Verisign proposed prices above that cap.[77] These two safeguards—competitive rebidding and price controls—were the principal mechanisms constraining Verisign's exercise of monopoly power. Verisign set out to eliminate both.

58. **September 2003: SiteFinder.** Verisign's willingness to leverage its control of the .com registry infrastructure for private gain was demonstrated early and dramatically. On September 15, 2003, Verisign unilaterally deployed a "wildcard" DNS record in the .com zone, meaning that all queries for unregistered domain names (every misspelling, every lapsed domain, every experimental URL) were redirected to Verisign's own advertising portal, "SiteFinder."[78] The portal displayed search results and links to paid advertisements, and Verisign captured 65 million visits in the first

---

[76] *CFIT*, 611 F.3d at 505-06; *see* CFIT Complaint, *supra* note 20.

[77] 2001 Registry Agreement, *supra* note 74, §25(B) ("Registry Operator shall be awarded a four-year renewal term unless ICANN demonstrates that … (d) the maximum price for initial and renewal registrations proposed in the Renewal Proposal exceeds the price permitted under Section 22 of this Registry Agreement.") & §25(D); Appendix G to 2001 Registry Agreement (Apr. 16, 2001), https://www.icann.org/en/registry-agreements/com/revised-verisign-com-registry-agreement-appendix-g-16-04-2001-en (setting $6.00 cap).

[78] Letter from Paul Twomey, President & CEO, ICANN, to Russell Lewis, Exec. Vice President, VeriSign Naming & Directory Servs. (Oct. 3, 2003), https://www.icann.org/resources/unthemed-pages/twomey-to-lewis-2003-10-03-en ("Twomey Letter").

week and four to seven million unique visitors per day.[79] The ICANN Security and Stability Advisory Committee found that the change "appear[ed] to have considerably weakened the stability of the Internet," breaking anti-spam systems and email infrastructure.[80] The Internet Architecture Board published a commentary detailing how the wildcard deployment violated assumptions "deeply embedded in the behavior of Internet protocols and applications," negatively impacting "both individual Internet applications and indeed the Internet architecture itself."[81]

59. ICANN demanded that Verisign suspend SiteFinder, writing that Verisign's actions constituted a "violation of the Code of Conduct and equal access provisions, failure to comply with the obligation to act as a neutral registry service provider, failure to comply with the Registry Registrar Protocol, failure to comply with domain registration provisions, and provision of an unauthorized Registry Service."[82]

60. **The February 2004 lawsuit.** Verisign complied with ICANN's SiteFinder demand but launched its first salvo in February 2004, suing ICANN in federal court for breach of contract and antitrust claims. Verisign alleged that ICANN had engaged in a "brazen attempt . . . to assume 'regulatory power' over VeriSign's

---

[79] Jay Lyman, *VeriSign Wildcard Service Brings Call to Stop, Lawsuit*, TECHNEWSWORLD (Sept. 22, 2003), https://www.technewsworld.com/story/verisign-wildcard-service-brings-call-to-stop-lawsuit-31639.html; *Advisory Concerning VeriSign's Deployment of DNS Wildcard Service* (September 19, 2003), https://www.icann.org/en/announcements/details/advisory-concerning-verisigns-deployment-of-dns-wildcard-service-19-9-2003-en.

[80] *Advisory Concerning Demand to Remove Verisign's Wildcard* (Oct. 3, 2003), https://www.icann.org/en/announcements/details/advisory-concerning-demand-to-remove-verisigns-wildcard-3-10-2003-en.

[81] *IAB Commentary: Architectural Concerns on the use of DNS Wildcards*, INTERNET ARCHITECTURE BOARD (Sept. 19, 2003), https://datatracker.ietf.org/doc/statement-iab-2003-09-20-dns-wildcards/.

[82] Twomey Letter, *supra* note 78.

business" by demanding that Verisign shut down Site Finder.[83] Verisign's lawsuit folded in additional grievances, including a 2002 dispute over Verisign's proposed "Wait Listing Service" and broader claims that ICANN was exceeding its "technical coordination function" and improperly asserting "authority to 'regulate' the services VeriSign may offer and the price at which they may be offered."[84]

61. The filing was the opening salvo in a litigation campaign that would consume years, drain ICANN's limited resources, and generate the financial leverage Verisign needed to extract the concessions it sought. Over the next two years, Verisign waged a siege on multiple fronts, simultaneously draining ICANN through litigation, attacking its credibility through covert public relations campaigns, exploiting its financial dependence, and intimidating its staff and Board members. The Ninth Circuit credited allegations of this campaign in *CFIT*, holding that they stated viable claims under both Sections 1 and 2 of the Sherman Act. The conduct, as alleged in the

---

[83] Complaint ¶ 4, *VeriSign, Inc. v. ICANN*, No. CV04-1292 (C.D. Cal. Feb. 26, 2004) ("Verisign v. ICANN Complaint"), https://www.icann.org/en/system/files/files/complaint-26feb04-en.pdf; *see* Declan McCullagh, *Verisign sues ICANN to restore Site Finder*, CNET (Feb. 26, 2004), https://www.cnet.com/tech/tech-industry/verisign-sues-icann-to-restore-site-finder/.

[84] Verisign v. ICANN Complaint ¶¶ 3-4, 19, 44-45, *supra* note 83. Specifically, in 2002, Verisign proposed a "Wait Listing Service" that would charge consumers $35 per year to reserve already-registered domain names, gaining the right to register them upon expiration. Wait Listing Service, https://icannwiki.org/Wait_Listing_Service (last visited Sept. 1, 2026). The proposal drew immediate opposition from the registrar community. A group of domain name registrars sued both ICANN and Verisign and described the service as "an unlawful and fraudulent protection racket" to "dupe consumers into buying domain names the consumers will never be able to register," and alleged that Verisign was improperly attempting to simultaneously sell domain owners "insurance" against Wait Listing subscribers, "playing their unknowing customers against each other for merely maintaining the status quo." Robert McMillan, *Domain Registrars Sue ICANN, VeriSign*, NETWORKWORLD (Feb. 28, 2004), https://www.networkworld.com/article/2330947/domain-registrars-sue-icann--verisign.html; *see also Registrars File Lawsuit Against ICANN and VeriSign*, CIRCLEID (Feb. 27, 2004), https://circleid.com/posts/registrars_file_lawsuit_against_icann_and_verisign.

underlying CFIT complaint[85] and recounted by the Ninth Circuit, included the following:

62. **Astroturfing and negative publicity campaigns.** Verisign orchestrated a campaign to undermine ICANN's public credibility and legitimacy. As alleged in the CFIT complaint and credited by the Ninth Circuit, Verisign "'stacked' ICANN's public meetings with VeriSign supporters, hired purportedly independent organizations and individuals to advocate VeriSign's position, paid bloggers to attack ICANN's reputation, [and] planted news stories critical of ICANN in mainstream media[.]"[86] In one instance, a public relations professional operating under a pseudonym, "Steven Forrest," maintained a blog called "Free2Innovate"—which Verisign itself cited as an independent source in its competitive bid for the .net registry[87]—with near-exclusive pro-Verisign content. The same "Steven Forrest" also submitted a comment to ICANN's formal comment process on the proposed Verisign-ICANN settlement agreement (discussed below), arguing that "[t]he agreements will, for the first time, give innovators a clear understanding of just exactly how they go about deploying such new services."[88] When journalists publicly identified the likely author in July 2006, the blog ceased publication.[89] The seriousness of this conduct was

---

[85] *See* CFIT Complaint, *supra* note 20.

[86] *See CFIT*, 611 F.3d at 505; CFIT Complaint, *supra* note 20, ¶ 211.

[87] *See* .Net Application Form submitted by VeriSign, Inc., available at https://archive.icann.org/en/tlds/net-rfp/applications/verisign.htm ("Additionally, VeriSign operated .org with no SLA violations; PIR/Afilias have violated multiple SLA metrics in every month since the transition, though they have not been reported. A recent discussion highlighted these problems (www.free2innovate.net) and inconsistencies in the performance and reporting of Afilias.").

[88] Comment of Steven Forrest (Oct 28, 2005), available at https://forum.icann.org/lists/settlement-comments/msg00010.html.

[89] Kieren McCarthy, *Where Has Bill Hobbs Gone?*, KIERENMCCARTHY.CO.UK (Sept. 8, 2006), https://www.kierenmccarthy.co.uk/2006/09/08/where-has-bill-hobbs-gone/ (identifying "Steve Forrest" of the Free2Innovate blog as Nashville public relations professional Bill Hobbs, and noting "an intriguing 99 percent pro-VeriSign bias" in the blog's content); *see also Free2Innovate is a Paid Corporate PR Blog?*,

later acknowledged by Verisign itself, which pledged in its later settlement with ICANN to "not participate in, contribute monies for, encourage or provide other support for any activities by or for third parties that seek to undermine ICANN's role … *and it will immediately cease any such ongoing activities*."[90] Indeed, the settlement required Verisign not only to stop undermining ICANN but affirmatively to "reiterate its support for ICANN as the appropriate technical coordination body for the DNS" and to "continue to be an advocate for" ICANN's role in Internet governance.[91] It also anticipated Verisign's channeling of anti-ICANN activity through ostensibly independent organizations: it provided that Verisign could not "use its membership [in organizations] as a device to avoid" its anti-undermining obligations.[92]

63. This pattern later continued: in 2015, it was reported that an analyst named "Zeus Kerravala" had written a number of pro-Verisign articles for the platform Network World without disclosing that he was in fact a "paid Verisign consultant"; when Network World learned that it had been misled, it removed the articles.[93]

---

TEXTURBATION (July 14, 2006), http://texturbation.com/blog/2006/07/14/free2innovate-is-a-paid-corporate-pr-blog/ [https://web.archive.org/web/20060806050627/http://texturbation.com/blog/2006/07/14/free2innovate-is-a-paid-corporate-pr-blog/].

[90] Settlement Agreement Between ICANN and VeriSign, (2005) ("Verisign-ICANN Settlement Agreement"), https://www.icann.org/en/system/files/files/icann-vrsn-settlement-agreement-24oct05-en.pdf, at § 1(B) (emphasis added); *see id.* § 1(C) (establishing dedicated mediation and arbitration process for enforcement of this provision, with arbitration to produce "final and binding decision within fifteen (15) business days"); *CFIT*, 611 F.3d at 505 (noting this provision of settlement).

[91] *Id.* § 1(A).

[92] *Id.* § 1(B).

[93] Paul Stahura, *Verisign Should Clear Up the Paid "Analysts" Controversy*, CIRCLEID (Nov. 9, 2015), https://circleid.com/posts/20151109_verisign_should_clear_up_the_paid_analysts_controversy/; Kevin Murphy, *Pro-.com analyst "sponsored" by Verisign. Is this a big deal?* DOMAIN INCITE (Nov. 4, 2015), https://domainincite.com/19546-pro-com-analyst-sponsored-by-verisign-is-this-a-big-deal.

64. **Financial coercion and threats to critical infrastructure.** The Ninth Circuit credited allegations that Verisign simultaneously exploited ICANN's financial dependence on Verisign to coerce ICANN into accepting anticompetitive contract terms. The CFIT plaintiffs alleged that Verisign threatened to withhold funding from ICANN, "jeopardizing its stability and existence"[94] and that, at the same time, Verisign leveraged "its oppressive and costly litigation … and the promise of a financial bailout and windfall of $12,000,000 in order to coerce ICANN into the conspiracy."[95] The severity of this threat was later confirmed by the 2006 .com Registry Agreement (discussed *infra*) itself: it contained a "No Offset" clause providing that "[a]ll payments due under this Agreement shall be made in a timely manner throughout the term of this Agreement and notwithstanding the pendency of any dispute (monetary or otherwise) between Registry Operator and ICANN"—a provision whose inclusion indicates that the threat of payment withholding was sufficiently real to require explicit contractual prohibition.[96]

65. The coercive effect of this campaign was also later confirmed by ICANN's own Board members. One member, Susan Crawford, voting against the 2006 agreement, warned that "threats by VeriSign to impose litigation costs on ICANN that are not reasonably related to the issues actually being litigated" were "yet another reason not to enter into this proposed agreement" and rejected the proposition that "rejecting the proposed registry agreement will automatically cost ICANN $5 million in legal fees[.]" Another expressed concern about "the linking of the ICANN budget with all of this process."[97]

---

[94] CFIT Complaint, *supra* note 20, ¶ 212.

[95] *Id.* ¶¶ 209, 212; *CFIT*, 611 F.3d at 504-05 (conduct put ICANN in "financial jeopardy").

[96] 2006 Registry Agreement, *supra* note 1, § 8.1.

[97] 2006 ICANN Board Statements, *supra* note 23. Crawford later served as Special Assistant to the President for Science, Technology, and Innovation Policy in the Obama Administration.

66. **Vexatious litigation.** Verisign filed or threatened a series of lawsuits against ICANN, exploiting the massive financial asymmetry between a publicly traded corporation with billions in revenue and a nonprofit organization. Verisign brought claims against ICANN in federal court that were dismissed without prejudice; filed similar claims again in federal court that were partially dismissed with prejudice; proceeded to file for a third time in state court; and then proceeded in arbitration against ICANN.[98]

67. The cumulative effect of these proceedings was to put ICANN in "financial jeopardy" by forcing it to divert resources to legal defense at precisely the moments when ICANN should have been exercising its oversight function—a dynamic ICANN's own dissenting Board members recognized at the time.[99]

68. **Threats to ICANN.** As alleged in the CFIT complaint, Verisign "threatened ICANN, its Staff members, and its Board members with litigation, arbitration, government investigation and even personal financial liability," thus putting them in "personal financial jeopardy."[100]

69. Notably, even as Verisign was coercing ICANN on .com, the competitive bidding process demonstrated exactly what it could produce for consumers. As discussed below, in 2005, the .net registry contract was placed out for competitive bids. Verisign's bid was selected, but only because Verisign reduced its fee from

---

[98] CFIT Complaint, *supra* note 20, ¶¶ 181, 207-11; *CFIT*, 611 F.3d at 505–07; *see* Verisign, Inc. v. ICANN, https://www.icann.org/resources/pages/verisign-v-icann-2012-02-25-en (collecting documents from litigation) (last visited Sept. 1, 2026); *ICANN Takes Steps to Move VeriSign Contract Dispute from Litigation to Arbitration* (Nov. 12, 2004), https://www.icann.org/en/announcements/details/icann-takes-steps-to-move-verisign-contract-dispute-from-litigation-to-arbitration-12-11-2004-en (recounting procedural history).

[99] CFIT Complaint, *supra* note 20, ¶¶ 181, 207, 209; *CFIT*, 611 F.3d at 505–07; 2006 ICANN Board Statements, *supra* note 23.

[100] CFIT Complaint, *supra* note 20, ¶¶ 6, 211, 213; *CFIT*, 611 F.3d at 505 (crediting allegations that Verisign "threatened ICANN with litigation, arbitration, and government investigation").

$6.00 (the then-existing price cap) to $4.25 ($3.50 plus a $0.75 “ICANN fee”) and committed to improved security and operating specifications.[101] As W.G. Champion Mitchell, Chairman and CEO of Network Solutions, later testified before the House Committee on Small Business: “VeriSign because of the rebid had to make commitments to improve the security of .net and, at the same time, drop the price from $6.00 to $3.50. That is what competition does. It gets you better security and lower prices at the same time.”[102] The .net rebid thus provided a concrete, contemporaneous demonstration of the consumer harm caused by eliminating competitive bidding for .com.

**2. ICANN’s capitulation and the division of monopoly profits.**

70. By 2005, Verisign had, according to ICANN, breached the terms of the 2001 Registry Agreement in ways that gave ICANN the right to seek competitive bids to replace Verisign or even to terminate the agreement.[103] Rather than exercise that right, ICANN agreed to settle Verisign’s lawsuit and enter into the 2006 .com Registry Agreement.

71. The settlement simultaneously resolved three separate proceedings Verisign had initiated or provoked: a federal lawsuit then on appeal to the Ninth

---

[101] *See* 2005 .net Registry Agreement § 7.3(a) (effective July 1, 2005), https://www.icann.org/en/registry-agreements/net/net-registry-agreement-01-07-2005-en (setting maximum Verisign fee at $3.50 plus an additional “ICANN fee” of $.75, or a maximum total fee of $4.25).

[102] *Contracting the Internet*, *supra* note 24.

[103] CFIT Complaint, *supra* note 20, ¶¶ 152-154; *ICANN Takes Steps to Move Verisign Contract Dispute from Litigation to Arbitration* (Nov. 12, 2004), https://www.icann.org/en/announcements/details/icann-takes-steps-to-move-verisign-contract-dispute-from-litigation-to-arbitration-12-11-2004-en (“In addition to ICANN’s arbitration demand, ICANN has filed today an answer to VeriSign’s California state court complaint, and also a counterclaim asking the court to find that VeriSign is in breach of its .COM registry agreement with ICANN”); 2001 Registry Agreement, *supra* note 74, § 25 (entitling ICANN to refuse renewal of agreement in the event “Registry Operator is in material breach of [the] Registry Agreement.”).

Circuit, a state court lawsuit, and an ICC arbitration proceeding.[104] But ICANN was not merely coerced; it was incentivized. Under the settlement, Verisign agreed to pay ICANN "registry-level fees" beginning at $6 million per year and increasing to as much as $12 million per year.[105] This was far above the fees ICANN had received under prior agreements: under the 2001 Registry Agreement, Verisign's fixed annual fee to ICANN was capped at $100,000 per year, increasing automatically by 15% per year.[106]

72. Meanwhile, ICANN released Verisign from all claims arising from the breaches of the 2001 Registry Agreement that had given ICANN the right to seek competitive bids, forfeiting the leverage it could have used to restore competition.[107] Verisign also expressly pledged to cease its attacks on ICANN's credibility and legitimacy, a commitment so central to the deal that the parties established a dedicated

---

[104] Verisign-ICANN Settlement Agreement, *supra* note 90, § 2.

[105] CFIT Complaint, *supra* note 20, ¶¶ 204-09; *CFIT*, 611 F.3d at 501; 2006 Registry Agreement, *supra* note 1, § 7.2 (providing for quarterly payments to ICANN of $1,500,000, with fees escalating based on growth in domain name registrations); *compare* 2001 Registry Agreement, *supra* note 74, § 7(D).

[106] 2001 Registry Agreement, *supra* note 74, § 7(D) ("Fee Caps. The Fixed Registry-Level Fee Cap shall be US$ 100,000 per year until and including June 30, 2002; shall automatically increase by 15% on July 1 of each year beginning in 2002").

[107] Verisign-ICANN Settlement Agreement, *supra* note 90, § 6 (mutual release of "any and all claims and causes of action, whether known or unknown, that have arisen as of the date of this Agreement"); *see also supra* note 20, ¶¶ 152–53 (alleging Verisign's breaches gave ICANN the right to seek competitive bids); *ICANN Takes Steps to Move Verisign Contract Dispute from Litigation to Arbitration* (Nov. 12, 2004) ("In addition to ICANN's arbitration demand, ICANN has filed today an answer to VeriSign's California state court complaint, and also a counterclaim asking the court to find that VeriSign is in breach of its .COM registry agreement with ICANN"), https://www.icann.org/en/announcements/details/icann-takes-steps-to-move-verisign-contract-dispute-from-litigation-to-arbitration-12-11-2004-en.

expedited arbitration mechanism solely to enforce it.[108] Registrants had no seat at the table and were expressly excluded from any rights under the settlement.[109]

73. The 2006 agreement represented a division of monopoly profits: Verisign obtained permanent control of the .com registry, elimination of competitive bidding, and the ability to raise wholesale prices, while ICANN received a substantially increased revenue stream funded by those same supracompetitive prices. This arrangement gave ICANN a direct financial stake in the perpetuation of the monopoly it was nominally charged with overseeing. It also set the pattern for every subsequent renewal, including the 2020 agreement in which ICANN approved further price increases and meanwhile received $20 million in additional payments from Verisign.

74. This concern was echoed by ICANN Board members. In a statement issued in connection with her vote against approving the 2006 Registry Agreement, Board member Susan Crawford wrote:

> Most of the energy behind the lawsuit has dissipated. The claims made by VeriSign have either been dismissed (as has happened to the antitrust claims) or resolved (as has happened to most of the "registry service" unhappiness). Yet ICANN is taking the occasion of this almost-irrelevant lawsuit to ensure a major source of funding for itself that appears to be based on the assumption of an (as-yet-unapproved) $50 million/year budget. In exchange, the proposed agreement provides that the existing price cap on .com registrations be raised.

[108] Verisign-ICANN Settlement Agreement, *supra* note 90, § 1(B) ("Verisign agrees that … it will not participate in, contribute monies for, encourage or provide other support for any activities by or for third parties that seek to undermine ICANN's role"); *id.* § 1(C) (establishing dedicated mediation and arbitration process for enforcement of this provision, with arbitration to produce "final and binding decision within fifteen (15) business days"); *see CFIT*, 611 F.3d at 505 (noting this provision of settlement).

[109] Verisign-ICANN Settlement Agreement, *supra* note 90, § 10 ("Nothing in this Agreement shall confer any rights upon any person or entity who is not a party to this Agreement, nor shall anything in this Agreement be construed as creating an obligation by either ICANN or VeriSign to any non-party to this agreement.").

> All of this raises the spectre of substantial institutional self-dealing, carried out with a particular litigious registry. If ICANN is going to succeed on the world stage, it should set its budgets with reference to the costs of accomplishing its core mission, not on what it can extract from such negotiations. If ICANN has reached the view that it should not regulate prices and should get out of the business of governing registry business models, then that would be a welcome development. But this ought to be an explicit deregulatory policy adopted across the board that affects all relevant actors.
>
> ….
>
> ICANN has often appropriately claimed that its legitimacy is founded on its bottom-up private policy generation. To sidetrack this experiment in private rule-making by allowing a single litigious registry to get a better deal than others undermines ICANN's core mission. ICANN should strive to be a model of private self-governance.
>
> ….
>
> We should avoid the appearance of carrying out special deals that shore up our treasury at the expense of our accountability to that community. We should reject the proposed new registry agreement.[110]

75. Another dissenting Board member, Peter Dengate Thrush, wrote:

> I am also concerned about the almost unanimous outcry from the community, but I would, as a director, have no hesitation in voting for this if I thought it was in ICANN's best interests. But as I don't, I have become very much concerned about the consequences of the lack of support at this time in the community.
>
> I'm also concerned about the linking of the ICANN budget with all of this process and the fact that as far as the community was concerned, it was all negotiated behind closed doors. So I'm voting no.[111]

76. In *CFIT*, the Ninth Circuit held that the plaintiff sufficiently alleged that ICANN was "a private standards-setting body" within the meaning of *Allied Tube &*

---

[110] 2006 ICANN Board Statements, *supra* note 23.

[111] *Id.* (emphasis added).

*Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), and that it sufficiently "alleged that VeriSign's improper coercion of ICANN and attempts to control ICANN's operations in its own favor violated Section 2."[112]

77. The central anticompetitive feature of the 2006 .com Registry Agreement was its effective elimination of any credible path to competitive bidding and replacement with a presumptive right of perpetual renewal. As described above, the 2001 Registry Agreement had two principal constraints on Verisign's exercise of monopoly power. The first was Section 25(D), which provided that "[i]n the event ICANN does not award Registry Operator a renewal registry agreement according to Subsection 25(B), ICANN shall call for competitive proposals." The second was Appendix G, which capped the wholesale price at $6.00 per domain per year; among the grounds on which ICANN could decline to renew was a proposal by Verisign to charge more than the cap.[113]

78. The 2006 agreement eliminated both safeguards. Section 4 narrowed the grounds for non-renewal to a single standard under which Verisign would automatically receive a successor agreement unless a court or arbitrator issued an order finding Verisign to be in "fundamental and material breach" of certain enumerated obligations, and Verisign failed to cure the breach within ten days of that final order.[114] Under the 2001 agreement, ICANN itself could decline to renew if it demonstrated any of four grounds, including that the registry operator had failed to

---

[112] *CFIT*, 611 F.3d at 506–07.

[113] 2001 Registry Agreement, *supra* note 74, §25(B) ("Registry Operator shall be awarded a four-year renewal term unless ICANN demonstrates that … (d) the maximum price for initial and renewal registrations proposed in the Renewal Proposal exceeds the price permitted under Section 22 of this Registry Agreement.") & §25(D); Appendix G to 2001 Registry Agreement (Apr. 16, 2001), https://www.icann.org/en/registry-agreements/com/revised-verisign-com-registry-agreement-appendix-g-16-04-2001-en (setting $6.00 cap).

[114] 2006 Registry Agreement, *supra* note 1, § 4.2.

provide substantial service to the Internet community, had proposed prices exceeding its contractual cap, or was in material breach of any provision of the agreement.[115]

79. As alleged in the CFIT complaint and credited by the Ninth Circuit, both ICANN and Verisign "understood that [the provision] never would be triggered."[116] By contrast, the rebid provisions of the 2001 agreement, which could have been activated by Verisign's own proposal to charge more than the $6.00 per domain cap, would already have been triggered had they remained in effect.

80. The pricing provisions were equally significant. Under the 2001 agreement, price increases were permitted only "to reflect reasonably demonstrated increases in the net costs of providing Registry Services," ensuring that Verisign recovered "such costs and a reasonable profit thereon."[117] This cost-justification requirement, which tracked the cost-based pricing framework embedded in the .com registry's governance since the original 1993 NSF contract, was the mechanism through which the price cap was meant to evolve: if Verisign's costs genuinely rose, prices could follow; if they did not, prices stayed flat.

81. The 2006 agreement severed that link entirely: it authorized Verisign to increase the wholesale price by up to 7% per year in four out of every six years, with

[115] 2001 Registry Agreement, *supra* note 74, §25(B)

[116] CFIT Complaint, *supra* note 20, ¶ 184; *CFIT*, 611 F.3d at 502.

[117] 2001 Registry Agreement, *supra* note 74, § 22(A) ("The price(s) to ICANN-accredited registrars for entering initial and renewal domain name registrations into the Registry Database and for transferring a domain name registration from one ICANN-accredited registrar to another will be as set forth in Section 5 of the Registry-Registrar Agreement (attached as Appendix F). These prices shall be increased through an amendment to this Agreement as approved by ICANN and Registry Operator, such approval not to be unreasonably withheld, to reflect reasonably demonstrated increases in the net costs of providing Registry Services arising from (i) new or revised ICANN specifications or policies adopted after the Effective Date, or (ii) legislation specifically applicable to the provision of Registry Services adopted after the Effective Date, to ensure that Registry Operator recovers such costs and a reasonable profit thereon; provided that such increases exceed any reductions in costs arising from (i) or (ii) above.").

no requirement that costs had risen at all.[118] The agreement further provided that Consensus Policies adopted through ICANN's normal multistakeholder process "shall not … prescribe or limit the price of Registry Services," effectively prohibiting ICANN from ever using its own governance mechanisms to constrain Verisign's pricing.[119] Nor were these restrictions limited to pricing: the agreement also prohibited Consensus Policies from modifying the renewal or termination provisions, the fee structure, or the very limitations on Consensus Policies themselves.[120] The agreement also eliminated the Code of Conduct that had governed Verisign's operations under the 2001 agreement[121] and relieved Verisign of its obligation to invest a minimum of $200 million in registry infrastructure.[122]

82. Under the prior 2001 agreement, Verisign already charged the maximum price ($6) permitted by the applicable price cap; the maximum price was thus the de

---

[118] 2006 Registry Agreement, *supra* note 1, § 7.3(d)(ii) (specifying that the "maximum price for registry services" "shall be:" "for each calendar year beginning with 1 January 2007, the smaller of the preceding year's Maximum Price or the highest price charged during the preceding year, multiplied by 1.07; provided, however, that such increases shall only be permitted in four years of any six year term of the Agreement.").

[119] *Id.* § 3.1. As explained in the 2006 Registry Agreement, "Consensus Policies" are "specifications or policies established … pursuant to the procedure set forth in ICANN's Bylaws and due process" and "shall be designed to produce, to the extent possible, a consensus of Internet stakeholders, including the operators of gTLDs."

[120] *See id.* §3.1(b)(v)(D), (F), (H) (providing that Consensus Policies "shall not … modify the terms or conditions for the renewal or termination of this Agreement," "modify the limitations on Consensus Policies or Temporary Specifications or Policies," or "modify the terms of Sections 7.2 and 7.3 [the agreement's pricing provisions].").

[121] CFIT Complaint, *supra* note 20, ¶¶ 167-68, 171, 217; *compare* 2006 Registry Agreement, *supra* note 1, *with* Appendix I to 2001 Registry Agreement (May 25, 2001), https://www.icann.org/en/registry-agreements/com/com-registry-agreement-appendix-i-25-5-2001-en.

[122] CFIT Complaint, *supra* note 20, ¶ 216; *compare* 2006 Registry Agreement, *supra* note 1, *with* Appendix W to 2001 Registry Agreement (Apr. 16, 2001), https://www.icann.org/en/registry-agreements/com/revised-verisign-com-registry-agreement-appendix-w-16-04-2001-en.

facto price.[123] The 2006 agreement thus did not merely raise the cap: it replaced a framework in which prices were tethered to costs with one in which prices could rise by 7% annually regardless of costs and meanwhile stripped ICANN of any mechanism to revisit that decision. The Ninth Circuit held that CFIT's allegations concerning the elimination of competitive bidding and the pricing provisions of the 2006 .com Agreement were sufficient to state Section 1 claims. On competitive bidding, the court wrote that "[t]he allegation in this case regarding the elimination of competitive bidding at the expiration of each successive registry agreement means that any other potential registry operator is excluded from competition." On pricing, the court concluded that "CFIT ha[d] adequately alleged that the pricing provision in VeriSign and ICANN's 2006 .com Agreement unlawfully restrains trade."[124]

83. The ICANN Board approved the 2006 .com Registry Agreement on February 28, 2006, by a vote of 9 to 5, with one abstention.[125]

84. The five dissenting Board members stated their reasons. Board member Susan Crawford warned that "[t]he proposed new Registry Agreement with VeriSign poses unacceptable risks to the values that underly ICANN's mission." Crawford specifically identified the agreement as a vehicle for monopoly profit-sharing between ICANN and Verisign, warning of the "spectre of substantial institutional self-dealing, carried out with a particular litigious registry" and observing: "No constituency within ICANN has supported this arrangement, and most (not all with monetary aims) have opposed it." Crawford further warned that "[i]f projections of the litigation burdens here stem from threats by VeriSign to impose litigation costs on ICANN that are not reasonably related to the issues actually being litigated, then that is yet another reason

---

[123] CFIT Complaint, *supra* note 20, ¶ 166.

[124] *CFIT*, 611 F.3d at 504.

[125] ICANN Board Approves Verisign Settlement Agreements (Feb. 28, 2006), https://www.icann.org/en/announcements/details/icann-board-approves-verisign-settlement-agreements-28-2-2006-en.

not to enter into this proposed agreement," and urged: "We should avoid the appearance of carrying out special deals that shore up our treasury at the expense of our accountability to that community."[126]

85. Dissenting Board member Raimundo Beca, who noted his "personal background and experience in price settlements," stated that it was "absolutely unacceptable" to approve "a 7 % annual rise on rates not justified by costs," particularly given that Verisign had "offered a $US 3 rate on its recent bid on .net." Board member Peter Dengate Thrush, who also voted against the deal, voiced concern about the "concept of perpetual renewal," objected to "the almost unanimous outcry from the community" and echoed Crawford's profit-sharing critique: "I'm also concerned about the linking of the ICANN budget with all of this process and the fact that as far as the community was concerned, it was all negotiated behind closed doors." Board member Joichi Ito voted against because, "although the settlement has a great number of short term merits, not approving the settlement might have a greater benefit for ICANN and the community in the long run." Board member Njeri Rionge, the fifth dissenter, acknowledged that "the community with whom we are representing are clearly not in favour of this agreement."[127]

86. Even Board members who voted in favor expressed discomfort. ICANN's President and CEO, Paul Twomey, acknowledged that the process had been "constrained by a lot of what is the possible as opposed to what one would like to really achieve." Board member Demi Getschko admitted he was "really not comfortable with many aspects of this settlement: the ceiling clause, the 'possible perpetual' renewal and so on" but voted yes because "we are really restricted on time to take this decision."[128]

---

[126] 2006 ICANN Board Statements, *supra* note 23.

[127] *Id.*

[128] 2006 ICANN Board Statements, *supra* note 23.

87. The agreement also drew scrutiny from Congress. In June 2006, the House Committee on Small Business held a hearing titled "Contracting the Internet: Does ICANN Create a Barrier to Small Business" to examine the proposed ICANN-Verisign settlement and its impact on small businesses. At the hearing, W.G. Champion Mitchell, Chairman and CEO of Network Solutions (then one of the largest domain registrars) testified that the deal amounted to a closed-door division of monopoly profits:

> It's not an arms-length contract between two independent parties. What you had was the regulator and the regulated getting into a room with the door closed without anybody being aware that it was happening and agree to essentially a perpetual renewal provision that gave a perpetual monopoly, and they are a monopoly. I mean, they are the only people you can get it from. …. They got into the room, they closed the door, and they made an agreement and here was the agreement. VeriSign gets a perpetual monopoly. Verisign gets a price increase without have had [sic] it reviewed or justified. ICANN gets $80 million of additional fees and gets removed from any review.

88. Mitchell estimated that the price increase would result in "$1.3 billion dollars in monopoly taxes" over the term of the agreement, adding: "ICANN is not left out. ICANN gets a slice of that monopoly profit. They will get about $200 million in fees over that time of which about half of it will come out of the monopoly profit."[129]

89. Representative Sue Kelly, a Republican member of the Committee, expressed skepticism that the price increases would benefit consumers: "It seems to me when you are talking about increased price, and you are allowed to do that at VeriSign, I don't know that is going to produce any better safety or security for anybody who is paying that additional cost. I haven't heard anything today that tells me that is going to be the product of the increase. If your costs are going down, why are you increasing the cost to people?"

---

[129] *Contracting the Internet*, *supra* note 24.

90. Beckwith Burr, a former NTIA official who helped create ICANN, acknowledged that VeriSign held a "dominant position in the domain name registration world" and questioned whether ICANN had "the ability and the legitimacy" to serve as a check on VeriSign's market power, stating:

> The real issue here is every registry is a monopoly for that registry, and there is no question that VeriSign and .com has a dominant position in the domain name registration world. The real question ought to be is VeriSign in a position to misuse its dominant position and, if so, are the kinds of checks and balances that we have in place by law adequate? Does the Justice Department have ability to get at this and look at it?
>
> If you want to give ICANN the job of being the substitute Justice Department, do they have the ability and the legitimacy to be that? I think there is a very important question about what are the checks and balances on VeriSign's ability to misuse its market position but I hate to get sort of completely side derailed by this perpetual renewal issue.[130]

91. In 2010, the Ninth Circuit reversed dismissal of the CFIT plaintiffs' Sherman Act claims, holding that the allegations of coercion and anticompetitive conduct were sufficient to state claims under both Sections 1 and 2. The case settled in 2011. The competitive safeguards were never restored.

**D. Since 2010, Verisign Has Maintained and Entrenched Its Monopoly**

92. The .com Registry Agreement has a fixed term (typically six years) after which it must be renewed or extended. Under the original 2001 agreement, each renewal carried a credible threat of competitive discipline: if Verisign proposed prices above the cap or failed to meet other conditions, ICANN could decline to renew and trigger competitive bidding from alternative operators. The 2006 agreement eliminated that threat by narrowing the grounds for non-renewal to a standard both parties understood would never be met. Since 2006, every renewal has been a foregone

[130] *Id.*

conclusion, and every renewal has required ICANN's affirmative approval of the terms Verisign sought.

93. The fifteen years that followed have been a story of compounding harm. At every juncture where the monopoly might have been challenged it was instead reinforced. ICANN approved every renewal, every extension, and every price increase Verisign sought, without exception. The competitive safeguards were progressively dismantled, the pricing restrictions removed, and the extraction accelerated.

**1. The 2012 renewal**

94. On December 1, 2012, Verisign and ICANN renewed the .com Registry Agreement for a six-year term.[131] The wholesale price now stood at $7.85, already 31% above the $6.00 cap that had prevailed before 2006. ICANN negotiated the renewal privately with Verisign, without consulting the ICANN community or registrants, and the result benefited both parties.

95. For ICANN, the deal replaced Verisign's capped quarterly fixed fee with a per-domain transaction fee of $0.25 for every .com registration, renewal, or transfer, a change ICANN itself acknowledged would constitute "a substantial increase in Verisign's contribution"—an extra $4.2 million, or $22.4 million in total, paid to ICANN.[132] For Verisign, ICANN's Board approved pricing terms that would have permitted wholesale increases of seven percent in each of four years, to as high as $10.29.[133] ICANN did not negotiate lower increases and did not require cost justification. Instead, it gave Verisign a price increase, and secured a revenue increase for itself funded by the same registrants whose price protection it was eliminating.

---

[131] .com Registry Agreement between ICANN and VeriSign, Inc. dated Dec. 1, 2012 (hereinafter "2012 Registry Agreement"), https://www.icann.org/en/registry-agreements/com/com-registry-agreement-1-12-2012-en.

[132] Kevin Murphy, *Dotcom hike will net millions of bucks for Verisign, ICANN*, THE REGISTER (Mar. 28, 2012), https://www.theregister.com/on-prem/2012/03/28/dotcom-hike-will-net-millions-of-bucks-for-verisign-icann/1064020.

[133] *Id.*

96. The only constraint came from outside the Registry Agreement. Critics of the deal argued that .com prices "could be easily halved to just a few dollars per domain per year if the contract was opened to a competitive bidding process."[134] The Internet Commerce Association, the principal trade group representing domain registrants, advocated for a price freeze, arguing that Verisign's price increases were "arbitrary and not done out of economic necessity" and pointing out at the time that "Verisign charges just $5.86 for the far less-used .net domain name, even though both domains use the same infrastructure and have similar operational costs."[135]

97. Ultimately, NTIA agreed to approve the Cooperative Agreement renewal on terms that froze the wholesale price at $7.85. Amendment 32 to the Cooperative Agreement provided that the wholesale price would not exceed $7.85 for the six-year term and (as in every prior and subsequent amendment) expressly stated that the Department's approval "is not intended to confer federal antitrust immunity on Verisign with respect to the .com Registry Agreement."[136]

98. The Internet Commerce Association estimated that the price freeze saved .com registrants approximately $600 million over the term of the agreement.[137] And the market's reaction to the 2012 price freeze was immediate: Verisign's stock price fell.[138] That reaction, the inverse of the 17% stock price increase that would follow the

[134] *Id.*

[135] David Goldman, *New Verisign deal blocks .com price hikes*, HARTFORD BUSINESS JOURNAL (Nov. 30, 2012), https://hartfordbusiness.com/article/new-verisign-deal-blocks-com-price-hikes/.

[136] Amendment 32 to Cooperative Agreement, ¶ 5 (Nov. 29, 2012), https://www.ntia.gov/files/ntia/publications/amendment_32_11292012.pdf.

[137] Philip Corwin, *VeriSign Agrees to .Com Price Freeze as Agreement Renewal Condition*, INTERNET COMMERCE ASSOCIATION (Nov. 30, 2012), https://www.internetcommerce.org/blog/dotcom_price_freeze/.

[138] Steven Overly, *VeriSign stock falls after '.com' contract renewal includes price freeze*, WASHINGTON POST (Dec. 9, 2012), https://www.washingtonpost.com/business/capitalbusiness/verisign-stock-falls-after-com-contract-renewal-includes-price-freeze/2012/12/07/2404e448-408b-11e2-a2d9-822f58ac9fd5_story.html.

removal of price caps in 2018 (discussed below), confirmed that investors understood Verisign's value to be a function of its monopoly pricing authority, not its operational performance.

99. The 2012 renewal demonstrated that the Registry Agreement's anticompetitive terms were already producing their intended results. ICANN approved the pricing terms Verisign sought. It negotiated no reduction, required no cost justification, and secured an increased revenue stream for itself funded by the same registrants whose prices were rising. That the wholesale price was ultimately frozen at $7.85 was the result of external intervention, not any safeguard in the Registry Agreement itself.

**2. The 2016 extension**

100. In October 2016, two years before the existing term of the 2012 Registry Agreement was set to expire, Verisign and ICANN extended the .com Registry Agreement through November 30, 2024, again without competitive bidding. The stated justification was to align the agreement's term with a related contract governing Verisign's role in maintaining the internet's "root zone."[139] No alternative operator was considered and no competitive bids were solicited. ICANN approved the extension, thus extending the $7.85 pricing restriction through 2024.[140] However, the protection would not last. As discussed below, within two years, the pricing restriction would be eliminated entirely; within four, ICANN would approve the maximum price increases the restriction had been designed to prevent.

[139] Approved Board Resolutions, Regular Meeting of the ICANN Board (Sept. 15, 2016), https://www.icann.org/en/board-activities-and-meetings/materials/approved-resolutions-regular-meeting-of-the-icann-board-15-09-2016-en ("What is the proposal being considered? The proposed Amendment: (1) extends the term of the .COM Registry Agreement to 30 November 2024 to coincide with the term of the Root Zone Maintainer Services Agreement (RZMA) between ICANN and Verisign)[.]").

[140] *See* Amendment 1 to the .com Registry Agreement (Oct. 20, 2016), https://itp.cdn.icann.org/en/files/registry-agreements/com/com-amend-1-pdf-20oct16-en.pdf.

101. Notably, the 2016 extension was negotiated against a backdrop of continued intimidation. Weeks before the extension was executed, Verisign demonstrated that its pattern of threatening critics had not abated. In September 2016, three think tank scholars published a white paper that included, among other things, a discussion of the potential for antitrust litigation against ICANN and Verisign.[141] The paper's discussion rested on a premise that ICANN itself had publicly endorsed: days earlier, ICANN's general counsel wrote in a letter to the Wall Street Journal that ICANN "does not enjoy an 'antitrust exemption,'" "ICANN isn't and never has been exempted from antitrust laws," and that "[a]pplicable antitrust law will provide accountability to and protection for the international internet community."[142]

102. Verisign's reaction was different. On September 13, 2016, the day before the authors were scheduled to testify before a Senate subcommittee, Verisign's general counsel sent them a letter dismissing as a "complete fabrication[]" the paper's observation "that parties wishing to bring lawsuits could assert that 'ICANN was involved in a conspiracy to fix prices and perpetuate a Verisign monopoly over premium web properties.'"[143] He accused the authors of making "false statements," "urge[d]" that they "remove these misrepresentations" from their paper, and warned

[141] *See* Berin Szóka, Brett Schaefer & Paul Rosenzweig, *ICANN Transition Is Premature: Unanswered Questions Require an Extension*, TECHFREEDOM, at 18-21 (Sept. 8, 2016), available at https://www.dailysignal.com/2016/09/08/icann-transition-is-premature-unanswered-questions-require-an-extension-partial-transition/.

[142] Letter from John Jeffrey, General Counsel and Secretary, ICANN, to the Editor, Wall Street Journal (published as "The Icann Move Has Long Been U.S. Policy," WALL ST. JOURNAL (Sept. 11, 2016), https://www.wsj.com/articles/the-icann-move-has-long-been-u-s-policy-1473612839.

[143] Letter from Thomas Indelicarto, General Counsel, VeriSign, Inc., to Berin Szoka, Brett Schaefer & Paul Rosenzweig, at 1 (Sept. 13, 2016), http://docs.techfreedom.org/Verisign_White_Paper_Response_Letter.pdf (quoting Szóka et al., , *ICANN Transition Is Premature: Unanswered Questions Require an Extension*, *supra* note 141, at 18 (writing, in discussion of ICANN's potential antitrust liability, that "a plaintiff might well argue that ICANN was involved in a conspiracy to fix prices and perpetuate a Verisign monopoly over premium web properties.")).

that failure to retract "by the issuance by you of a corrective notice" would "justifiably . . . raise more far-reaching questions about your paper, sources of information and, indeed, motives."[144]

103. At the hearing the following day, Senator Ted Cruz entered the letter into the record. The following exchange occurred:

> **Cruz**: Mr. Szóka, I understand that, just yesterday, you and Mr. Rosenzweig received a hostile letter from Verisign's general counsel regarding the White Paper that you both authored along with the Heritage Foundation expressing concerns with the transition. With that objection, I'd like to include that letter in this record.
>
> The Verisign letter strongly suggests that if you do not remove references to Verisign in your White Paper which the company disagrees with, the company may take additional action.
>
> **I will note that it is highly concerning that Verisign would send a letter of this nature to witnesses of this oversight committee the day before they are scheduled to give testimony. Such a letter could only be designed to have a chilling effect on witness participation and to disrupt the oversight functions of this subcommittee, which is seeking immediate answers to time-sensitive questions on an issue that has the full attention of the entire United States congress**.
>
> I would also note that it is more than a little ironic that Verisign, which has a direct working relationship with ICANN and the United States Department of Commerce, would seek to stifle individual speech in this way, which just so happens to be the main focus of today's hearing. This letter unfortunately perhaps provides a glimpse into how Verisign and ICANN can be expected to conduct themselves post-transition without government authority over them. Given the allegations against you, would you like to offer any rebuttal or response to Verisign's letter?
>
> **Szóka**: We did issue a very brief public comment. I will say, first, I've been in the think tank world for going on nine years and I've never received any kind of letter like that. It was not simply a correction, and we did note that there were perhaps slightly confusing word choices in our paper and we're

[144] *Id.* at 1, 3.

> happy to correct those. It was, as you say, a threat. And the issue that we were getting at was simply to illustrate that actually we tend to agree that ICANN probably is not immune from antitrust suit and that the transition probably won't change that.
>
> Our point really was to say there are still unanswered questions about antitrust law, and the purpose of the paragraph that Verisign objected to was simply to illustrate what such suits might look like and suggest that ICANN is inherently tied up in very controversial auctions at which there are lots of money at stake and ICANN has a direct financial interest. And we were simply explaining that it would be unreasonable to expect that plaintiffs would not bring this kind of suit and that antitrust litigation, whether frivolous or meritorious, will be used to attack ICANN and to discredit it by those that would indeed prefer to push to the ITU model.
>
> **Cruz**: Would you say that threatening witnesses before a Senate oversight hearing is consistent with an entity that we are being told we should trust to respect and protect free speech?
>
> **Szóka**: No sir, although I would just remind everyone that this was Verisign and not ICANN. And again, I'm not accusing anybody of anything. We were simply trying to explain that there are many unanswered questions.[145]

104. Verisign also brought former critics into its fold. In 2012, the Internet Commerce Association's legal counsel—who had served as an advocate for domain registrants, and has been described as "essentially the founding counsel of the organization"[146]—wrote in an online comment posted under his name that "ICANN neutered itself in 2006," adding that he "still believe[d] .Com base price should have been reduced by $2 to .Net level."[147] Under his leadership, the ICA that same year

---

[145] Protecting Internet Freedom, *supra* note 27, at 2:55:33.

[146] *See* Andrew Allemann, *Phil Corwin leaves Internet Commerce Association*, DOMAIN NAME WIRE (Nov. 3, 2017), https://domainnamewire.com/2017/11/03/phil-corwin-leaves-internet-commerce-association/.

[147] Comment of "Philip Corwin" (Nov. 30, 2012) on Kevin Musphy, *Verisign loses right to increase .com prices*, Domain Incite (Nov. 30, 2012), https://domainincite.com/11156-breaking-verisign-loses-right-to-increase-com-prices.

urged that Verisign's fee be reduced by "at least $2," arguing "the price would be lower if competitive contract proposals were solicited from other companies."[148] In November 2017, eleven months before Amendment 35 to the Cooperative Agreement removed the Registry Agreement's price caps (discussed below), Verisign hired him as its own Policy Counsel.[149]

**3. The 2018 amendment**

105. By 2018, the Registry Agreement's anticompetitive terms had produced exactly the structural lock-in they were designed to create. The presumptive renewal provision foreclosed competitive bidding at every renewal cycle. ICANN's financial dependence on Verisign ensured no internal resistance. The Registry Agreement itself contained no constraint on Verisign's pricing; the wholesale price had remained at $7.85 since 2012 only because the Cooperative Agreement's price ceiling independently prohibited Verisign and ICANN from agreeing to any higher price without Department of Commerce approval.

106. In October 2018, that ceiling was removed. Amendment 32 to the Cooperative Agreement had itself contained a provision entitling Verisign to seek removal of the pricing restrictions if it could demonstrate to NTIA that "market conditions no longer warrant such restrictions."[150] Verisign would be "deemed to have made such a showing upon demonstrating that competition from other top level domains, use of alternative Internet navigation techniques (including search engines, browsers and URL shorteners, among others), reduced demand for domain names, or other factors are sufficient to constrain Verisign's pricing[.]"[151] The provision did not

---

[148] Overly, *supra* note 138.

[149] *Former ICA Legal Counsel Phil Corwin Accepts a New Position as Policy Counsel for Verisign*, DN JOURNAL (Nov. 6, 2017), https://www.dnjournal.com/archive/lowdown/2017/dailyposts/20171106-2.htm.

[150] Amendment 32 to Cooperative Agreement, ¶ 3, *supra* note 136.

[151] *Id.*

require an independent economic analysis, provide for public comment, or require NTIA to consult anyone other than Verisign itself.

107. Verisign sought removal and, in 2018, NTIA granted it through Amendment 35 to the Cooperative Agreement.[152] The stated premise—that "ccTLDs [country code TLDs], new gTLDs, and the use of social media have created a more dynamic DNS marketplace"[153]—was unsupported by any independent analysis and, as discussed below, is contradicted by the empirical record in the years since.[154] At the same time, Amendment 35 expressly stated, as had every prior amendment, that the Department's approval was "not intended to confer federal antitrust immunity on Verisign with respect to the .com Registry Agreement."[155]

108. Amendment 35 did not itself set or approve any specific wholesale price. Instead, it removed the ceiling and left the actual price to be determined by Verisign and ICANN in perpetuity. Section 2(b) expressly deleted the prior pricing restrictions limiting Verisign's price to $7.85, while Section 2(a) provided that "Verisign and ICANN may agree to amend Section 7.3(d)(i) (Maximum Price) of the .com Registry Agreement" to permit increases of up to seven percent annually in four of every six years, in perpetuity, without Department of Commerce approval:

> Without further approval by the Department, at any time following the Effective Date of this Amendment 35, Verisign and ICANN may agree to amend Section 7.3(d)(i) (Maximum Price) of the .com Registry Agreement to permit Verisign in each of the last four years of every six year period, beginning two years from the Effective Date of this Amendment 35 (i.e., on or after the anniversary of the Effective Date of this Amendment 35 in 2020- 2023, 2026-2029, and so on) to increase the Maximum Price charged by Verisign for each yearly registration or renewal of a .com domain name

---

[152] Amendment 35 to Cooperative Agreement (Oct. 26, 2018), https://www.ntia.gov/sites/default/files/publications/amendment_35_0.pdf ("Amendment 35").

[153] *Id.* at 1.

[154] *See infra* §§ IV.F, V.

[155] Amendment 35, *supra* note 152, at 5.

> up to seven percent over the highest Maximum Price charged in the previous calendar year.[156]

109. Amendment 35 went further still. Not only did it pre-approve future price increases without government review; it ensured that the pricing restrictions could never be restored. Section 6(a) provides that "neither party may amend the Cooperative Agreement without the mutual written agreement of the other."[157] Before Amendment 35, the Cooperative Agreement's pricing restrictions could be tightened unilaterally, as they had been in 2012. After Amendment 35, both parties must consent to any change. The pricing ceiling was not merely removed; it was locked open.

110. And Amendment 35 eliminated the requirement that NTIA approve successive renewals of the Registry Agreement. Section 4(c) provides that the Department's approval of any amendment to or "the renewal, extension, continuation or substitution of the .com Registry Agreement, shall not be required unless Verisign seeks to change a term" on a short list of designated subjects; pricing changes within the pre-approved 7% framework are expressly excluded from that list.[158] The practical consequence is that Verisign and ICANN can renew the Registry Agreement on its existing terms, including the 7% compounding pricing provision and the presumptive perpetual renewal, indefinitely, without further government review.

111. What remained after Amendment 35, and what this action challenges, is the Registry Agreement between Verisign and ICANN: a private contract between two private parties, now operating without any external check on its anticompetitive pricing provisions.

---

[156] *Id.* at 2.

[157] *Id.* at 5.

[158] *Id.* at 3. Section 4(b) of Amendment 35 requires NTIA approval for "[a]ny change to Section 7.3(d) of the .com Registry Agreement which sets forth the Maximum Price restrictions (*other than as agreed as set forth in Section 2 (Pricing Flexibility) in this Amendment 35*)." (emphasis added). The italicized carve-out exempts the pre-approved 7% pricing framework from the approval requirement.

112. The market understood immediately: Verisign's stock rose 17 percent on the day Amendment 35 was signed.[159] The first permitted price increase (in 2020) was estimated to add $85 million to Verisign's annual revenue.[160]

**4. The 2020 ICANN agreement**

113. With the Cooperative Agreement's pricing ceiling removed, Verisign and ICANN turned to the agreement this action challenges: the .COM Registry Agreement. The wholesale .com price had been held at $7.85 per domain per year since 2012. Although Amendment 35 blessed increases of up to seven percent annually, those increases could not take effect until the Registry Agreement's own pricing provisions were amended.

114. The result was Amendment 3 to the Registry Agreement, proposed for public comment in January 2020[161] and executed in March 2020, which rewrote the agreement's pricing provision to authorize Verisign to increase the maximum wholesale price by up to seven percent in four of every six years.[162] Over the first six-year pricing cycle, this would raise the wholesale price from $7.85 to a maximum of $10.26. As noted above, at approximately 160 million active .com registrations, even the first year's increase would add an estimated $85 million to Verisign's annual revenue.

---

[159] Tomi Kilgore, *VeriSign's stock rockets back to dot-com bubble levels after ICANN agreement*, MARKETWATCH (Nov. 2, 2018), https://www.marketwatch.com/story/verisign-stock-rockets-back-to-dot-com-bubble-levels-after-icann-agreement-2018-11-02.

[160] Warren-Nadler Letter, *supra* note 46, at 2.

[161] *See* Verisign Investor Relations, *ICANN and Verisign Announce Proposed Amendment to .COM Registry Agreement* (Jan. 3, 2020), https://investor.verisign.com/news-releases/news-release-details/icann-and-verisign-announce-proposed-amendment-com-registry/.

[162] *See* Third Amendment to the .Com Registry Agreement, at 6, https://itp.cdn.icann.org/en/files/registry-agreements/com/com-amend-3-pdf-27mar20-en.pdf (last visited Sept. 1, 2026).

115. On March 27, 2020, ICANN approved the amendment.[163] Verisign and ICANN subsequently executed Amendment 3 to the Registry Agreement, implementing the maximum price increases. Verisign meanwhile agreed to pay ICANN, in connection with a proposed "Letter of Intent," an additional $20 million over five years "to support ICANN org's core mission to ensure the stable and secure operation of the Internet's unique identifier systems."[164] This payment was in addition to the $0.25 transaction fee ICANN already received for each .com domain registration or renewal, a fee that, applied to approximately 160 million active registrations, yields roughly $40 million per year in revenue directly tied to Verisign's .com registry.

116. Under the new agreement, Verisign's .com-related payments to ICANN, an estimated $44 million per year, accounted for nearly 30 percent of ICANN's total operating revenue of approximately $150 million.[165]

117. ICANN's approval of the 2020 amendment was the predictable consequence of the structural lock-in the Registry Agreement's own terms had created. The presumptive renewal provision foreclosed competitive alternatives.

---

[163] *See ICANN Decision Paper: Amendment 3 to .COM Registry Agreement, and Binding Letter of Intent between ICANN and Verisign* (Mar. 27, 2020), https://itp.cdn.icann.org/en/files/registry-agreements/com/com-decision-document-27mar20-en.pdf.

[164] *Id.* at 3, 6.

[165] ICANN reported total revenue and support of approximately $149 million for the fiscal year ending June 30, 2023. *See* Report of Independent Auditors and Consolidated Financial Statements, at 5, https://www.icann.org/en/system/files/files/icann-financial-report-fye-30jun23-en.pdf (last visited Sept. 1, 2026). Verisign's .com-related payments to ICANN consist of (a) a transaction fee of $0.25 for each .com domain registration or renewal, which at approximately 160 million active registrations yields roughly $40 million per year; and (b) $4 million per year under Amendment 3. ICANN's own funding-by-source report for the period July 2022 to June 2023 confirms that Verisign's total payments to ICANN, including fees from .com and .net, were approximately $53 million, or 36% of the total funding ICANN received. ICANN, Funding by Source, Fiscal Year 2023 (Oct. 4, 2023), https://www.icann.org/en/announcements/details/icann-publishes-fy23-annual-report-and-audited-financial-statements-04-10-2023-en.

ICANN's financial dependence on Verisign, deepened by the $20 million payment, gave it every incentive to approve rather than resist.

118. Nothing in Amendment 35 required ICANN to agree to any price increase, let alone the maximum. As the ICA observed, "it would be consistent with Amendment 35 if no changes at all were made to the .COM Registry Agreement."[166] ICANN could have conditioned its approval on an independent economic study of .com pricing. It could have required Verisign to demonstrate that the increases were cost-justified. It did none of these things. Indeed, ICANN and Verisign had agreed as recently as 2016 to maintain the $7.85 wholesale price cap through 2024. Amendment 3 abandoned that commitment four years early.

119. As the ICA noted, ICANN and Verisign negotiated the amendment "without first having sought or obtained stakeholder input," i.e., input from registrars or affected consumers.[167] And when the Amendment was put out for public comment, the opposition was both unprecedented (previous comment periods had typically received under 20 comments[168]) and overwhelming: over 9,000 responded—an unprecedented volume—over just three months, with the ICA estimating (based on its analysis of these public comments[169]) that only seven commenters out of

---

[166] Zak Muscovitch, *Report and Analysis of Public Comments Submitted to ICANN on the .COM Pricing Provisions (Part II)*, CIRCLEID (Mar. 6, 2020), https://circleid.com/posts/20200306_report_and_analysis_of_public_comments_submitted_to_icann_part_ii.

[167] Letter from Zak Muscovitch, ICA General Counsel, to ICANN (Mar. 17, 2020), https://itp.cdn.icann.org/en/files/correspondence/muscovitch-to-icann-board-17mar20-en.pdf.

[168] *See* Zak Muscovitch and Nat Cohen, *Report and Analysis of Public Comments Submitted to ICANN on the .COM Pricing Provisions (Part I)*, CIRCLEID (Mar. 6, 2020), https://circleid.com/posts/20200306_report_and_analysis_of_public_comments_submitted_to_icann_part_i. In early March, the ICA published a two-part report and analysis of the public comments submitted in response to then-proposed Amendment 3.

[169] The full set of comments remain available on ICANN's website at the following link: https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/latest (last visited Sept. 1, 2026).

approximately 9,000 submitted comments clearly in favor of the proposed amendment and that the only substantive comment supporting the price increases came from Verisign itself:[170]




120. ICANN itself admitted as much: in its own analysis of the public comments, ICANN noted that approximately 95% of comments concerned "proposed changes to the maximum allowable wholesale price for .COM registry services," and that these comments "were nearly unanimous in voicing disagreement or concern[.]"[171]

121. The majority of these comments came from thousands of individual registrants—small business owners, software developers, nonprofit operators, students, and domain holders from dozens of countries—who described in plain language the harm that the Complaint's class members have suffered. One commenter, a small business owner in a developing country, wrote: "The increase can seriously hurt our business. We are based in a third world country where the minimum wage is

[170] *See Report and Analysis of Public Comments Submitted to ICANN on the .COM Pricing Provisions (Part I)*, *supra* note 168.

[171] Staff Report of Public Comment Proceeding, at 4 (Mar. 26, 2020) ("ICANN Staff Report"), https://itp.cdn.icann.org/en/files/registry-agreement/report-comments-com-amendment-3-26mar20-en.pdf.

100 dollars per month."[172] A domain holder wrote: "There's no option for domain owners to choose a cheaper alternative because there are none. Domain owners are held to ransom and have to pay ever increasing prices for the profit of one company (and ICANN) as there's no alternative."[173] A high school student wrote that "cheap '.com' domains have allowed me to scale my business with no upfront capital. Raising the prices of '.com' registrations will take away this opportunity from my business and other young entrepreneurs."[174]

122. The companies that actually sell .com domains to the public, and that would be forced to pass Verisign's price increases through to their customers, opposed the amendment on both substance and process grounds. Namecheap, then the third-largest registrar with 10 million domain names under management, estimated that Verisign's cost to operate the .com registry is "approximately $1.00 to $3.00 per domain name, with the remaining wholesale price representing a significant profit for Verisign's no-bid contract with ICANN."[175] Namecheap observed that even with prices frozen at $7.85, Verisign's net income had grown 91 percent (from $320 million to $612 million) between 2012 and 2019, driven entirely by growth in the registration base rather than price increases, further noting that "due to gained

---

[172] *See* Comment of Nacer Lalaoui dated Feb. 10, 2020, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/message/IHZAMHGAXS6F2NOJOJSKYOFOCCCFVAHH/.

[173] Comment of Michael Keeney dated Feb. 11, 2020, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/LDKUUKQWLH3MTJPBDBYB4FVSWTLCV33X/.

[174] Comment of Noah Solomon dated Feb. 10, 2020, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/message/HPTBIEID5T3FUFTVP2YL4BPH2UWB25KU/.

[175] Comment of Owen Smigelski dated Feb. 14, 2020 (attaching Namecheap comment), https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/ZBGRVEAD7ZVWWFXG4YDYPRTMM4MUC5AX/; *see also* Zak Muscovitch and Nat Cohen, *Report and Analysis of Public Comments Submitted to ICANN on the .COM Pricing Provisions (Part II)*, CIRCLEID (Mar. 6, 2020), https://circleid.com/posts/20200306_report_and_analysis_of_public_comments_submitted_to_icann_part_ii (summarizing Namecheap comment).

efficiencies, the cost of .com domain names should remain static or go down," and urged that "[c]onsumers would be better protected if ICANN allowed the .com … contracts to proceed to competitive bidding to ensure consumers (rather than corporations) are protected."[176]

123. GoDaddy, the world's largest registrar, asserted that "from an end user's perspective, Verisign's .COM does not have natural competitors to constrain retail pricing within the market" and that "[t]here is no effective competition to assist in establishing what is a reasonable price for .COM."[177] GoDaddy urged ICANN to "conduct an independent economic study of the domain name market" before agreeing to any price increases, a study ICANN never conducted, and further objected that ICANN had negotiated the amendment with Verisign before seeking community input, warning that "a considerable sum of money" was "exchanging hands with no real details provided as to how this money will be allocated and ultimately accounted for" and that "many in the community … believe that ICANN's public consultations are nothing more than a check-the-box activity, which … draws into question not only the public consultation process, but the integrity of ICANN and its process overall."[178]

124. Automattic, the parent company of WordPress and an ICANN-accredited registrar, called the $20 million payment from Verisign to ICANN "questionable at best, and far worse in less charitable optics," noting a "complete lack of accountability behind this payment" and that "there is no guarantee it will be used for anything other than general ICANN operations."[179] Automattic also pointed out that the amendment

---

[176] *Id.*

[177] Comment of Ashley Heineman dated Feb. 14, 2020 (attaching GoDaddy comment) at 2, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/SLNJDH5IKLAOBXPUECMC323J4I4LOJFU/.

[178] *Id.* at 2-3.

[179] Comment of Kellie Peterson dated Feb. 13, 2020, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/FG5PBNNXRPU7TM7SXFSH7XTFBP3SM5JM/.

would break ICANN's and Verisign's 2016 commitment to maintain the $7.85 price cap through 2024, asking: "What good are such obligations if they are simply reverted at their request? This erodes what is left of the trust the community has in the ICANN organization."[180]

125. TurnCommerce, the operator of the registrar NameBright, was more direct, calling the $20 million "the only explanation for ICANN's agreement"—a "kickback" received by ICANN for "violating its duty to its stakeholders in a secret, backroom deal it negotiated with Verisign"—and concluding:

> Amendment 3 is a symptom of a larger problem: ICANN handed Verisign a perpetual, no-bid contract that removes market discipline that would ensure lower prices and greater innovation and investment in the .com registry. If Verisign were subject to competition for the contract at the end of every term, it would not seek to raise prices for registrations—it would be forced to lower them significantly if it desired to keep the contract. Amendment 3 benefits only ICANN and Verisign.[181]

126. ICANN's own official constituencies reached the same conclusion. The Registrar Stakeholder Group, the representative body of ICANN-accredited registrars[182], stated that "the proposed price increases are without sufficient justification" and that "ICANN has not explained how increased domain name prices are in the public interest or how this furthers the security and stability of the DNS," concluding that the increases "appear only to benefit one company, which has the right to operate .com in perpetuity (and without a competitive bidding process)."[183] The

---

[180] *Id.*

[181] Comment of Jeffrey Reberry dated Feb. 14, 2020 (attaching TurnCommerce comment), https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/DKTPU4ZXFDQIDCCMCTMDRODXJSUBPHTM/.

[182] *See About the RrSG*, Registrar Stakeholder Group, https://rrsg.org/about/ (last visited Sept. 1, 2026).

[183] Comment of Zoe Bonython dated Feb. 14, 2020 (attaching Registrar Stakeholder Group comment) at 1, https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/AC6VEVRGHFHE2D4LRP3ARKJOVV564NZG/.

Group objected that "ICANN did not consult with the community prior to the negotiation of this amendment," and that "it is not clear that ICANN negotiated the Proposed Amendment with the interests of the community ahead of those of Verisign or ICANN org."[184]

127. Greg Rafert, Ph.D., an economist specializing in competition and antitrust analysis who had previously served as ICANN's own retained expert on the competitive effects of the new gTLD program, submitted a formal economic analysis concluding "that there is no economic rationale for Verisign to increase prices for .COM and that price increases for .COM will harm consumers."[185] Dr. Rafert noted that Verisign's stated justification for the increases, that it faced a more "dynamic" and competitive marketplace, in fact predicted the opposite result: "In the face of heightened competition ... economic theory and empirical economic studies predict that a firm would typically lower, not increase, prices."[186] That Verisign instead sought to raise prices was, he concluded, "consistent with a marketplace in which Verisign has market power."[187] Dr. Rafert documented that Verisign's revenue had nearly doubled over the preceding decade (from $616 million to $1.23 billion) while its total costs had remained essentially flat and in fact decreased in 2019, producing gross profit margins of 85.3% and operating margins of 65.5%, compared to S&P 500 averages of 42.5% and 13.6% respectively[188]:

---

[184] *Id.* at 6.

[185] *See* Rafert Response, *supra* note 40, at 1, 3. As noted above, Rafert previously "worked, as an independent consultant, on behalf of ICANN to analyze topics related to ICANN and the TLD marketplace" on several occasions, including "[a]n assessment, conducted from 2015 through 2016, of the competitive effects associated with the new gTLD program for ICANN" that "examined changes in market prices, share, and power for domain registries and registrars as a result of the program." *Id.* at 3.

[186] *Id.* at 1.

[187] *Id.* at 8.

[188] *Id.* at 9-12.




128. Dr. Rafert further found that consumers were "unlikely to switch to other, less expensive TLDs due to the high costs associated with switching from a .COM domain," and that although Verisign's net income had reached approximately $612 million by 2019, its research and development and capital expenditures had remained constant, undermining any claim that price increases were needed to fund infrastructure investment.[189] Rafert concluded: "Taken together, there is little evidence of movement away from .COM by consumers towards other TLDs in the marketplace, which indicates that .COM does not face meaningful competition from other TLDs. Given the lack of meaningful competition, Verisign's interest in increasing prices for .COM is consistent with a firm holding market power."[190]

129. Arif Ali, a partner at Dechert LLP who had represented parties in ICANN-related proceedings and formerly co-chaired Dechert's international arbitration practice, submitted a detailed comment noting that Amendment 35 merely permitted price increases but "nowhere does Amendment 35 require ICANN and

[189] *Id.* at 2, 16-17.
[190] *Id.* at 22.

Verisign to increase the prices for .COM registry services, let alone raise them to the maximum amount permitted by Amendment 35," and that any price increase was "unnecessary and entirely unwarranted" given that Verisign's operating margin exceeded 60 percent while its costs had decreased over the previous decade.[191] Ali emphasized that the Amendment "does not require Verisign to provide any justification for its price increases, even in light of Verisign's continually decreasing costs," and concluded: "The only rational explanation for this inexplicable proposal is that ICANN's and Verisign's relationship is far too familiar, and has resulted in an arrangement where ICANN and Verisign profit themselves at the expense of the public. ICANN's responsibility is to the Internet community and public as a whole, not to Verisign."[192] He warned that "perpetual price increases" risked "creating a cost-prohibitive barrier to the .COM gTLD, eliminating access to the world's most important gTLD to those who cannot afford to pay the price of admission."[193]

130. Greg Thomas, the founder of DNSDecrypt, submitted a comment drawing on his experience as a former senior Verisign employee (between 2009-2010 and 2013-16) who had "direct responsibility for designing and coordinating execution of policy programs that supported [Verisign's] continuing ability to manage core Internet infrastructure, including the .COM and .NET domain name registries."[194] Thomas described the dynamic between the two organizations as an "aggravated imbalance," characterizing Verisign as a company with "a reputation for behaving as an entitled monopolist" and "thin-skinned and aggressive tendencies, including an itchy trigger finger when it comes to the creative and anti-competitive use of legal

---

[191] Comment of Rosey Wong dated Feb. 13, 2020 (attaching comment from Arif Hyder Ali), https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/3XMCAGR5K2CZEXTAHWBDMYWRH25C7RGX/.

[192] *Id.* at 7, 8-9.

[193] *Id.* at 8.

[194] Comment of Greg Thomas, *supra* note 30.

counsel and the civil tort," facing off against "a consensus-driven debating society [ICANN] for smart and talented people that is preternaturally broke." He wrote that the $20 million payment created "the widespread perception that ICANN has engaged in a quid pro quo by trading approval of .COM price increases for $20 million—a stain of self-dealing that no amount of security, stability, and resiliency (SSR) whitewashing can remove."[195]

131. Verisign's own public comment did not defend its pricing on the merits. Titled "Troubling Efforts to Distort and Undermine the Multistakeholder Process," the unsigned, four-page letter devoted the bulk of its length to attacking the commenters rather than addressing their arguments.[196] Verisign characterized the near-unanimous opposition as a "concerted effort to distort this public comment period" by "a small but vocal group" of "domain name speculators" who had attempted to "hijack" ICANN's processes.[197] It offered no cost justification for the price increases. Instead, Verisign closed by noting that it "look[ed] forward to working with ICANN and the community to consider the extent to which new processes, rules and oversight can be employed to prevent groups like ICA and their registrars from continuing to distort and undermine the multistakeholder process in the future"[198]—in essence, by threatening to rewrite the rules to suppress future opposition.

132. On March 26, 2020, ICANN published a "staff report" summarizing the public comments and acknowledging that they were "nearly unanimous in voicing disagreement or concern" to the proposed pricing changes.[199] Less than twenty-four

---

[195] *Id.*

[196] *See* Comment of Melissa Sembler dated Feb. 14, 2020 (attaching unsigned comment from Verisign), https://lists.icann.org/hyperkitty/list/comments-com-amendment-3-03jan20@icann.org/thread/ALEDZRP2E35XDKMIQIB5FKBYFOJNKX4M/.

[197] *Id.* at 1.

[198] *Id.* at 4.

[199] ICANN Staff Report, *supra* note 171, at 4.

hours later, on a Friday during the first weeks of the COVID-19 pandemic, ICANN's CEO approved Amendment 3 without any revisions to its proposed terms.[200]

133. Rather than engage with the substance of the opposition, ICANN's Decision Paper accompanying its March 27, 2020 approval devoted a preliminary section to characterizing those who had "fueled the high volume of comments," including the ICA and Namecheap, as "active players in the so called 'aftermarket' for domain names, where domain name speculators attempt to profit by 'buying low and selling high'"—effectively adopting the same characterization that Verisign had advanced in its own public comment—and attempted to redirect attention from the wholesale monopoly price to registrars' retail pricing, observing that GoDaddy had raised retail renewal prices even while wholesale prices were frozen.[201]

134. As its formal justification, ICANN stated that it was "not a competition authority or price regulator" and had "neither the remit nor expertise to serve as one," and that it was "electing to instead continue to defer to the DOC and DOJ, by applying the terms as agreed between the DOC and Verisign in Amendment 35 to the Cooperative Agreement."[202] ICANN thus treated the pricing provisions as a foregone conclusion dictated by Amendment 35, even though Amendment 35 merely permitted price increases and nowhere required them, and even though, as ICANN's own

---

[200] *See* Letter from Zak Muscovitch, General Counsel, Internet Commerce Association, to ICANN Board of Directors, at 1 (Apr. 2, 2020), https://itp.cdn.icann.org/en/files/correspondence/muscovitch-to-botterman-icann-board-02apr20-en.pdf (recounting history); *see* ICANN Decision Paper, *supra* note 163.

[201] ICANN Decision Paper, *supra* note 163, at 3. Further, ICANN's observation that registrars raised retail prices while wholesale prices were frozen does not support the conclusion ICANN drew from it. As discussed below, the competitive registrar market operates on margins so thin that wholesale cost increases are passed through to consumers at rates approaching 100%, a conclusion ICANN's own retained expert economist reached in prior proceedings. That registrars adjusted retail prices during a period of frozen wholesale costs reflects competitive margin dynamics, not an argument that wholesale pricing is irrelevant.

[202] *Id.* at 4-5.

Decision Paper acknowledged, Amendment 3 was "essentially restoring the pricing structure from the 2006 .COM [registry agreement]," i.e., the same pricing structure at issue in *CFIT*, where the Ninth Circuit reversed dismissal of Sherman Act claims.[203]

135. Further, ICANN's claim that it has "neither the remit nor expertise" to address pricing is contradicted by its own institutional history. ICANN was created, in the words of its founding board chair, to "break the monopoly of Network Solutions,"[204] and the government's founding directive charged ICANN with ensuring that "the pressure of competition" would be "the most effective means of discouraging registries from acting monopolistically."[205] Consistent with this, ICANN's general counsel, Louis Touton, acknowledged as early as 2001 that constraining registry pricing was central to ICANN's mission. In analyzing ICANN's registry agreements, Touton wrote:

> TLD registry operators will inevitably acquire some attributes of monopoly power. This is a necessary consequence of (a) the technical impracticality of having more than one operator of the core registry function for a given TLD and (b) the economic "lock-in" that consumers undergo when they establish web sites and other services at a registered domain name within the TLD. Without protective provisions about how they operate, TLD operators will have incentives to use this sole-source position in abusive ways.[206]

136. Touton further explained that "ICANN's agreements with the registry operators have a series of competition-promoting constraints on the registry operators' behavior" and specifically identified "capping prices the registry operator can demand

---

[203] *Id.* at 4.

[204] Statement of Esther Dyson, *supra* note 14.

[205] White Paper, *supra* note 16, at 31,745-46.

[206] General Counsel's Analysis of .name SLD E-mail Forwarding Service (July 30, 2001), https://www.icann.org/en/contracted-parties/registry-operators/general-counsels-analysis-of-name-sld-e-mail-forwarding-service-30-07-2001-en.

from registrars" as one of them.[207] An independent evaluation ICANN commissioned three years later confirmed this understanding, finding:

> ICANN has acknowledged that TLD registry operators "inevitably acquire some attributes of monopoly power" because of the "technical impracticality of having more than one operator" for a TLD. The situation is reinforced by the economic lock-in that occurs when an individual or entity begins to use a particular domain name. As a registrant establishes an online presence, it makes an investment—both tangible and intangible—in that registration. Indeed, for a large company, that investment can represent a substantial asset, not unlike more traditional forms of intellectual property. For a smaller company, that investment can be the most critical part of its business, without which it would fail. Because of the lockin effect, and out of concern that a registry operator might abuse its sole-source position to take advantage of the registrant, ICANN has developed constraints on operating a TLD that are embodied in each Registry Agreement. These generally uniform constraints are intended as protective measures against potentially abusive behavior, and are not supposed to affect unrelated business decisions. For example, the price caps on the fee a registry may charge registrars for a registration can be adjusted downwards, but not upwards. Registries, for the most part, have accepted these constraints as part of the privilege of operating a TLD.[208]

137. ICANN also put this understanding into practice. When it opened the .org and .net registries to competitive bids in 2002 and 2004, respectively, it made pricing a key criterion.[209]

---

[207] *Id.*

[208] Summit Strategies International, *Evaluation of the New gTLDs: Policy and Legal Issues*, at 105 (July 10, 2004), https://archive.icann.org/en/tlds/new-gtld-eval-31aug04.pdf.

[209] *See* ICANN, Draft Procedure for Designating Subsequent .net Registry Operator (June 2, 2004), https://www.icann.org/en/announcements/details/draft-procedure-for-designating-subsequent-net-registry-operator-2-6-2004-en ("5.2.4 ICANN shall select as the successor Registry Operator the eligible party that it reasonably determines is best qualified to perform the registry function under terms and conditions developed pursuant to Subsection 4.3 of this Agreement, taking into account all factors relevant to the stability of the Internet, promotion of competition, and maximization of consumer choice, including without limitation: functional capabilities and performance specifications proposed by the eligible party for its operation of the

138. Consistent with this, ICANN's 2001 .com Registry Agreement included exactly such provisions: a wholesale price cap and a requirement that any increase "reflect reasonably demonstrated increases in the net costs of providing Registry Services."[210] And when those protections were eliminated in the 2006 agreement, the parties went further, expressly providing that Consensus Policies (the policies ICANN develops "based on a consensus of Internet stakeholder groups"[211]) "shall not … prescribe or limit the price of Registry Services."[212] An organization does not need to contractually prohibit its own policy process from addressing pricing if it never had authority over pricing in the first place. ICANN's claim that it is "not a price regulator" thus describes not an inherent limitation but the consequence of the very anticompetitive agreement this action challenges. Indeed, Verisign's own 2004 lawsuit against ICANN rested on the premise that ICANN had exactly this authority: it sued ICANN for acting contrary to its "clear and express mandate to promote competition."[213]

---

registry, the price at which registry services are proposed to be provided by the party, the relevant experience of the party, and the demonstrated ability of the party to manage domain name or similar databases at the required scale."); ICANN, Reassignment of .org Top-Level Domain: Criteria for Assessing Proposals (May 20, 2002), https://archive.icann.org/en/tlds/org/criteria.htm ("In view of the noncommercial character of many present and future .org registrants, affordability is important. A significant consideration will be the price at which the proposal commits to provide initial and renewal registrations and other registry services. The registry fee charged to accredited registrars should be as low as feasible consistent with the maintenance of good-quality service.").

[210] 2001 Registry Agreement, *supra* note 74.

[211] *See* Margie Milam, Transcript of *ICANN Start, Episode 4: Consensus Policies, Registries, and Registrars*, ICANN (Mar. 30, 2010), https://www.icann.org/en/system/files/files/transcript-icann-start-04-31mar10-en.pdf ("A consensus policy is a specification that is based on a consensus of Internet stakeholder groups. What that really means is, it's a policy that receives broad support, demonstrated by an ICANN board action that establishes the policy, or a recommendation made by the GNSO Council.").

[212] 2006 Registry Agreement, *supra* note 1, § 3.1.

[213] Verisign v. ICANN Complaint ¶ 3, *supra* note 83.

139. The DOJ Antitrust Division had identified ICANN's abdication as the core problem twelve years earlier. In its 2008 letter to NTIA, the Division stated that "ICANN is obligated to manage gTLDs in the interests of registrants and to protect the public interest in competition," directly contradicting ICANN's later claim that it lacked the "remit" to address pricing.[214] The Division urged ICANN to "employ tools such as competitive bidding to manage TLDs in a manner that safeguards the interests of registrants in obtaining high quality domains at the lowest possible prices," concluding that "ICANN ha[d] not come close to fulfilling its obligations to employ competitive principles in its management of TLD registry operations."[215]

**5. The 2024 renewal**

140. With the Cooperative Agreement's pricing restrictions removed and Amendment 3 in effect, Verisign raised wholesale prices to the maximum permitted level in every year it was allowed to do so: from $7.85 to $8.39 in September 2021[216]; from $8.39 to $8.97 in September 2022; from $8.97 to $9.59 in September 2023; and from $9.59 to $10.26 in September 2024.[217] That represents a cumulative increase of roughly 30 percent in four years.

141. The cumulative impact of these increases drew bipartisan congressional scrutiny. In July 2024, with the .com Registry Agreement approaching its renewal

---

[214] Garza Letter, *supra* note 39, at 4.

[215] *Id.* at 8.

[216] Andrew Alleman, *Breaking: Verisign announces .com price hike to $8.39*, DOMAIN NAME WIRE (Feb. 11, 2021), https://domainnamewire.com/2021/02/11/breaking-verisign-announces-com-price-hike-to-8-39/ (reporting Verisign announcement that prices would increase from $7.85 to $8.39 on September 1, 2021).

[217] Verisign, Inc., Annual Report (Form 10-K), at 26 (Feb. 15, 2024), https://www.sec.gov/Archives/edgar/data/1014473/000101447324000006/vrsn-20231231.htm ("We increased the annual registry-level wholesale fee for each new and renewal .com domain name registration from $8.39 to $8.97 effective September 1, 2022 and from $8.97 to $9.59 effective September 1, 2023. On February 8, 2024, we announced that we will increase the annual registry-level wholesale fee for each new and renewal .com domain name registration from $9.59 to $10.26, effective September 1, 2024.")

date, House Energy and Commerce Committee Chair Cathy McMorris Rodgers, Subcommittee on Communications and Technology Chair Bob Latta, and Subcommittee on Oversight and Investigations Chair Morgan Griffith wrote to NTIA observing that "[m]embers of Congress ha[d] also noted that Verisign's exclusive control of .com allows it to operate as a monopoly over the .com registry" and that "[m]onopolistic elements and excessive domain name price increases stifle the ability of potential .com registrants to conduct business online."[218]

142. Separately, on November 21, 2024, Senator Elizabeth Warren and Representative Jerrold Nadler sent a letter to NTIA and the Department of Justice warning that "Verisign and ICANN may have a collusive relationship" in which Verisign has "used its monopoly power … to capture ICANN and its millions of consumers" and urging the DOJ to "again investigate Verisign for violations of antitrust laws, and, if necessary, hold the Company accountable."[219] The letter cited the 30 percent price increase, the $20 million ICANN payment, Verisign's per-domain profit margins of nearly 66 percent, and the DOJ's own 2008 determination that Verisign "possesses significant market power."[220]

143. Despite this bipartisan congressional pressure, nothing changed. On November 27, 2024, ICANN approved another renewal of the .com Registry Agreement through November 30, 2030, with Verisign again designated as the sole registry operator.[221] No competitive bidding was conducted, no alternative operator was considered, and no independent economic study was commissioned. ICANN could have used this renewal—the first since bipartisan congressional alarm, the

---

[218] Rogers Letter, *supra* note 45, at 2.

[219] Warren-Nadler Letter, *supra* note 46, at 2-3, 4.

[220] *See id.*

[221] *ICANN Renews .COM Registry Agreement with Verisign* (Nov. 27, 2024), https://www.icann.org/en/announcements/details/icann-renews-com-registry-agreement-with-verisign-27-11-2024-en; 2024 Registry Agreement, *supra* note 1.

Warren-Nadler letter, and 9,000 comments opposing the prior amendment—to require competitive bidding, impose pricing reforms, or commission the pricing study that GoDaddy, the DOJ, and multiple commenters had urged for years. It did not.

144. As with prior renewals, stakeholders protested that ICANN negotiated the terms with Verisign and presented the finished agreement for public comment only after the terms had been finalized.[222] They also protested that the comment period was not listed on ICANN's official "Upcoming Proceedings" page and closed on November 5, 2024, leaving only six business days (during the Thanksgiving holiday) between ICANN's November 19 staff report summarizing comments and the November 30 renewal deadline for ICANN to consider any feedback received.[223]

145. ICANN received twenty-seven public comments on the proposed renewal, down from over 9,000 on the 2020 amendment.[224] This was likely because, after the 2020 comment period, ICANN replaced its open email-based comment process with a system requiring commenters to create an account through ICANN's website, a change the Internet Commerce Association characterized as having "the obvious and intended effect of severely limiting public participation by making it more onerous for members of the public to submit comments to ICANN."[225] Many of the commenters who navigated this process nonetheless raised the same concerns as

---

[222] TurnCommerce Inc. Public Comment on Proposed Renewal of the Registry Agreement for .COM dated Nov. 5, 2024, Supplemental Filing No. 2 ("ICANN's Public Comment Period is Broken: Serious Concerns to the ICANN Public Comment Process and Continual increase of .COM Prices") at 3, 4-5, https://www.icann.org/en/public-comment/proceeding/proposed-renewal-of-the-registry-agreement-for-com-26-09-2024/submissions/turncommerce-inc-05-11-2024.

[223] *Id.* at 3, 6.

[224] *See* Public Comment Submissions for Proposed Renewal of the Registry Agreement for .COM, https://www.icann.org/en/public-comment/proceeding/proposed-renewal-of-the-registry-agreement-for-com-26-09-2024/submissions.

[225] *See* Internet Commerce Association Public Comment on Proposed Renewal of the Registry Agreement for .COM, at 2 (Nov. 5, 2024), https://www.icann.org/en/public-comment/proceeding/proposed-renewal-of-the-registry-agreement-for-com-26-09-2024/submissions/internet-commerce-association-05-11-2024.

their 9,000 predecessors: calls for competitive bidding, an independent economic study, and pricing reform. ICANN rejected these requests.

146. The 2024 renewal also deepened ICANN's financial entanglement with Verisign. For the first time, the renewed Registry Agreement gave ICANN the right to adjust its own registry-level fees in line with inflation.[226] In October 2024, while the public comment period on the proposed .com renewal was still open and before it was approved, ICANN sent a letter to registry operators announcing that it would raise the per-domain transaction fee effective January 1, 2025[227], citing "the proposed .COM RA" as part of the contractual basis for the adjustment in a separate white paper.[228] As noted above, ICANN has stated that it has "neither the remit nor expertise" to address Verisign's 7% annual wholesale price increases to registrants. But it negotiated, and immediately exercised, the right to raise its own fees from the same transactions.

---

[226] 2024 Registry Agreement, *supra* note 1, §7.2(d) ("(d) Adjustments to Fees. Notwithstanding any of the fee limitations on the amount of Registry-Level Fees to be paid by Registry Operator to ICANN under Section 7.2(a) or 7.2(b) of this Agreement, commencing upon December 1st of each year during the Term, the then-current fees set forth in Section 7.2(a) and Section 7.2(b) may be adjusted, at ICANN's discretion, by a percentage equal to the percentage change, if any, in (i) the Consumer Price Index for All Urban Consumers, U.S. City Average (1982-1984 = 100) published by the United States Department of Labor, Bureau of Labor Statistics, or any successor index (the "CPI") for the month which is one (1) month prior to the commencement of the applicable year, over (ii) the CPI published for the month which is one (1) month prior to the commencement of the immediately prior year. In the event of any such increase, ICANN shall provide notice to Registry Operator specifying the amount of such adjustment. Any fee adjustment under this Section 7.2(d) shall be effective as of the first day of the first calendar quarter following at least thirty (30) days after ICANN's delivery to Registry Operator of such fee adjustment notice.")

[227] Letter from Russ Weinstein, Vice President, GDD Accounts and Services, ICANN, to Registry Operators (Oct. 24, 2024), https://itp.cdn.icann.org/en/files/contracted-parties-communications/attn-planned-registry-level-fee-adjustment-24oct24-en.pdf.

[228] *ICANN Registry-Level and Registrar-Level Fees Adjustment*, at 3, 10 (Oct. 30, 2024) https://itp.cdn.icann.org/en/files/registry-operators/registry-registrar-level-fees-adjustment-30oct24-en.pdf.

147. Separately, ICANN and Verisign committed, in a December 1, 2024 "Second Amendment" to the parties' Letter of Intent (the mechanism whereby Verisign had previously provided $20 million to ICANN) that the parties would "negotiate in good faith to extend the Term of the LOI on substantially similar terms before" its December 31, 2025 expiration date.[229]

148. On November 29, 2024, two days after ICANN announced the renewal of the Registry Agreement and one day before the Cooperative Agreement was set to automatically renew on its existing terms, NTIA issued a public statement. NTIA acknowledged that Verisign's "role as the .com registry does offer it significant power over wholesale pricing" and stated that NTIA "believes a reduction in .com prices would be in the best interest of the public."[230] Yet NTIA conceded that it "does not have authority to set .com domain prices," that "both parties must agree to any changes in order for the Cooperative Agreement to be amended," and that "despite our best efforts, we have been unable to agree how wholesale .com pricing should change."[231] In the same statement, NTIA reaffirmed that "the Cooperative Agreement continues to provide that it 'is not intended to confer federal antitrust immunity on Verisign.'"[232] The government had thus concluded that .com prices should come down, that Verisign holds a veto over any reduction, and that it has preserved the antitrust laws as the available remedy.

149. On April 23, 2026, Verisign announced a fifth consecutive maximum price increase: from $10.26 to $10.97, effective November 1, 2026.[233] If Verisign

---

[229] *See* Second Amendment to the Letter of Intent between ICANN and Verisign (Dec. 1, 2024), https://itp.cdn.icann.org/en/files/registry-agreements/multiple/verisign-loi-amendment-2-01-12-2024-en.pdf.

[230] NTIA, *The .com Cooperative Agreement: Ensuring Internet Stability and Security*, *supra* note 47.

[231] *Id.*

[232] *Id.*

[233] *Verisign Reports First Quarter 2026 Results* (Apr. 23, 2026), https://investor.verisign.com/static-files/fe73cf1b-c2fb-496e-91a9-52582845cffd.

continues to exercise all permitted increases, as it has previously done without exception, wholesale prices will reach approximately $13.44 by 2030, a cumulative increase of approximately 71 percent over the $7.85 price that prevailed before the pricing restrictions were removed.

150. Because the Registry Agreement renews presumptively and indefinitely, this structure operates as a compounding ratchet in perpetuity: prices rise by up to 7% in four of every six years, with no competitive check, no requirement of cost justification, and no mechanism for reduction. The rate of increase substantially exceeds the inflation rate and, as explained below, bears no relationship to Verisign's actual costs, meaning that the gap between price and cost widens every cycle.[234]

151. Under the current structure, if each successive six-year renewal follows the same pattern, wholesale prices will reach approximately $17.62 by 2036 and exceed $23 by 2042, at which point the markup over Verisign's operating costs would likely exceed (conservatively) 450%.[235] If the domain base continues to grow at its

---

[234] Four 7% increases over a six-year cycle produce a cumulative increase of approximately 31% (1.07^4 = 1.3108), which is equivalent to an annual rate of approximately 4.6%. By comparison, the average annual increase in the CPI since the adoption of the 2006 .com Registry Agreement has been approximately 2.5%. *See* Consumer Price Index, 1913-, Federal Reserve Bank of Minneapolis, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913- (annual average CPI of 201.6 in 2006 and 321.9 in 2025) (last visited Sept. 1, 2026). This means that, over each six-year contract cycle, Verisign's price increases compound at roughly twice the historical rate of inflation.

[235] Over the most recent decade, Verisign's total operating expenses grew from $453.4 million in 2015 to $535.6 million in 2025, an annual growth rate of approximately 1.7%. *See* Verisign, Inc., Annual Report (Form 10-K), at 52 (Feb. 19, 2016), https://investor.verisign.com/sec-filings/sec-filing/10-k/0001014473-16-000086 ("2015 10-K"); 2025 10-K, supra note 2, at 38. Projecting this 1.7% annual growth rate forward seventeen years yields estimated total expenses of approximately $713 million in 2042. Dividing by the current .com and .net domain base of 173.5 million, and conservatively assuming no growth in that base, produces estimated per-domain costs of approximately $4.11. At a projected wholesale price of $23.09, the markup over operating costs would be approximately 450%.

recent historical rate of approximately 2% per year, the markup would exceed 680%.[236]

### E. The Government Has Expressly Preserved Defendants' Private Antitrust Liability

152. Across nearly three decades, every relevant actor—the United States government, ICANN, and Verisign itself—has agreed that Verisign's operation of the .com registry and ICANN's oversight of it are subject to the antitrust laws.

153. The Department of Commerce's 1998 White Paper calling for privatization of the DNS specifically considered and rejected the argument that the new corporation should receive antitrust immunity. Several commenters had urged that "the U.S. Government should provide full antitrust immunity or indemnification for the new corporation." The White Paper declined, stating: "applicable antitrust law will provide accountability to and protection for the international Internet community. Legal challenges and lawsuits can be expected within the normal course of business for any enterprise and the new corporation should anticipate this reality."[237] The DOC emphasized in another section of the same paper: "[t]he new corporation does not need any special grant of immunity from the antitrust laws so long as its policies and practices are reasonably based on, and no broader than necessary to promote the legitimate coordinating objectives of the new corporation."[238]

154. An express anti-immunity clause has been part of the Cooperative Agreement since it was first executed in 2001, when the Agreement in Principle between the Department of Commerce, ICANN, and Verisign required Verisign's own

---

[236] If the .com and .net domain base grows at approximately 2% per year, consistent with its growth over the most recent decade (139.8 million in 2015 to 173.5 million in 2025), the 2042 base would reach approximately 243 million registrations. At projected per-domain costs of approximately $2.93 ($713 million in estimated expenses / 243 million registrations) and a wholesale price of $23.09, the markup would exceed 680%.

[237] White Paper, *supra* note 16, at 31,747.

[238] *Id.* at 31,750.

"recognition … that any approval by the Department of Commerce of the new registry agreements is not intended to confer antitrust immunity on VeriSign with respect to the registry agreements."[239] That clause has been repeatedly reasserted in subsequent amendments to the Cooperative Agreement, including Amendment 24 (2001)[240], Amendment 32 (2012)[241], and Amendment 35 (2018)[242], the same amendment in which the Department functionally eliminated its oversight of Verisign's price.

155. Most recently, in November 2024, NTIA independently emphasized the point in a public statement accompanying the Cooperative Agreement's renewal, affirming that "the Cooperative Agreement continues to provide that it 'is not intended to confer federal antitrust immunity on Verisign.'"[243] This affirmation was made in the same statement in which NTIA stated it "believe[d] a reduction in .com prices would be in the best interest of the public" and conceded it "does not have authority to set

---

[239] Commerce, ICANN, and Verisign Agreement in Principle (May 18, 2001), https://www.ntia.gov/press-release/2001/department-commerce-icann-and-verisign-agreement-principle ("The Department of Commerce, ICANN, and VeriSign have agreed in principle on the following additional terms to be included in the ICANN and VeriSign Registry Agreements and related agreements, subject to final legal documentation. … Recognition by VeriSign that any approval by the Department of Commerce of the new registry agreements is not intended to confer antitrust immunity on VeriSign with respect to the registry agreements.").

[240] U.S. Department of Commerce, Amendment 24, at 7 (May 25, 2001), https://www.ntia.gov/files/ntia/publications/amend24.pdf ("The Department of Commerce hereby approves the .org Registry Agreement, the .net Registry Agreement, and the .com Registry Agreement, attached hereto as Exhibits 1, 2, and 3 respectively. This approval is not intended to confer federal antitrust immunity on VeriSign with respect to the Registry Agreements.")

[241] Amendment 32 to Cooperative Agreement, *supra* note 136, at 2 ("The Department's approval of the .com Registry Agreement is not intended to confer federal antitrust immunity on Verisign with respect to the .com Registry Agreement.").

[242] Amendment 35, *supra* note 152, at 5 ("Antitrust Immunity. The Department's approval of this Amendment 35 is not intended to confer federal antitrust immunity on Verisign with respect to the .com Registry Agreement.").

[243] NTIA, *The .com Cooperative Agreement: Ensuring Internet Stability and Security*, *supra* note 47.

.com domain prices," confirming that the government cannot fix the pricing problem through regulation and has preserved the antitrust laws as the available remedy.[244]

156. Members of Congress have reached the same conclusion. In their November 2024 letter, Senator Elizabeth Warren and Representative Jerrold Nadler quoted Amendment 35's anti-immunity clause and wrote that the "DOJ should investigate Verisign for violations of antitrust laws, and, if necessary, hold the Company accountable."[245]

157. ICANN's general counsel has publicly confirmed that ICANN "isn't and never has been exempted from antitrust laws," that "[n]o ruling in Icann's favor has ever cited an antitrust exemption as the rationale," that ICANN "has not been granted an antitrust exemption by any of its contracts with [NTIA]," and quoted the DOC's 1998 White Paper for the proposition that "'[a]pplicable antitrust law will provide accountability to and protection for the international internet community.'"[246] ICANN's founding board chair told Congress that "ICANN has no statutory or regulatory 'authority' of any kind."[247] Its CEO confirmed in written testimony submitted to Congress that ICANN is bound by federal laws "applicable to contracting, tortious and monopolistic behavior."[248]

---

[244] *Id.*

[245] Warren-Nadler Letter, *supra* note 46, at 4.

[246] Letter from John Jeffrey, General Counsel and Secretary, ICANN, *supra* note 142.

[247] Prepared Testimony of Esther Dyson, Interim Chairman of the Board of Directors Internet Corporation for Assigned Names and Numbers, Before the U.S. House of Representatives, Committee on Commerce, Subcommittee on Oversight and Investigations (July 22, 1999), https://www.icann.org/en/correspondence/documents/testimony-of-esther-dyson-before-the-us-house-of-representatives-committee-on-commerce-subcommittee-on-oversight-and-investigations-22-07-1999-en.

[248] Written Testimony of Dr. Paul Twomey, Chief Executive Officer of the Internet Corporation for Assigned Names and Numbers, Before the Subcommittee on Communications, Technology, and the Internet of the United States House of

158. Finally, Verisign itself has acknowledged this status. Its own 10-K states that amendments to the Cooperative Agreement are "not intended to confer federal antitrust immunity on the Company with respect to the .com Registry Agreement."[249] And in its 2004 lawsuit against ICANN, Verisign characterized ICANN's oversight as a "brazen attempt . . . to assume 'regulatory power'" that exceeded ICANN's "narrow purpose[]" to provide a "technical coordination function."[250] In the same complaint, Verisign alleged—in connection with its claim that ICANN had "unreasonably restrained and restricted competition" in violation of the Sherman Act—that ICANN's actions "ha[d] not been expressly or impliedly authorized or directed by DOC or any other agency of the United States Government, nor have these specific acts been the subject of active supervision by any agency of the United States Government."[251]

159. Plaintiff does not challenge any action taken by the United States government, nor does he challenge Verisign's petitioning of any government agency. What Plaintiff challenges is the .com Registry Agreement between Verisign and ICANN, a written contract between two private parties, and the conduct Verisign directed at and undertook in concert with ICANN to obtain, maintain, and enforce that agreement and its anticompetitive terms.

**F. Verisign's Prices are Supracompetitive.**

160. The wholesale price of .com registry services is supracompetitive by every available measure: Verisign's own costs, the fees charged by comparable registries worldwide, the prices that competitive bidding has produced for other TLDs, and the prices that Verisign itself has charged when subject to competition. Since the removal of the wholesale price cap in 2018, Verisign has raised prices to the

---

Representatives (June 4, 2009), https://www.icann.org/en/system/files/files/twomey-to-house-sub-comm-tech-04jun09-en.pdf ("Twomey Testimony").

[249] 2025 10-K, *supra* note 2, at 7.

[250] Verisign v. ICANN Complaint, *supra* note 83, ¶¶ 3-4, 19.

[251] *Id.* ¶¶ 86-87.

maximum permitted level in every year it has been allowed to do so, while the cost of providing registry services has been falling industry-wide.

161. The price increases since 2018 illustrate the pattern. Verisign has raised the wholesale price from $7.85 to $8.39 (September 2021) to $8.97 (September 2022) to $9.59 (September 2023) to $10.26 (September 2024), a cumulative increase of more than 30 percent. On April 23, 2026, Verisign announced the fifth consecutive maximum increase: from $10.26 to $10.97, effective November 1, 2026.[252] If Verisign exercises all permitted increases through the end of the current contract term, wholesale prices will reach approximately $13.44 by 2030. A firm subject to competitive discipline would not price this way.

**Verisign Wholesale Price (.com) and Registration Base**

| Date | Wholesale Price | .com Registrations[253] |
|---|---|---|
| Q2 2021 | $7.85 | 157M |
| September 1, 2021 | $8.39 | 158.6M |
| September 1, 2022 | $8.97 | 160.9M |
| September 1, 2023 | $9.59 | 160.8M |
| September 1, 2024 | $10.26 | 156.7M |
| Q2 2026 (current) | $10.26 | 166.6M |
| November 1, 2026 (announced) | $10.97 | — |
| *2030 (projected)*[254] | *$13.44* | — |

162. Nor do these prices bear any relationship to Verisign's actual costs. Verisign's own SEC filings and earnings disclosures indicate that the per-domain cost of providing .com registry services is approximately $3.09.[255] A competitive price

[252] *Verisign Reports First Quarter 2026 Results*, *supra* note 233.

[253] All .com registration numbers are from quarterly briefs published by DNIB that are available at *Quarterly Reports & Archives*, https://www.dnib.com/listing/report (last visited Sept. 1, 2026).

[254] The $13.44 figure assumes three additional maximum increases following the announced November 2026 increase ($\$10.97 \times 1.07^3 = \$13.44$).

[255] *See supra* note 6.

with a reasonable 10% margin would be approximately $3.40. The current wholesale price of $10.26 thus represents a markup of approximately 232% over cost. Viewed differently, that is a per-domain profit of $7.17 on a service that costs $3.09 to provide.

163. Even the $3.09 per-domain figure, derived from Verisign's total reported operating expenses, is likely conservative. It includes costs, such as $244 million in employee compensation and $69 million in stock-based compensation, that may substantially exceed the actual cost of providing registry services.[256] As far back as 2007, Karl Auerbach, a former member of the ICANN Board of Directors, publicly estimated that "the actual cost to VeriSign of providing the service of registering a domain name and publishing it via VeriSign's DNS servers is probably on the order of $0.03 per year per name, or less," writing that this amounted to "a built-in profit margin of about 21,400% of price over cost" and "cumulates over the 60,000,000 names (in .com) to a gift of about $383,400,000 per year granted by ICANN to Verisign."[257] The .com base has since grown to over 166 million registrations, and the wholesale price has risen from $6.42 to $10.26.

**1. Comparable registries charge less than Verisign.**

164. Wholesale registry fees, the per-domain annual price that registrars pay the registry operator, are published for a number of major country-code TLD registries worldwide. The list below includes eight of the ten largest country-code registries in the world (all but the state-controlled registries of China (.cn) and Russia (.ru)) together with Italy's .it.[258] These are not obscure comparators: three of them (.de, .uk,

---

[256] *See supra* note 6.

[257] Thomas Claburn, *VeriSign Domain Price Increase Criticized*, INFORMATION WEEK (Apr. 6, 2007), https://www.informationweek.com/it-leadership/verisign-domain-price-increase-criticized.

[258] DNIB Q2 2026, *supra* note 4 (listing ten largest country code TLDs, or "ccTLDs," as of June 30, 2026). All figures regarding the number of sites operating

and .nl) rank among the ten largest top-level domains of any kind in the world, alongside .com itself.[259] Each provides the same core technical service as .com (maintaining a domain database, operating DNS infrastructure, and processing registrations) under competitive or cost-based discipline. In every case, the price falls far below Verisign's $10.26:

- Germany's .de registry, operated by the non-profit cooperative DENIC (approximately 18 million domains), appears to charge an estimated wholesale fee of approximately €2.20 per domain per year[260] (approximately $2.54[261]).
- The United Kingdom's .uk registry, managed by the public benefit company Nominet with approximately 10.5 million domains, charges member registrars £3.90 per domain per year (approximately $5.25).[262]

---

under the domain names below are from this source except for Italy. *See supra* note 32.

[259] *Id.* (listing .de, .uk, and .nl as third, sixth, and tenth largest TLDs, respectively, by number of reported domain names).

[260] DENIC, a cooperative, does not appear to publish a single wholesale price list. The €2.20 figure has been reported by third-party sources analyzing DENIC's cost structure. *See The United Kingdom's Domain Dilemma: 36 Million Domains, Three Extensions, and a Split That Won't Heal*, (Mar. 23, 2026), https://domainsproject.org/blog/uk-domain-dilemma (reporting .de price of 2.2 Euros/year). DENIC's 2025 Activity Report is consistent with this estimate; it reports income from "member turnover" of €17,793,000 across 17,663,886 domains, or approximately € 1.01 per domain (€17,793,000/17,663,886 = €1.01). *See* DENIC, 2025 Activity Report, https://www.denic.de/en/2025-activity-report/ (last visited Sept. 1, 2026). Under either figure, the .de wholesale fee is a fraction of Verisign's, despite .de being the third-largest TLD in the world.

[261] All currency conversions are based on exchange rates as of August 4, 2026.

[262] *UK Pricing Schedule*, REGISTRAR RESOURCES (last updated Apr. 9, 2026), https://registrars.nominet.uk/uk-namespace/managing-account/payments/fee-schedule/.

- The Netherlands' .nl registry, operated by the nonprofit foundation SIDN (approximately 6.1 million domains), charges registrars €4.38 per domain per year (approximately $5.05).[263]
- Brazil's .br registry, Registro.br, a division of the nonprofit NIC.br (approximately 5.8 million domains) charges a uniform price of BRL 40 per year for a one-year registration (approximately $7.78), whether the domain is registered directly by the end user or through an intermediary (i.e., registrar). This price has remained unchanged since 2017.[264]
- France's .fr registry, managed by AFNIC, a French non-profit organization, charges registrars €5.07 per domain per year (approximately $5.85) and manages approximately 4.5 million domains.[265] AFNIC is designated by the French government through a public-tender process for renewable five-year terms.[266]
- Australia's .au registry, the Australian Domain Name Association ("auDA"), charges registrars AUD $8.64 per domain per year (approximately $6.09)

---

[263] *Our Prices*, https://www.sidn.nl/en/our-prices (last visited Sept. 1, 2026).

[264] *See Domain Payment*, https://registro.br/ajuda/pagamento-de-dominio/ (last visited Sept. 1, 2026). Notably, Registro.br does not operate through a wholesale/retail model. Instead, BRL 40 appears to be the uniform price charged to all registrants regardless of whether they register directly or through an intermediary. This makes the comparison conservative: the BRL 40 figure represents the total cost to the end user, while Verisign's $10.26 is only the wholesale component

[265] *The .fr TLD increases from €4.56 to €5.07 from 1 March 2024* (Jan. 15, 2024), https://www.afnic.fr/en/observatory-and-resources/news/the-fr-tld-increases-from-e4-56-to-e5-07-from-1-march-2024/. This March 2024 price increase appears to be AFNIC's most recent increase.

[266] *See* M.E. Haas, *Domains and Domain Names in France*, LEXOLOGY (May 8, 2019), https://www.lexology.com/library/detail.aspx?g=3e74c374-f0b7-4508-b877-6dd63f8ce082 ("The law provides that the French registry must be domiciled in the European Union and is appointed by the Ministry for Digital Economy pursuant to a public tender process, for a five-year period that can be renewed once.")

and manages approximately 4.4 million domains.[267] auDA selects its registry operator through periodic open competitive tender, most recently in 2023.[268]

- India's .in registry, operated by the National Internet Exchange of India (NIXI), charges registrars INR 500 per domain per year (approximately $5.26) and manages approximately 4.1 million domains.[269] As discussed below, NIXI selects its backend operator through competitive government tender, most recently in 2024 and previously in 2018, when the winning bid of $0.70 per domain undercut the incumbent's $1.10 bid.
- The European Union's .eu registry, managed by EURid under a contract with the European Commission, charges registrars €4.60 per domain per year for renewals (approximately $5.30) and manages approximately 3.7 million domains.[270] As a not-for-profit organization, EURid has stated that it "sets its fees in direct relation to costs incurred." The .eu renewal fee was held flat at €3.75 from the registry's launch in 2006 through the end of 2022; since then it has risen to €4.60, a total increase of approximately 23% over the registry's nearly two-decade history.[271] The European Commission selects the .eu operator through a competitive procedure based on criteria including

---

[267] *Statement on .au domain name licence wholesale price* (June 23, 2025), https://www.auda.org.au/news-insights/statements/statement-on-au-domain-name-licence-wholesale-price/.

[268] *auDA announces Identity Digital reappointed as .au registry operator* (Aug. 26, 2023), https://www.auda.org.au/news-insights/statements/auda-announces-identity-digital-reappointed-au-registry-operator/.

[269] *.IN Registry: Tariff*, https://www.registry.in/tariff (last visited Sept. 1, 2026).

[270] *See Become an accredited registrar*, https://eurid.eu/en/become-a-eu-registrar/ (last visited Sept. 1, 2026).

[271] *EURid to raise prices as of 1 January 2023* (Nov. 21, 2022), https://eurid.eu/lv/news/eurid-to-raise-prices-as-of-1-january-2023/ [https://web.archive.org/web/20260422061636/https://eurid.eu/lv/news/eurid-to-raise-prices-as-of-1-january-2023/].

"quality of service, human and technical capacity, and financial standing"; EURid was most recently designated for 2022-2027.[272]

- Italy's .it registry, managed by the Italian National Research Council, charges registrars €3.30 per domain per year for renewals (approximately $3.81) and manages approximately 3.5 million domains.[273]

165. These registries all operate at a fraction of .com's 166-million-domain scale and therefore bear higher per-domain fixed costs. Yet all charge well below Verisign's $10.26, with most clustering between $5 and $6. The underlying technical service is the same regardless of whether a registry operates a country-code or generic TLD. And the pattern is consistent: where a general-purpose registry is subject to competitive or cost-based discipline, it charges far less than $10.26.

**Wholesale Registry Fees for Comparable Domain Registries**

| Registry | Registrations | Wholesale Fee (approx.) |
|---|---|---|
| .de (Germany) | 18 million | ~$2.54 |
| .uk (United Kingdom) | 10.5 million | $5.25 |
| .nl (Netherlands) | 6.1 million | $5.05 |
| .br (Brazil) | 5.8 million | $7.78 |
| .fr (France) | 4.5 million | $5.85 |
| .au (Australia) | 4.4 million | $6.09 |
| .in (India) | 4.1 million | $5.26 |
| .eu (European Union) | 3.7 million | $5.30 |
| .it (Italy) | 3.5 million | $3.81 |
| **Comparators combined** | **60.6 million** | **~$5.21 (average)** |
| **.com (Verisign)** | **166.6 million** | **$10.26** |

[272] *The European Commission designates the Registry of the .eu Top Level Domain name for the next five years*, DIGIBYTE (Oct. 25, 2021), https://digital-strategy.ec.europa.eu/en/news/european-commission-designates-registry-eu-top-level-domain-name-next-five-years.

[273] *Becoming a Registrar*, REGISTROIT, https://www.nic.it/en/registrars/becoming-registrar (last visited Sept. 1, 2026) ("The cost of yearly renewal is 3.30 euros. The cost that is charged corresponds to the annual maintenance fee of the domain.").

166. The effect of competitive bidding on Verisign's own pricing has been demonstrated directly. In 2005, ICANN competitively bid the .net registry, another Verisign-operated TLD. Five organizations submitted proposals, including the operators of .org, .de, and .us.[274] An independent evaluation commissioned by ICANN found that all five bidders "ha[d] the capability to run the .NET registry," and that "the risk to the operation of .NET is minimal" if the contract were awarded to either of the top two bidders.[275] Verisign retained the contract, but only after cutting its wholesale price from the preexisting $6.00 cap to $4.25 cap (a maximum fee of $3.50 to Verisign plus an "ICANN fee" of $.75) and committing to operating specifications that the independent evaluator rated as exceeding requirements, despite not proposing the lowest price among the five bidders.[276] As the Chairman and CEO of Network Solutions testified before Congress: "That is what competition does. It gets you better security and lower prices at the same time."[277]

167. But .net, which is still managed by Verisign, was placed under the same structure challenged here: a presumptive-renewal agreement, never reopened to competition, with annual price increases of up to 10%, steeper even than .com's 7%. Predictably, .net's wholesale price has since climbed back toward .com's.[278] A single

---

[274] Telcordia, *ICANN .net RFP Evaluation Final Report*, at 20 (Mar. 28 2005), https://archive.icann.org/en/tlds/dotnet-reassignment/net-rfp-finalreport-28mar05.pdf.

[275] *Id.* at 6.

[276] *Id.* at 56 (listing Verisign as second of five on "pricing rank" and exceeding requirements on requirements related to technical competence); 2005 .net Registry Agreement § 7.3(a) (effective July 1, 2005), https://www.icann.org/en/registry-agreements/net/net-registry-agreement-01-07-2005-en (setting maximum Verisign fee at $3.50 plus an additional "ICANN fee" of $.75, or a maximum total fee of $4.25); *CFIT*, 611 F.3d at 500 (noting 2005 .net agreement lowered price from $6 to $4.25).

[277] *Contracting the Internet*, *supra* note 24.

[278] *See* .NET Registry Agreement (effective Jan. 1, 2023), https://itp.cdn.icann.org/en/files/registry-agreements/net/net-agreement-pdf-01-07-2023-en.pdf, § 4.2 ("This Agreement shall be renewed upon the expiration of the initial term... unless the following has occurred: (i)... an arbitrator or court has determined that Registry Operator has been in fundamental and material breach... and (ii)... Registry Operator

competitive bid lowered the price once; without the credible threat of future rebidding, it did not stay low.

168. Indeed, the Ninth Circuit has already credited allegations that competitive bidding would produce substantially lower prices for .com itself. As alleged in the CFIT complaint and recounted by the Ninth Circuit, if .com had been put out for competitive bid, "the costs of domain name registrations would have fallen to at least as low as $3.00 per domain name, with at least the same level and quality of services provided by VeriSign"; counsel for CFIT also represented that potential competitors "had stated publicly that, if awarded the .com contract, they could and would offer registry services at or below $3 per domain name."[279]

169. Verisign's own conduct validates these estimates. As noted above, when Verisign faced competitive bidding for the .net registry in 2005, it bid $3.50 per domain to win the contract. Adjusted for inflation, these figures—$3.00 and $3.50 in 2005—are approximately $5.12 and $5.97 in 2026 dollars, closely tracking the wholesale fees charged by the comparable registries above.[280]

170. Notably, NTIA, the same agency that holds the .com Cooperative Agreement with Verisign, issued an open competitive procurement for the .us registry

---

has failed to comply... with the decision of the arbitrator or court."); *id.* § 7.3(a) ("The Service Fee charged during a calendar year... shall not exceed the highest Service Fee charged during the preceding calendar year multiplied by 1.10."), Ex. A (listing fee of $9.92 plus $.75 "ICANN fee").

[279] CFIT Complaint, *supra* note 20, ¶ 191; *CFIT*, 611 F.3d at 503-04 (crediting allegations and noting "[c]ounsel for CFIT stated at oral argument before the district court that potential competitors of VeriSign had stated publicly that, if awarded the .com contract, they could and would offer registry services at or below $3 per domain name.").

[280] Calculated using the Bureau of Labor Statistics CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (January 2005 to January 2026) (last visited Sept. 1, 2026).

contract in December 2025.[281] The solicitation requires that all proposed fees be "in the public interest, reasonable, and market based," and that bidders provide "appropriate justifications addressing these principles."[282] No comparable requirement applies to .com.

171. The Department of Justice Antitrust Division independently reached the same conclusion about the value of competitive bidding, meanwhile rejecting the argument that such bidding would reduce an operators' incentive to invest in registry operations or that transferring registry operations from one company to another would present risks. As noted above, it wrote in a 2008 letter:

> Finally, **ICANN should require competitive bidding for renewals of a gTLD registry agreement, rather than granting the incumbent operator a perpetual right to renew without competition. Such a mechanism would both assist in disciplining the conduct of the incumbent during the initial term insofar as the incumbent would want to maximize the likelihood of renewal, and ensure the benefits of competition when potential operators bid for the right to operate the gTLD in the renewal term.** Instead, ICANN has conformed the proposed registry agreement to the existing gTLD agreements, effectively granting perpetual renewal rights to registry operators without the prospect of periodic rebidding, and without regard to potential adverse competitive effect. **Experience with the .net TLD and other gTLDs has shown that competitive bidding in the award of gTLD registry agreements, and periodic rebidding, has served as an effective tool for managing the interests of registrants in gTLDs. Indeed, competitive bidding has resulted in lower domain prices and higher operating specifications than what ICANN has achieved through non-competitive negotiations. In particular, competitive bidding prompts bidders to propose and accept registry improvements, higher operating standards, and lower registration fees to win the contract.**

[281] *See NTIA Issues Draft Request for Proposals for Administration of .us Top Level Domain* (Dec. 15, 2025), https://www.ntia.gov/press-release/2025/ntia-issues-draft-request-proposals-administration-us-top-level-domain.

[282] NTIA, Requirements Document: Administration of the United States Country Code Top Level Domain for the National Telecommunications and Information Administration, at 18, (updated Dec. 15, 2025) https://sam.gov/workspace/contract/opp/3e5638fb45df4c2e9c342eab64b36c03/view.

> Opponents of competitive bidding on renewals have contended that ICANN needs to grant perpetual registry contracts in order to motivate registry operators to invest in their registries. **However, incumbent registry operators have an incentive to make investments in order to maintain their competitive advantage in a rebid situation. Thus, the effect on innovation of potential termination of a registry agreement is at worst inconclusive. Further, experience demonstrates that any concern about the risk of transferring a new gTLD registry after a rebid is misplaced.** Management and operation of many gTLDs and ccTLDs have been successfully transferred without imposing undue burdens on DNS stability or security. For example, VeriSign successfully transferred the .org registry to the Public Interest Registry in January 2003.[283]

172. The letter added in a footnote: "We have identified no registry operator that reduced investment because of potential termination."[284]

### 2. Registry costs have fallen while Verisign's prices have risen.

173. The 2005 .net competitive bid likely overstates the competitive price that would prevail today, because the cost of providing registry services has fallen sharply since 2005. The clearest publicly available evidence comes from the Public Interest Registry ("PIR"), the nonprofit that operates .org.[285] In 2016, PIR put its backend

---

[283] Garza Letter, *supra* note 39, at 7-8.

[284] *Id.* at 8 n.11.

[285] PIR's current .org wholesale price is not used as a benchmark because, like .com and .net, .org is operated under a no-bid agreement. *See* .ORG Registry Agreement (effective June 30, 2019), https://itp.cdn.icann.org/en/files/registry-agreements/org/org-agmt-pdf-30jun19-en.pdf. Despite its name, PIR transfers its surplus revenue to its parent organization, the Internet Society, which uses the funds for its own programmatic purposes (a structure functionally equivalent to profit distribution). *See* IRS Form 990, Calendar Year 2024, Schedule I (Nov. 12 2025), https://pir.org/wp-content/uploads/2025/11/2024-Filed-Form-990-Public-Disclosure-Copy-PIR.pdf (reporting $29,000,000 in grants to Internet Society, $29,000,000 to Internet Society Foundation, and $3,000,000 to Connected Giving Foundation, or $61,000,000 in total grants to parent and affiliated organizations). ISOC's attempted sale of PIR to private equity firm Ethos Capital for more than $1 billion in 2019, blocked by ICANN in 2020 after widespread opposition, illustrated the extent of .org's

registry operations (the technical infrastructure for operating a top-level domain) out for competitive bid and received proposals from more than twenty service providers in fifteen countries.[286] The resulting competition cut PIR's backend costs by approximately half to "less than $2.00 per domain per year" in 2018, reducing total annual backend costs from $37.8 million to $18.1 million.[287] After a second request for proposals, costs fell further: by 2024, PIR was paying approximately $10.5 million, or about one dollar per domain per year, a drop of "nearly 75% since PIR put the contract out for a rebid in 2016."[288]

174. The same trajectory is visible in competitive bidding for India's .in "back-end" contract in response to a RFP put out by the National Internet Exchange of India (NIXI). In 2018, the winning bid of $0.70 per domain per year undercut the

---

value as a revenue-generating asset. *See* Timothy B. Lee, *ICANN blocks controversial sale of .org domain to a private equity firm*, ARS TECHNICA (Apr. 30, 2020), https://arstechnica.com/tech-policy/2020/05/icann-blocks-controversial-sale-of-org-domain-to-a-private-equity-firm/.

[286] *Public Interest Registry Selects Afilias for Back-End Registry Services*, PUBLIC INTEREST REGISTRY (Nov. 14, 2016), https://pir.org/news-insights/public-interest-registry-selects-afilias-for-back-end-registry-services/ (describing "a competitive procurement process through which Public Interest Registry evaluated more than 20 potential service providers representing 15 countries.").

[287] *See* Andrew Allemann, *PIR (.Org) slashes registry fee to Afilias in half to $18 million*, DOMAIN NAME WIRE (Oct. 28, 2019), https://domainnamewire.com/2019/10/28/pir-org-slashes-registry-fee-to-afilias-in-half-to-18-million/; Kieren McCarthy, *PIR Saves Millions in .org Rebid*, THE REGISTER (Nov. 4, 2016), https://www.theregister.com/on-prem/2016/11/14/pir-saves-millions-in-org-rebid/473391 ("Public Interest Registry (PIR) announced Monday that it had re-selected Afilias as its backend operator after a nine-month retendering process. Afilias does all the hard work of adding, removing and transferring .org domains and charges PIR just over $33m a year, or around $3 per domain, to do so. Both PIR and Afilias declined to provide details of the new contract, but industry insiders expect it to come out at approximately $2 per domain – a savings of around $10m for PIR.").

[288] *See* Andrew Allemann, *PIR (.org) tax return: new Identity Digital contract about $1 per domain*, DOMAIN NAME WIRE (Nov. 17, 2025), https://domainnamewire.com/2025/11/17/pir-org-tax-return-new-identity-digital-contract-about-1-per-domain/ (noting that "registry services expenses are down nearly 75% since PIR put the contract out for a rebid in 2016" and PIR's new backend contract "creates a benchmark for a high-volume registry at about $1 per name.").

incumbent's $1.10 bid by 36% in a contest between two "fierce" rivals.[289] At the time, .in had only approximately 2.2 million registrations, a small fraction of .com's 166 million, meaning that the economies of scale available to a registry serving .com's far larger base would drive per-domain costs substantially lower still. The scope of the Indian government's competitive procurement was also comprehensive: the winning bidder was required to operate the core registry services.[290]

175. In 2024, India's NIXI again opened a competitive government bidding process involving approximately 4.2 million domains; Tucows, a Canadian internet services company, was selected and replaced the prior incumbent.[291] Although the exact terms of the 2024 contract were not publicly disclosed, Tucows' CEO characterized the pricing as "typical of a large, high volume customer" and one industry publication estimated the winning bid at approximately $0.50 per domain per year.[292]

176. Verisign has never subjected any component of its .com registry operations to competitive procurement. Instead, over the same decade in which competitive bidding drove backend costs below one dollar per domain for both PIR and NIXI, Verisign raised .com wholesale prices by more than 30%.

177. Verisign's own financial disclosures show that this divergence is not cost driven: Verisign's per-domain operating costs declined from $3.24 in 2015 to $3.09 in

---

[289] Kevin Murphy, *Afilias sues India to block $12 million Neustar back-end deal*, DOMAIN INCITE (Aug. 27, 2018), https://domainincite.com/23364-afilias-sues-india-to-block-12-million-neustar-back-end-deal.

[290] *See* Request for Proposal Selection of Technical Service Provider ("TSP") for .IN domain Registry, National Internet Exchange of India (Jan 30, 2018), available at https://registry.in/system/files/NIXI_RFP_for_Selection_of_TSP_0.pdf.

[291] *See Case Study: Executing the Largest Domain Migration in History*, https://www.tucowsregistry.com/nixi-whitepaper (last visited Sept. 1, 2026).

[292] Kevin Murphy, *Largest back-end switch ever as GoDaddy loses deal*, DOMAIN INCITE (Feb. 18, 2025), https://domainincite.com/30758-largest-back-end-switch-ever-as-godaddy-loses-deal.

2025 (a figure that itself reflects the cost structure of a monopolist, including $69.7 million in stock-based compensation alone).[293]

**3. Verisign has overcharged consumers by billions of dollars and harmed competition.**

178. The scale of the resulting overcharge is enormous. Measured against Verisign's own costs, a competitive wholesale price with a reasonable 10% margin would be approximately $3.40 per domain[294], making the per-domain overcharge $6.86 and the annual overcharge approximately $1.14 billion across .com's approximately 166 million registrations. If the competitive wholesale price for .com registry services is $5 per domain, consistent with the fees charged by most of the comparable registries listed above, the yearly overcharge is approximately $5.26 per domain per year, or roughly $876 million annually. At $6 per domain, the overcharge is approximately $4.26 per domain, or roughly $710 million annually. Measured against the most forgiving benchmark, the pre-2018 wholesale price cap of $7.85 ( which was itself above competitive levels), the annual overcharge is still approximately $401 million annually.

179. Even the pre-2020 $7.85 price represented a markup of more than 150% over Verisign's estimated per-domain costs of approximately $3.09, an operating margin above 50% that no firm facing meaningful competitive pressure could sustain. By contrast, a competitive wholesale price of $5 per domain would still yield Verisign

[293] *See* 2025 10-K, *supra* note 2, at 50 (listing $69.7 million in stock-based compensation). Verisign's 2015 operating expenses were $453.4 million on a domain base of 139.8 million, or $3.24 per domain. 2015 10-K, *supra* note 235, at 29, 52. Its 2025 operating expenses were $535.6 million on a domain base of 173.5 million, or $3.09 per domain. *See supra* note 6.

[294] 3.09 x 1.10 = 3.39. As noted above, SEC filings indicate Verisign's approximate per-domain is $3.09. *Supra* note 6.

an operating margin of approximately 38% (nearly triple the S&P 500 average) while saving registrants over $875 million per year.[295]

180. These benchmarks are also conservative: the comparable registries from which they are drawn operate at a fraction of .com's scale. At 166 million registrations, .com enjoys far greater economies of scale than any comparator, and a competitively determined .com wholesale price would likely fall at or below the low end of the range, not above it.

181. Under any of these measures, the aggregate harm to .com registrants is measured in the billions of dollars. And the overcharge is growing. If Verisign exercises all permitted increases through 2030, as it has done without exception since 2021, wholesale prices will reach approximately $13.44, and the annual overcharge will exceed $1 billion under any reasonable benchmark.

182. Under the current perpetual renewal structure, this extraction will accelerate: as noted above, if Verisign continues exercising the maximum permitted 7% annual increases through each successive six-year renewal period, prices will exceed $23 per domain by 2042.[296] At an inflation-adjusted competitive benchmark of approximately $7.42 (i.e., $5 in 2042 dollars), the annual overcharge would be approximately $4 billion if .com registrations continue growing at their historical rate.[297]

---

[295] At a wholesale price of $5, Verisign's per-domain operating profit would be $1.91 ($5.00 – 3.09), yielding an operating margin of approximately 38% ($1.91/$5.00).

[296] *See supra* ¶¶ 150-52.

[297] A competitive benchmark of $5 per domain in 2026 dollars, adjusted to 2042 at the historical average CPI rate of 2.5%, is approximately $7.42. *See supra* note 234. If .com registrations grow at approximately 2.7% per year, consistent with .com's growth over the most recent decade (127.5 million in Q2 2016 to 166.6 million as of Q2 2026), the 2042 .com base will reach approximately 255 million registrations. *See* Verisign, Domain Name Industry Brief Q2 2016, https://www.dnib.com/listing/report (reporting 127.5 million .com registrations as of June 30, 2016); DNIB Q2 2026, *supra* note 4 (reporting 166.6 million .com registrations as of June 30, 2026). At a

183. Verisign's financial disclosures confirm the extraction. Its operating margins exceed 67%,[298] higher than Apple, Microsoft, Alphabet, and more than five times the S&P 500 index average.[299] Yet Verisign spends just 6 percent of revenue on research and development, or roughly one dollar in R&D for every ten dollars it returns to shareholders through stock buybacks and dividends.[300] Its CEO received $14 million in compensation in 2024[301] for overseeing a workforce of just approximately 930 employees.[302] In 2025, Verisign returned over $1 billion to shareholders through buybacks ($858.6 million) and dividends ($215.2 million), the first dividends in the company's history.[303] The extraction is also accelerating. In the first quarter of 2026 alone, Verisign returned approximately $288 million to shareholders ($214 million in share repurchases and $74 million in a newly initiated quarterly dividend) while maintaining an operating margin of 68.5%.[304]

184. Taken together, these benchmarks demonstrate the direct anticompetitive effects of the .com Registry Agreement and Defendants' acquisition and maintenance of Verisign's monopoly over .com registry services. The agreement has produced

---

price of $23.09 and an inflation-adjusted competitive benchmark of approximately $7.42, the annual overcharge would be ($23.09 - $7.42) x 255 million = approximately $4.0 billion.

[298] 2025 10-K, *supra* note 2, at 26, 38. In 2025, Verisign's revenues were $1.656 billion and its operating income was $1.121 billion.

[299] *See supra* notes 7 and 8.

[300] 2025 10-K, *supra* note 2, at 26, 28 (R&D spending of $103.6 million, or 6.3% of revenues), 25 ($858.6 million in repurchase of common stock and $215 million in dividends).

[301] Verisign, Inc., 2025 Proxy Statement at 35 (Apr. 11, 2025), https://investor.verisign.com/static-files/45f924ed-a195-4cf0-9006-955d3a09c81f (reporting total compensation for D. James Bidzos of $14,055,378 for fiscal year 2024).

[302] 2025 10-K, *supra* note 2, at 7.

[303] *Id.* at 25, 30.

[304] *Verisign Reports First Quarter 2026 Results*, *supra* note 233 (noting that Verisign earned $293.6 million in operating income and $428.9 million in revenue, or an operating margin of approximately 68.5%, in Q1 2026).

wholesale prices far above the levels that competition or meaningful oversight would otherwise produce, has foreclosed entry by firms that would likely provide TLD registry services at a fraction of Verisign's price, and has eliminated the constraints (competitive bidding, wholesale price caps, independent oversight) that were designed to prevent exactly this outcome.

185. Finally, Verisign has publicly claimed that .com's wholesale price is "lower than 87 percent of the 448 gTLDs" for which pricing data is available, and has pointed to legacy TLDs such as .org ($9.93), .biz ($15.00), and .info ($17.50) as comparators.[305] But this comparison underscores rather than refutes the overcharge. At 166 million registrations, .com's domain base dwarfs every TLD Verisign cites; it is more than 31 times larger than .info and orders of magnitude larger than a typical new gTLD.[306] That .com's wholesale price is comparable to TLDs operating at a tiny fraction of its scale, rather than dramatically below them, is itself evidence that .com's pricing reflects monopoly power rather than market conditions. The relevant question is not whether .com costs less than .info, but whether .com's price reflects competitive conditions when measured against its estimated per-domain costs of approximately $3.09, or against the fees charged by comparable registries operating under competitive or cost-based discipline, as detailed above. By either measure, it does not.

186. There is no legitimate procompetitive justification for the Registry Agreement. The presumptive renewal provision cannot be justified on the ground that it provides stability; competitive bidding for comparable TLD registries has

[305] Pat Kane, *Setting the Record Straight – Myths vs. Facts about .com*, VERISIGN (Aug. 13, 2024), https://blog.verisign.com/domain-names/myths-vs-facts-about-dot-com/ ("While other generic TLDs (gTLDs) do not share .com's pricing transparency, the annual wholesale renewal price of a .com domain name is lower than 87 percent of the 448 gTLDs for which such data is available from registrars. Based on that data, some of the largest original gTLDs, which have been in the market for over 20 years, have renewal pricing of $9.93 (.org), $15.00 (.biz), and $17.50 (.info).")

[306] *See* DNIB Q2 2026, *supra* note 4 (listing ten largest generic TLDs and noting that "the top 10 gTLDs compris[e] 88.1% of all gTLD domain name registrations[.]").

consistently produced both lower prices and reliable, uninterrupted service, and the DOJ itself has rejected this argument. Nor can Verisign's supracompetitive pricing be justified as funding infrastructure investment: Verisign devotes a small fraction of .com revenue to infrastructure while spending billions on stock buybacks. Any procompetitive benefits could be achieved through substantially less restrictive alternatives, including periodic competitive bidding with appropriate continuity safeguards or cost-based constraints on pricing similar to those in the 2001 Registry Agreement.

## V. RELEVANT MARKET

187. At all relevant times, Verisign possessed monopoly power in the market for .com domain name registry services. The .com TLD is the most valuable and widely used top-level domain in the world. As of Q2 2026, there were approximately 166 million .com registrations, representing over 41% of all domain registrations worldwide.[307] Verisign is the sole operator of the .com registry. No other entity can provide .com registry services, and no registrar or registrant can obtain .com domains from any source other than Verisign. Verisign's market share within the .com registry services market is 100%.

### A. Registrants Are Locked in to .Com

188. Businesses and individuals that have built their online identities around .com domains face prohibitive switching costs. Abandoning a .com domain means losing accumulated search engine optimization, inbound links, customer goodwill, and email continuity (and risking that a competitor will acquire the abandoned domain). For many .com registrants, their domain name has become their trademark or trade name, such as "Google.com." These registrants do not regard domain names in other TLDs as reasonable substitutes.

[307] DNIB Q2 2026, *supra* note 4.

189. For all practical purposes, registrants of .com domain names are locked in to perpetual renewal regardless of price increases. The cost of switching domains—things like rebranding, rebuilding search engine rankings, notifying customers, migrating email systems, and risking loss of the abandoned domain to a competitor or bad actor—dwarfs the annual registration fee itself. A .com registrant paying $10.26 per year in wholesale fees may face switching costs orders of magnitude larger, which is why even substantial overcharges do not trigger meaningful defection.

190. The lock-in is reflected in Verisign's own transaction data. In 2025, approximately 73% of all .com and .net registration transactions were renewals of existing domains, not new registrations. Verisign processed 41.7 million new registrations that year, yet the combined domain base grew by only 4.5 million (from 169.0 million to 173.5 million), meaning approximately 37.2 million domains expired during the year. At Verisign's most recently reported renewal rate of 75.4%, these non-renewals imply roughly 114 million renewal transactions alongside the 41.7 million new registrations.[308] Verisign's revenue is thus overwhelmingly derived from a captive, locked-in base of existing registrants for whom the switching costs described above are not theoretical.

191. Industry participants have confirmed this dynamic firsthand. In a November 2024 public comment opposing the price increases in the proposed .com renewal, the CEO of Tucows Domains, one of the largest registrars, stated that "because of the sunk cost that prohibits domain-switching, registrants will be forced to

[308] 2025 10-K, *supra* note 2, at 25, 27 (reporting 41.7 million new .com and .net domain name registrations in 2025; domain name base of 173.5 million as of December 31, 2025, up from 169.0 million as of December 31, 2024; and a final .com and .net renewal rate of 75.4% for Q3 2025). Verisign reports .com and .net data on a combined basis; .com constitutes approximately 93% of the combined domain name base. Domain Name Industry Brief: Quarterly Report Q1 2026, https://www.dnib.com/articles/the-domain-name-industry-brief-q1-2026 (reporting 163.6 million .com and 12.4 million .net domain name registrations as of March 31, 2026).

continue to pay these increases," concluding: "as consumers are locked in, there either needs to be competition at the registry level or some form of price constraint."[309]

192. The economic literature on switching costs in the domain name system confirms this lock-in. An independent expert economic analysis commissioned in connection with arbitration proceedings against ICANN found that "[s]witching costs may create an incentive for the registry to act opportunistically by raising wholesale registration fees above levels that would prevail in the absence of switching costs."[310] ICANN's own general counsel acknowledged as early as 2001 that "TLD registry operators will inevitably acquire some attributes of monopoly power" due to "the technical impracticality of having more than one operator of the core registry function for a given TLD" and "the economic 'lock-in' that consumers undergo when they establish web sites and other services at a registered domain name within the TLD," warning that "[w]ithout protective provisions about how they operate, TLD operators will have incentives to use this sole-source position in abusive ways."[311]

193. The Department of Justice independently confirmed these conclusions. In a December 2008 letter to NTIA, the Antitrust Division found that "VeriSign possesses significant market power as the operator of the .com registry because many registrants do not perceive .com and other gTLDs (such as .biz and .info) and country code TLDs ('ccTLDs,' such as .uk and .de) to be substitutes."[312] The Division

---

[309] Public Comment of Tucows Domains dated Nov. 5, 2024, https://www.icann.org/en/public-comment/proceeding/proposed-renewal-of-the-registry-agreement-for-com-26-09-2024/submissions/tucows-domains-05-11-2024.

[310] Expert report of Professor Dr. Frank Verboven and Dr. Gregor Langus, ¶ 127 (Nov. 30, 2021), ICDR Case No. 01-20-0000-6787, *Namecheap Inc. v. ICANN*, https://www.icann.org/en/system/files/files/irp-namecheap-claimants-pre-hearing-expert-report-professor-verboven-langus-redacted-30nov21-en.pdf ("2021 Verboven and Langus Report") (citing Massimo Motta (2009). Competition policy: theory and practice. Cambridge: Cambridge University Press, pp. 443 – 444)).

[311] General Counsel's Analysis of .name SLD E-mail Forwarding Service, *supra* note 206.

[312] Garza Letter, *supra* note 39, at 2 (emphasis in original).

explained that registrants "frequently purchase domains in TLDs other than .com as *complements* to .com domains, not as substitutes for them;" for example, a registrant of a particular .com domain "will frequently also perceive a need to register the same domain in all or most available TLDs (e.g., google.info and google.biz) because of a desire to expand their presence on the Internet and to protect their brands from being exploited by others."[313]

194. The Division further concluded that "existing gTLDs likely would not become a competitive threat to .com registrations because the network effects that make .com registrations so valuable to consumers will be difficult for other TLDs to overcome."[314] Finally, the Division warned that "introducing new gTLDs likely would enable the exercise of market power by gTLD operators and likely would not constrain the exercise of market power by .com" and that "there will continue to be a need for Section 7.3 [the Registry Agreement's pricing provision] of the .com registry agreement to replace the discipline that market competition does not provide[.]"[315]

## B. New gTLDs Have Not Created Competition

195. The DOJ's predictions proved correct. Despite the introduction of over 1,200 new gTLDs since 2012, .com's dominance has only strengthened.[316] As of Q1 2026, the .com renewal rate is 74.9%, compared to an average of 31.0% across "new generic" TLDs (or "ngTLDs"), i.e., the new top-level domains (e.g., .art, .photography) that ICANN introduced beginning in 2012.[317] As shown in the chart below, even the six largest ngTLDs by number of registrations have renewal rates

[313] *Id.* at 2.

[314] *Id.*

[315] *Id.* at 2-3.

[316] *ICANN Opens Application Window for New Generic Top-Level Domains* (Apr. 30, 2026), https://www.icann.org/en/announcements/details/icann-opens-application-window-for-new-generic-top-level-domains-30-04-2026-en (noting "introduction of more than 1,200 new gTLDs" since 2012).

[317] DNIB Q2 2026, *supra* note 4. DNIB regularly prepares averages of the renewal rates across domains and domain types.

between 14% and 30%, indicating that registrants treat them as disposable in a way they do not treat.com. Verisign has raised wholesale prices by more than 30% from 2021 to 2024 with no meaningful decline in the domain base, demonstrating that registrants perceive no viable substitute.




196. The stability of .com's market share is also telling. Despite raising wholesale prices by more than 30% during a period in which over 1,200 alternative TLDs were available, .com's share of all domain name registrations worldwide has remained essentially unchanged. In Q1 2021, the quarter before the first of the above price increases took effect, .com accounted for approximately 42.5% of all domain registrations worldwide (154.6 million out of 363.5 million).[318] Five years and four successive 7% price increases later, .com's share stands at approximately 41.5% (166.6 million out of 401.6 million).[319] This is the hallmark of monopoly power: the ability to raise prices substantially without losing market share to competitors. A firm

[318] Domain Name Industry Brief: Quarterly Report Q1 2021, https://www.dnib.com/media/downloads/reports/pdfs/2021/domain-name-report-Q12021.pdf.

[319] DNIB Q2 2026, *supra* note 4.

in a competitive market that imposed a 30% price increase while 1,200 rivals entered the market would lose share; .com did not.

197. These conclusions were independently confirmed by an economist whom ICANN itself has previously retained to study this exact question. Dr. Greg Rafert, an industrial organization economist specializing in competition and antitrust analysis, was engaged by ICANN on multiple occasions, including to conduct a 2015-16 assessment of the competitive effects of the new gTLD program that "examined changes in market prices, share, and power for domain registries and registrars as a result of the program."[320] Having completed that ICANN-commissioned work several years prior, Dr. Rafert independently submitted a 23-page economic analysis during the 2020 public comment proceedings opposing Verisign's proposed price increase.

198. Dr. Rafert observed that Verisign's stated rationale for the price increase, that it faced a more "dynamic" and competitive marketplace, was the opposite of what economic theory predicted.[321] "If it is true," he wrote, "that .COM is facing increased competition, then a large body of economic research suggests that instead of requesting a price increase for .COM, Verisign should be lowering .COM prices to allow it to compete against new gTLDs and ccTLDs."[322] That Verisign instead sought to raise prices was "consistent with a marketplace in which Verisign has market power (allowing it to extract rents, i.e. fees, from consumers) and where demand is inelastic," a conclusion "supported by the observation that when .COM prices have increased in the past, .COM registrations and renewals have apparently been unaffected."[323]

199. Dr. Rafert also identified three natural experiments in which price shocks that would have triggered substitution in a competitive market produced no measurable response: when Verisign raised the .com wholesale price from $6.42 to

---

[320] *See* Rafert Response, *supra* note 40, at 3.
[321] *Id.* at 5.
[322] *Id.* at 8.
[323] *Id.* at 8-9.

$7.85, registrations and renewals were unaffected; when the .info registry waived its fees entirely, .com registrations "were once again not apparently affected"; and when .net registration prices were reduced to less than 75% of the .com price, "there was no apparent impact on .COM registrations or renewals."[324]

200. More broadly, Dr. Rafert also documented that .com's registration base had continued to grow at approximately the same rate after new gTLDs began launching, with renewal rates remaining stable (and even rising) throughout a period in which available TLDs expanded to over 1,500[325]:

**Figure 2: Registration Volumes in .COM, Other Legacy TLDs, and Top gTLDs (2001 – 2019)[23]**




[324] *Id.* at 20-21.

[325] *Id.* at 17-20 & Figs. 2-4. As noted above, Verisign's .com renewal rate has continued to remain consistent in the six years since.







201. Dr. Rafert ultimately concluded:

> Taken together, there is little evidence of movement away from .COM by consumers towards other TLDs in the marketplace, which indicates that .COM does not face meaningful competition from other TLDs. Given the lack of meaningful competition, Verisign's

> interest in increasing prices for .COM is consistent with a firm holding market power …. To summarize, in the face of increased competition that .COM is allegedly facing, a firm would typically lower prices. Yet, Verisign is asking to increase its prices for .COM. This is occurring while Verisign earns high gross profit and operating margins, that have grown over time, and that suggest that Verisign should decrease the prices of .COM. Finally, these increased prices for .COM will harm consumers, since there is little evidence that .COM is facing meaningful competition from new gTLDs and ccTLDs.[326]

202. Dr. Rafert's analysis was submitted in 2020. The increases that followed confirmed his predictions: Verisign raised prices by more than 30%, and .com's registration base and renewal rates were unaffected.

203. New gTLDs' failure to draw registrants away from .com is corroborated by independent academic research. A 2015 study by computer scientists at the University of California, San Diego, analyzed registrant behavior across hundreds of new TLDs introduced during the first eighteen months of ICANN's expansion program. The study found that "the introduction of the new TLDs had only minimal impact in the rate of registration of the old TLDs" and that "the new TLDs generally increase the total number of registrations rather than shift focus from old to new TLDs."[327] The study's overall conclusion was that "new gTLDs, while accruing significant revenue for registrars, have yet to provide value to the Internet community in the same way as legacy TLDs."[328]

204. .Com's dominance is self-reinforcing. Because .com is the established default, registrants choose it. Because registrants choose it, users expect it. Because

---

[326] *Id.* at 22-23.

[327] Tristan Halvorson et al., *From .academy to .zone: An Analysis of the New TLD Land Rush*, Proceedings of the 2015 Internet Measurement Conference 381, 385 (Oct. 2015), https://dl.acm.org/doi/10.1145/2815675.2815696.

[328] *Id.* at 393.

users expect it, new registrants have no practical alternative. No new entrant can replicate a network effect built over three decades and 166 million registrations.

205. The data reflect a structural reality: most people who buy a new gTLD domain are buying it in addition to their .com, not instead of it. Consistent with this, Halvorson et al. found that registrants treated new TLDs not as substitutes for .com but as supplementary: only 15% of new TLD registrations were for primary use (i.e., purchased for the purpose of establishing a web presence), while the majority were "speculative" (45.6%) or "defensive" (39.7%) in nature (for example, trademark holders purchasing names in new TLDs to protect brands they had already established in .com).[329] Of the defensive registrations that redirected to other domains, over 94% redirected to legacy TLDs, with more than half redirecting to .com.[330] A business that registers "mybrand.shop" to protect its trademark is not switching away from "mybrand.com." It is paying more money to protect the .com domain it already has.

206. Further, many TLDs carry specific associations (.pizza, .ai, .shop, etc.) and therefore are not generally perceived by registrants as close substitutes: a consumer looking for a bakery's website would not assume it was registered under .soccer, and a bakery would not register there. A 2016 survey of over 5,000 internet users commissioned by ICANN found that approximately 80% expected either "a very clear" (55%) or "some" (25%) relationship between a website's content and the TLD under which it is registered.[331] Many legacy gTLDs were also designed to cover

---

[329] Halvorson et al., *supra* note 327, at 381, 382, 390. "Primary" domains are those "purchased by a registrant with the intent to use that specific domain." "Defensive" domains are those purchased to "defend an existing web presence," for example by redirecting a user to a different domain name, often for trademark-protection purposes (e.g., the page "business.photography" redirecting to "business.com") Speculative domains are those purchased "to speculate on the domain itself with no intent to develop content." *Id.* at 389-90 & n.4.

[330] *Id.* at 389.

[331] 2021 Verboven and Langus Report, *supra* note 310, ¶ 112 n.96 (citing and discussing study).

thematic fields (for example, .com for commercial organizations, .org for nonprofits, .net for internet service providers) and continue to carry those associations in internet users' minds. A registry that sells .plumbing domains competes for a narrow slice of registrants interested in that keyword; it does not constrain Verisign's ability to set the wholesale price for .com.

**C. The Market Treats .Com as Irreplaceable**

207. The prices that consumers are willing to pay for .com domain names in secondary-market auctions dramatically exceed the prices they pay for domain names in other TLDs. According to the registrar GoDaddy, the most expensive publicly reported domain name sales in history are .com domains, among them ai.com ($70 million), carinsurance.com (49.7 million), voice.com ($30 million), and internet.com ($18 million), with .com addresses comprising all of the 25 most expensive domain name sales publicly reported.[332] The company Ring spent approximately $1 million to acquire ring.com, a purchase its CEO has credited with contributing $30 to $50 million to the company's brand equity (Ring was eventually acquired by Amazon for $1 billion).[333] Consumers commonly assume URLs end in .com, and many smartphone keyboards place a default ".com" button on the keyboard. Approximately 99 percent of Fortune 500 companies use .com domains.[334]

208. The existence of this secondary market is evidence that other TLDs are not substitutes. If a business could achieve comparable results with a .xyz, .io, or .ai

---

[332] Joe Styler, *The top 25 most expensive domain names*, GODADDY (Mar. 11, 2026), https://www.godaddy.com/resources/skills/the-top-20-most-expensive-domain-names.

[333] Ron Jackson, *After Selling Ring to Amazon for Over $1 Billion CEO Confirms He Paid $1 Million for Ring.com Domain*, DOMAIN NAME JOURNAL (Mar. 7, 2018), https://www.dnjournal.com/archive/lowdown/2018/dailyposts/20180307.htm.

[334] Monica Stankova, *Fortune 500 List of Companies 2025 and Their Domain Name Choices*, SMART BRANDING, https://smartbranding.com/fortune-500-list-of-companies-2025-and-their-domain-name-choices/ (last visited Sept. 1, 2026) (noting "[m]ore than 99% of Fortune 500 companies of 2025 use a .com domain name. Only three companies operate on a different domain extension.").

domain, there would be no reason to pay millions for a .com. That even the buyer of a domain about artificial intelligence paid $70 million for ai.com rather than using .ai is evidence that the market does not treat other TLDs as interchangeable with .com.

209. The investment community also treats Verisign as a monopoly. Wall Street analysts have described the company as an "internet toll-road"[335] and "a contractual monopoly" with a "golden goose in their registry business" that "has virtually no competition" and whose "financial statements … would look dramatically different with sustained competition."[336] Warren Buffett's Berkshire Hathaway was until recently the largest shareholder, at approximately 14 percent of outstanding shares[337], consistent with Buffett's well-known investment preference for wide-moat monopoly businesses.

**D. Verisign's Pricing Confirms Its Monopoly Power**

210. Verisign's pricing history independently confirms its monopoly power. Between 2022 and 2024, the period in which Verisign imposed the bulk of its more than 30% price increase, .com domain registrations declined from 160.5 million (Q4 2022) to 156.3 million (Q4 2024).[338] Yet despite the loss of over four million registrations, Verisign's total revenue grew from $1.42 billion to $1.56 billion.[339] A

---

[335] *See* Sandpiper Investment Research, *Verisign: A Durable Internet Toll-Road at 52-week Lows*, SEEKING ALPHA (Feb. 25, 2026), https://seekingalpha.com/article/4874283-verisign-a-durable-internet-toll-road-at-52-week-lows.

[336] Brice, *supra* note 9.

[337] *Buffett's Berkshire sells one-third of Verisign stake for $1.23 billion*, REUTERS (July 29, 2025), https://www.reuters.com/legal/government/buffetts-berkshire-sells-one-third-verisign-stake-123-billion-2025-07-28/ (noting Berkshire's sale of $1.23 of Verisign stock in 2025 reduced its ownership stake from 14.2% to 9.6%).

[338] *See* Domain Name Industry Brief: Quarterly Report Q4 2022, https://www.dnib.com/articles/the-domain-name-industry-brief-q4-2022 (reporting 160.5 million .com domain names in Q4 2022); Domain Name Industry Brief: Quarterly Report Q4 2024, https://www.dnib.com/articles/the-domain-name-industry-brief-q4-2024 (reporting 156.3 million in Q4 2024).

[339] *Compare* Verisign, 2022 Annual Report (Form 10-K), at 22 (Feb. 17, 2023), https://investor.verisign.com/static-files/a5a81633-9666-4181-8e8d-257197780a74

firm operating in a competitive market that lost over four million registrations in two years could not simultaneously increase its revenue by approximately $140 million. The divergence between declining volume and rising revenue is possible only because Verisign faces no competitive constraint on its pricing.

211. The pattern has not only continued but accelerated: by the end of 2025, Verisign's annual revenue had grown to $1.656 billion[340], and by Q2 2026, the .com domain base (166.6 million) had reached an all-time high. And the extraction is accelerating: Verisign's full-year 2026 revenue guidance of $1.745 to $1.755 billion[341] represents a 23% increase over FY 2022 revenue.[342] In the first half of 2026, Verisign's operating margins have risen to above 68%, it has returned approximately $574 million to shareholders through buybacks and dividends, and it continues to devote approximately six cents of every revenue dollar to research and development.[343]

212. A small but significant and non-transitory increase in the price of .com registry services would not cause any significant number of registrants to switch to other TLDs so as to make such a price increase unprofitable. Verisign has imposed

---

(reporting revenues of $1.43 billion for FY 2022) *with* Verisign, 2024 Annual Report (Form 10-K), at 24 (Feb. 13, 2025), https://investor.verisign.com/static-files/07036447-5ae1-4509-9882-6892e0e73743 (reporting revenues of 1.56 billion for FY 2024)

[340] 2025 10-K, *supra* note 2, at 25.

[341] Verisign, Inc., Q2 2026 Earnings Call Transcript (July 23, 2026), https://www.investing.com/news/transcripts/earnings-call-transcript-verisign-posts-mixed-q2-2026-results-as-growth-stays-firm-93CH-4810136 (noting Verisign raised 2026 revenue guidance to $1.745 billion to $1.755 billion).

[342] *See* Verisign Inc., 2022 Annual Report (Form 10-K), at 22 (Feb. 17, 2023), https://investor.verisign.com/static-files/a5a81633-9666-4181-8e8d-257197780a74 (reporting revenues of $1,424.9 million for fiscal year 2022). The midpoint of $1.75 billion represents a 23% increase over FY 2022 revenue of $1.425 billion.

[343] *See* Verisign, Inc., Quarterly Report (Form 10-Q), at 5, 14 (July 23, 2026), https://investor.verisign.com/static-files/dff2914d-38bf-4da9-8f46-f456d0d0d23f. (reporting margin of 68.3%, R&D spending of 6.4% of revenues, $426.8 million in share repurchases, and $147.8 million in dividends for H1 2026).

exactly these increases and the .com domain base has since grown to an all time high of 166.6 million.

212. The relevant geographic market is worldwide. The .com registry is a single, global infrastructure operated solely by Verisign. Verisign charges the same wholesale fee to every registrar regardless of geography, and consumers worldwide access .com domains through the same registry infrastructure.

213. There are insurmountable barriers to entry. Only one entity can operate the .com registry at any given time; the right to do so is conferred solely through the Registry Agreement with ICANN. The presumptive right of renewal contained in that agreement ensures that Verisign's monopoly is self-perpetuating. No potential competitor can enter this market without displacing Verisign through a competitive bidding process that, as a practical matter, will never occur under the current agreement.

## VI. ANTITRUST INJURY

214. Defendants' anticompetitive conduct resulted in antitrust injury to Plaintiff and other members of the proposed Class because it caused them to pay higher prices for .com domain name renewals than they otherwise would have paid but for Defendants' conduct.

215. Plaintiff and members of the proposed classes renewed .com domain names through ICANN-accredited registrars. Plaintiff paid for the cost of .com domain renewals either directly through their registrars or through bundled service plans. In every case, the wholesale registry fee charged by Verisign to the registrar constituted a material cost component of the retail price paid by Plaintiff and members of the proposed classes for their .com domain renewals.

### A. Inflated wholesale prices are passed on to consumer purchasers of .com domain names

216. The .com Registry Agreement contractually requires Verisign to charge the same base price to all registrars.[344] Every registrar therefore faces the same wholesale cost increase when Verisign raises prices: no registrar can avoid the increase, and there is no alternative supplier.

217. The economics of passthrough in this market are straightforward. When a monopolist raises the price of a uniform input that every downstream reseller must purchase, and those resellers compete intensely with one another to sell an undifferentiated product, economic theory predicts that cost increases will be passed through to end consumers at rates approaching or even exceeding 100%. The intuition is simple: in a competitive resale market, no firm earns margins large enough to absorb a cost increase that every competitor also faces. Each firm must raise its price or lose money on every sale. As Kellie Peterson, the Head of Domains for Automattic, the parent company of WordPress and an ICANN-accredited registrar, wrote during the 2020 public comment proceedings on Amendment 3: "There is no competition for this specific wholesale product as there might be with a physical good. Verisign has to compete with no one, however, Registrars must compete on the razor's edge of what Registrants are willing to pay."[345]

218. Three structural features of the .com registrar market make it a textbook case for near-complete passthrough. First, the wholesale price is uniform: every registrar pays Verisign the same base wholesale fee for every .com transaction, with any volume discounts or marketing incentive programs available to all registrars on

---

[344] 2024 Registry Agreement, *supra* note 1, § 7.3(e) (requiring Verisign to "charge the same price for Registry Services . . . to all ICANN-accredited registrars," while providing that "volume discounts and marketing support and incentive programs may be made if the same opportunities to qualify for those discounts and . . . programs is available to all ICANN-accredited registrars").

[345] Comment of Kellie Peterson, *supra* note 179.

the same qualifying terms, and no alternative supplier. Second, the product is undifferentiated: a .com domain registration at retail is functionally identical to the wholesale registry transaction, with no physical transformation or manufacturing by the registrar. Third, the downstream market is intensely competitive: over 2,400 active ICANN-accredited registrars compete for customers.[346]

**1. ICANN's own experts have confirmed near-complete passthrough in the domain name industry**

219. These are not theoretical predictions. They have been empirically tested and confirmed in the domain name industry by ICANN's own retained experts. In the Namecheap Independent Review Process, Namecheap, a major domain registrar, challenged ICANN's removal of wholesale price caps from the .org, .info, and .biz registry agreements. During those proceedings, ICANN retained Professor Dennis W. Carlton of the University of Chicago Booth School of Business to rebut Namecheap's claim that it would be harmed by the removal of the caps. Professor Carlton's answer was that Namecheap would not be harmed precisely because it would pass the wholesale increases on: registrars operate in a competitive market, lack the supracompetitive margins from which to absorb higher input costs, and therefore must pass those costs to their customers. As he put it, the impact of registry price increases "will be borne primarily by registrants," i.e., the individual purchasers of domain names.[347]

220. Professor Carlton explained why passthrough in this industry is essentially inevitable. Every registrar pays the same wholesale price to the registry; when the registry raises its wholesale price, every registrar's costs go up by the same amount at the same time. No registrar can undercut its competitors by absorbing the

[346] *See* FAQ for Registrants: About ICANN (Feb. 25, 219), https://www.icann.org/resources/pages/about-icann-faqs-2019-02-25-en (noting "[t]here are over 2,400 ICANN-accredited registrars throughout the world").

[347] *See* 2022 Carlton Report, *supra* note 53, ¶ 12 & §II.A.

increase, because every competitor faces the identical cost pressure.[348] In a competitive downstream market, like the intensely competitive registrar market, firms operating on thin margins have no choice but to pass cost increases on to their customers.[349]

221. As Professor Carlton put it: "in the absence of market power, firms do not earn supra-competitive margins from which to absorb higher input costs and thus must pass on input cost increases to customers," adding that "[t]he same conclusion applies in the case of cost decreases: Namecheap would pass cost decreases through to its customers."[350] He concluded that the "observed market conditions facing domain name registrars leads one to expect that changes in registry prices will be fully passed through over a reasonable time period, and therefore the data should indicate a passthrough rate of approximately one"—that is, approximately 100 percent.[351] He also recognized that, even if "the pass-through of cost increases may not be instantaneous," it would nonetheless be complete (i.e., 100%) "over a reasonable time period."[352]

222. Professor Carlton documented that registrars' own conduct confirms this. When ICANN first proposed removing the .org, .info, and .biz price caps in 2019,

---

[348] *Id.* ¶ 34 ("Since registries cannot discriminate when setting prices charged to registrars, any wholesale price increase faced by Namecheap also would be faced by other registrars. Namely, other registrars would not be competitively advantaged vis-à-vis Namecheap from the increased registry pricing and would face the same profit incentives as Namecheap to pass through higher registry prices to registrants.").

[349] *Id.* ¶ 17 ("Economic theory predicts that firms in competitive markets, when faced with common increases in input costs—such as those that Namecheap and other registrants would face from increased registry prices—will pass though the input cost increases to consumers."); *id.* ¶ 18 (opining that "the competitiveness of the domain registration industry is not up for debate" and noting that, according to Namecheap's own experts, "'registrars were fiercely competing on price'" and there is "intense competition among registrars").

[350] *Id.* ¶ 17 & n.17.

[351] *Id.* ¶ 17 n.18.

[352] *Id.*

Namecheap warned its customers that the change "could significantly increase the wholesale price that Namecheap pays for domains, and would force us to pass along those increases to you."[353] This is the predictable result of the industry's structure: because all registrars face the same wholesale price increase, a registrant cannot escape the higher cost by switching to a different registrar. Every registrar will pass through the same increase. The only way to avoid the overcharge would be to abandon the TLD altogether. As the evidence set forth above demonstrates, .com registrants do not do that.

223. Professor Carlton also tested his prediction against Namecheap's actual transaction-level data, tracking how Namecheap's retail prices responded to wholesale cost changes across multiple TLDs (including both new registrations and renewals) over the period from April 2018 to October 2021.[354] Although the specific passthrough rates he computed are redacted in the publicly available version of his report, his unredacted conclusions leave no ambiguity: the evidence "indicate[d] that Namecheap (and other competing registrars) would pass on any future registry price increases by raising prices to registrants" (i.e., end users) and the "passthrough analysis reported in the text is robust to various methodological choices."[355]

224. In other words, Professor Carlton demonstrated empirically what both economic theory predicts and the documentary evidence indicates: registrars pass through increased wholesale cost changes. His bottom line was clear: "the impact of registry price increases . . . will be borne primarily by registrants."[356] And this conclusion, he stated, "holds whether or not" the upstream registry has "sufficient market power to allow [it] to raise prices above the levels allowed under the prior

---

[353] *Id.* ¶ 21.
[354] *Id.* ¶¶ 22-27.
[355] *Id.* ¶¶ 12, 26 n.30.
[356] *Id.* ¶ 12.

price controls."[357] In other words, ICANN's own expert confirmed that wholesale overcharges are borne by end users.

225. Further, Professor Carlton's analysis involved .org, .info, and .biz, TLDs with far smaller registration bases than .com.[358] The downstream registrar market through which .com domains are sold is at least as competitive as the "fiercely" competitive market Carlton analyzed.[359]

226. A second economist retained by ICANN reached the same conclusion. In a February 2024 report, economist Gregory Leonard confirmed the economic logic underlying Professor Carlton's findings:

> a registrar has the incentive to pass on the wholesale price increase by increasing the retail price that it charges registrants for that TLD. By doing so, the registrar will maintain the spread that it earns over the wholesale price for each registration. Given that the registrar industry has numerous participants, is highly competitive, faces no significant impediments to changing retail prices, and all registrars would be subject to the same wholesale price increase, an economist would expect a wholesale price increase to be passed on to the retail price at a rate near 100%. Moreover, the registrar is unlikely to lose many registrants as a result of passing on a wholesale price increase for a given TLD. Given that all registrars (that partner with the registry operator of the TLD) face the same wholesale price increase for that TLD and have a similar incentive to pass it on, registrants would not be able to avoid a retail price increase by switching registrars.[360]

227. In a footnote to his analysis, Leonard noted that his conclusion was "[c]onsistent with" Dr. Carlton's empirical results, noting that, "in the arbitration

---

[357] *Id.*

[358] *Id.* ¶ 5 (describing assignment).

[359] *Id.* ¶ 18.

[360] Gregory K. Leonard, *Economic Analysis of Whether .info and .org Possess Market Power*, prepared for ICANN, at 20 (Feb. 14, 2024), https://www.icann.org/en/system/files/files/economic-analysis-info-org-14feb24-en.pdf.

between Namecheap and ICANN, ICANN's expert economist, Dr. Dennis Carlton, found pass on rates of near 100%."[361]

228. In sum, two separate economists retained by ICANN have independently confirmed the same conclusion: wholesale registry price increases are passed through to registrants at rates approaching 100%.

**2. Publicly available evidence shows passthrough across registrars.**

229. Publicly-available evidence confirms what economic theory predicts and ICANN's experts have established. Many .com registrars, including many of the largest, publicly attribute their .com price increases to Verisign's wholesale hikes (often by name) and/or raise prices in near-lockstep with each wholesale step.

230. **Namecheap**. Namecheap is the second-largest .com registrar with over 11 million .com domains under management.[362] When ICANN first proposed removing wholesale price caps in 2019, Namecheap warned customers: "This change could significantly increase the wholesale price that Namecheap pays for domains, and would force us to pass along those increases to you," a statement Professor Carlton cited as evidence that Namecheap "will behave like a firm in a competitive industry and pass through any input cost increases."[363] As noted above, Professor Carlton tested the prediction against Namecheap's own transaction-level data, tracking how Namecheap's retail prices responded to wholesale cost changes across multiple TLDs over the period from April 2018 to October 2021, and appears to have confirmed the prediction: according to Dr. Leonard, he found Namecheap passes through wholesale cost changes to its customers at rates "near 100%."

---

[361] *Id.* at 20 n.30.

[362] *See* Andrew Allemann, *Ranking domain registrars based on the latest .com data: GoDaddy, Namecheap and more*, DOMAIN NAME WIRE (Aug. 12, 2025), https://domainnamewire.com/2025/08/12/ranking-domain-registrars-based-on-the-latest-com-data-godaddy-namecheap-and-more/ (ranking top 10 registrars by total .com registrations under management as of the end of April 2025).

[363] 2022 Carlton Report, *supra* note 53, at ¶ 21.

231. **Tucows**. Tucows is a publicly traded company and the fourth-largest .com registrar family with over 10 million .com domains under management.[364] As far back as 2005, Tucows wrote in its 10-K that Verisign "currently charges registrars who use its shared registration system $6 for each registration, which most registrars, including our company, pass on to their customers."[365] Tucows has continued to attribute cost increases to Verisign by name: its 2024 10-K states that "Verisign, for instance, charges $10.26 per .com registration, with ICANN imposing an additional $0.18 fee. . . . In 2024, Verisign exercised this right, raising .com registration costs by 7%, impacting our cost of revenues."[366] Tucows' consumer registrar brand, Hover, communicates the same message directly to customers, writing in 2024: "Verisign, the registry for .COM is increasing the price for .COM domains for the third year in a row. The September 1, 2024, price increase applies to new domain registrations, renewals, and transfers for all registrars, Hover included."[367] In connection with the same post, Hover noted it was raising its price from $17.99/year to $18.99/year on September 1, 2024.[368] Hover published a near-identical post in 2022 as well.[369]

232. Tucows' own financial data illustrates the competitive dynamics that make passthrough inevitable. Its then-CEO explained to investors in 2018:

---

[364] Allemann, *supra* note 362.

[365] *See* Tucows Inc., Annual Report (Form 10-K) at 19 (Mar. 16, 2006), https://www.sec.gov/Archives/edgar/data/909494/000110465906017734/a06-2985_210k.htm.

[366] Tucows Inc., Annual Report (Form 10-K) at 12 (filed Mar. 13, 2025), https://ir.tucows.com/wp-content/uploads/2024-Q4-TCX-10K.pdf.

[367] Haley Midgette, *.COM Price Increase Takes Effect September 1, 2024*, HOVER (July 29, 2024), https://hover.blog/com-price-increase-takes-effect-september-1-2024/.

[368] *Id.*

[369] *.COM Price Increase 2022*, HOVER (Aug. 3, 2022), https://hover.blog/com-price-increase-2022/ (noting "Verisign, the registry for .COM domains will be increasing prices for the domain this September for the second year in a row" and explaining that prices would increase from $15.99/year to $16.99/year on September 1, 2022).

> The unit volume of .com sold goes up every year. The amount of money we pay to Verisign goes up commensurately. And the amount of money that the competitive registrar market allows us to generate stays flat. Like the prairies. Amazingly flat over now 18 years. And on a % basis it has gone from us making 40% of the .com revenue generated in 2000, all the way down to 12% in 2018. We make a little under $8 million per year on .com. That was true in both 2000 and 2018. They made roughly $19 million from our .com sales in 2000. In 2017 that number was nearly $67 million. This price increase only exacerbates that trend. And of course we believe that registrars do, by far, the lion's share of the work to generate that revenue.[370]

233. As the chart below from a Tucows' investor Q&A[371] illustrates, competition among registrars compressed Tucows' share of the .com revenue it generated from 40 percent to just 12 percent while Verisign's revenue tripled. At margins that thin, a registrar has no cushion with which to absorb a wholesale price increase.




---

[370] Andrew Allemann, *How the competitive domain registrar market keeps prices down*, DOMAIN NAME WIRE (Jan. 16, 2019), https://domainnamewire.com/2019/01/16/domain-registrar-competition/ (quoting Tucows CEO Elliot Noss).

[371] *See id.*

234. The CEO of Tucows' domains business confirmed as much several years later in the company's November 2024 public comment opposing the proposed .com renewal, writing: "The significant margin that Verisign already has in .com will only grow as prices are raised. TLD margins are already extremely thin for registrars. Most registrars, in fact, do not make money on domain sales but rather on hosting and other website-related services. Increased costs will absolutely be passed on to registrants."[372]

235. **GoDaddy**. GoDaddy is the largest .com registrar, with over 53 million .com domains under management (or slightly less than one-third of all .com registrations).[373] In its SEC filings, GoDaddy acknowledges that it has "no control over" Verisign, and states that if Verisign's fees increase, "it would have a significant impact upon [GoDaddy's] operating results" and "costs to [its] customers could become higher."[374] GoDaddy's Domain Discount Club, a membership tier serving high-volume customers, tracks wholesale increases, with .com prices moving in near-lockstep with each Verisign increase.[375] In its 2020 public comment opposing Amendment 3, GoDaddy stated that "the burden for an increase on .COM ultimately falls on the registrant" and that ICANN should ensure "any decisions made are based on relevant data and that any price increases have been duly considered with the entire community's best interests in mind."[376]

---

[372] Public Comment of Tucows Domains, *supra* note 309.

[373] Allemann, *supra* note 362.

[374] GoDaddy Inc., Quarterly Report (Form 10-Q) at 55 (May 1, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001609711/4aed9c26-5726-4d36-8043-bd4ee3c60873.pdf.

[375] Andrew Allemann, *How Domain Registrars Have Increased .com Prices*, DOMAIN NAME WIRE (Aug. 20, 2024), https://domainnamewire.com/2024/08/20/how-domain-registrars-have-increased-com-prices/ (tracking Domain Discount Club prices increases)

[376] Comment of Ashley Heineman, *supra* note 177.

236. **Porkbun and Cloudflare**. Porkbun and Cloudflare provide particularly transparent evidence of the passthrough dynamic because both operate at or near wholesale cost as a matter of corporate policy. Porkbun publishes blog posts in connection with Verisign price increases, identifying Verisign by name as the cause and explaining: "Registries such as Verisign set the wholesale price for domains they operate. When you register a new domain, Porkbun (as your registrar) pays the wholesale price for the registration. We then pass that cost on to you, including the ICANN fee and a credit card processing fee … At Porkbun, we usually sell all of our domains close to the wholesale cost, and we do everything in our power to give you the best price possible."[377] Porkbun has elsewhere explained that its pricing tends to mechanically track with Verisign's price increases, writing that it "currently, and historically, ha[s] sold .com, .net, .org domains at cost. That means at the cost we pay the registry + fees we need to cover, such as regulatory taxes and card processing fees, without any profit for ourselves. … When we mark up other, standard domains, typically the most we do so is $1 + those fees. We often do less than $1."[378]

237. Similarly, Cloudflare operates its registrar at wholesale cost with zero markup as a matter of corporate policy, making its pricing a transparent window into the wholesale cost structure. Its website explains: "Cloudflare offers domain names with no markups, passing on the same prices charged by domain name registries."[379] This constitutes 100% passthrough.

238. The same pattern extends across other registrars. In advance of each wholesale increase, many registrars across the market appear to send customer emails

---

[377] *Why Did .com Prices Go Up and How High Will They Go?* (last updated May 27, 2026), https://kb.porkbun.com/article/201-why-did-com-prices-go-up-and-how-high-will-they-go.

[378] *How Much Does a Domain Name Really Cost?* (June 23, 2021), https://porkbun.com/blog/how-much-does-a-domain-name-really-cost/.

[379] *Low-cost Domain Names*, https://www.cloudflare.com/application-services/solutions/low-cost-domain-names/ (last visited Sept. 1, 2026).

announcing corresponding retail price increases; these name Verisign as the cause, quote the new wholesale price, and urge customers to renew at current rates before the increase takes effect. These emails have been independently reproduced by recipients on domain industry forums: Dynadot, for example, emailed customers that "[t]he central registry will be increasing their prices for .COM domains," explaining that "[b]ecause of this, our prices will be updated as well" and that its bulk-tier pricing would increase by $0.67 (matching the Verisign wholesale increase to the penny).[380]

239. In sum, the pattern is consistent: registrars raise prices by at least the wholesale increase, and frequently attribute them to Verisign by name. The wholesale overcharge is not a cost that registrars can sustainably absorb, negotiate away, or offset through operational efficiency. Instead, it is a fixed, non-negotiable input cost that flows directly to the consumer.

240. The passthrough dynamic is also particularly clear in the renewal context. First-year registration pricing is sometimes discounted as a promotional tool to attract new customers, creating a temporary gap between retail price and wholesale cost that does not persist beyond the initial term. Renewal pricing, by contrast, more directly reflects the underlying wholesale cost. As Porkbun has explained to its customers: "The difference between the registry's wholesale price and the registrar's retail price is the retail markup aka registrar profit (for .com, ours is often $0)," and the "renewal price"—not the first-year price—"is the actual cost of the domain you'll be paying every year."[381] For .com, the .com Registry Agreement requires Verisign to charge the same base wholesale price to all registrars, with any volume discounts or marketing

---

[380] *See .COM Wholesale Prices Will Rise Again on September 1, 2024*, NAMEPROS (July 31, 2024), https://www.namepros.com/threads/com-wholesale-prices-will-rise-again-on-september-1-2024.1331539/ (collecting customer emails from registrars announcing .com price increases in response to Verisign's September 2024 wholesale increase).

[381] *How Much Does a Domain Name Really Cost?*, *supra* note 378.

incentive programs available to all registrars on the same qualifying terms.[382] Variation in retail renewal pricing thus reflects differences in registrar margins, not in the wholesale cost itself.

241. Based on Verisign's reported numbers, at least 70 percent of all .com registrations appear to be renewals, and it is in these recurring transactions (representing the vast majority of .com revenue) that the wholesale overcharge flows most directly and predictably to class members.[383]

242. Thus, Plaintiff and other members of the proposed Class who paid for .com domain renewals have suffered antitrust injury because they have been forced to pay supra-competitive prices for their .com domain names. These inflated wholesale prices have been passed on to them by registrars.

## VII. CONTINUOUS ACCRUAL

243. The .com Registry Agreement that Plaintiff challenges was most recently renewed in November 2024 and is effective through 2030.

244. During the four years preceding the filing of this Complaint, Defendants have maintained, implemented, and enforced the .com Registry Agreement, including

---

[382] 2024 Registry Agreement, *supra* note 1, § 7.3(e) (requiring Verisign to "charge the same price for Registry Services . . . to all ICANN-accredited registrars," while providing that "volume discounts and marketing support and incentive programs may be made if the same opportunities to qualify for those discounts and . . . programs is available to all ICANN-accredited registrars").

[383] According to its 2025 10-K, during 2025, Verisign processed 41.7 million new .com and .net domain name registrations while the combined domain name base grew from 169.0 million to 173.5 million, a net increase of 4.5 million. 2025 10-K, *supra* note 2, at 25, 27. The difference (approximately 37.2 million) represents domains that expired and were not renewed. Verisign's reported renewal rate of 75.4% for .com and .net combined (*see id.*) implies that these 37.2 million non-renewals represent approximately 24.6% of all domains that came up for expiration, yielding approximately 114 million renewals and a renewal share of approximately 73% of all .com and .net registration transactions. *Id.* Verisign reports .com and .net data on a combined basis; .com constitutes approximately 93% of the combined domain name base. DNIB Q2 2026, *supra* note 4 (reporting 166.6 million .com and 12.5 million .net domain name registrations as of June 30, 2026).

its pricing provisions and presumptive renewal provision. Throughout this period, Verisign has repeatedly charged, and Plaintiff and the other class members have repeatedly paid, wholesale .com registry fees that were inflated as a result of the anticompetitive restraints, unlawful monopolization, and conspiracy to monopolize alleged herein. These inflated fees were paid by Plaintiff and the other class members in connection with .com domain name renewals processed through the .com registry operated exclusively by Verisign. Each payment of these inflated fees by Plaintiff and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

245. During the last four years, Verisign has maintained and further entrenched its monopoly over the .com registry services market by enforcing the presumptive renewal provision that forecloses competitive bidding, by raising wholesale prices to the contractual maximum in every permitted year, and by continuing to benefit from the exclusionary conduct alleged herein. ICANN has maintained and enforced the .com Registry Agreement on terms that unreasonably restrain trade in the .com registry services market. Throughout this period, Defendants have jointly maintained and furthered their conspiracy to monopolize the .com registry services market.

## VIII. CLASS ACTION ALLEGATIONS

246. Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) on their own behalf and on behalf of the following class (the "Nationwide Injunctive Relief Class") for claims arising under Federal law:

> All persons or entities in the United States that paid for the renewal of one or more .com internet domain name registrations during the period beginning September 4, 2022 until the present (the "Class Period"). This class excludes the Defendants; the officers, directors, or employees of any Defendant; any subsidiary, affiliate, or other entity in which any Defendant has a controlling interest; and all ICANN-accredited domain name registrars. The Class also excludes all federal, state, or local governmental

entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

247. Plaintiff also seeks certification under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) of the following subclass for claims arising under various California antitrust, unfair competition, unjust enrichment, and consumer protection laws:

> **California Class**: All persons or entities that paid for the renewal of one or more .com internet domain name registrations, while residing in California, during the Class Period. This class excludes the Defendants; the officers, directors, or employees of any Defendant; any subsidiary, affiliate, or other entity in which any Defendant has a controlling interest; and all ICANN-accredited domain name registrars. The Class also excludes all federal, state, or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

248. The members of the Classes are so numerous that joinder is impracticable. On information and belief, millions of individuals, businesses, and other entities paid for .com domain name renewals during the Class Period. The precise number and identities of Class members are ascertainable and can be determined through appropriate discovery.

249. Common questions of law and fact exist as to all members of the Classes. Such questions of law and fact common to the Classes include, but are not limited to, the following:

a. Whether the .com Registry Agreement between Verisign and ICANN unreasonably restrains trade in the market for .com registry services;
b. Whether the elimination of competitive bidding for the .com registry contract is anticompetitive;
c. Whether the pricing provisions of the .com Registry Agreement, which authorize Verisign to raise wholesale prices without cost justification, are anticompetitive;

d. The proper definition of the relevant product and geographic markets;

e. Whether Defendants have substantial market power in the relevant market;

f. Whether Defendants have substantially foreclosed competition in the relevant market;

g. Whether Defendants' conduct has artificially raised the prices of .com domain name renewals;

h. Whether Defendants' conduct has a legitimate procompetitive justification;

i. Whether wholesale .com registry fee increases are passed through to end-user registrants;

j. The operative time period and extent of Defendants' antitrust violations;

k. Whether the conduct alleged herein caused damages to members of the Classes in the form of overcharges paid for .com domain name renewals, and the proper measure of such overcharge damages; and

l. The appropriate injunctive and equitable relief for the Classes.

250. Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members. By advancing their claims, Plaintiff will also advance the claims of all Class members, because Defendants participated in activity that caused all Class members to suffer similar injuries. Fed. R. Civ. P. 23(a)(3).

251. Plaintiff will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiff's claims and those of absent Class or Subclass members that would make class certification inappropriate. Counsel for Plaintiff are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiff's claims and those of absent Class members. Fed. R. Civ. P. 23(a)(4).

252. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and

comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3). The damages suffered by each Plaintiff and Class member is relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiff and Class members to redress the wrongs done to them. Even if Plaintiff and Class members could afford individual litigation, which is not the case, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

253. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole. Fed. R. Civ. P. 23(b)(2).

## IX. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 Unreasonable Restraint of Trade (On Behalf of the Nationwide Injunctive Relief Class) (against Verisign and ICANN)**

254. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255. Defendants have entered into a contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

256. The contract, combination, or conspiracy alleged herein consists of the .com Registry Agreement between Verisign and ICANN, most recently renewed in November 2024, a written contract between two private parties whose terms foreclose competitive bidding for the .com registry, grant Verisign a presumptive right of perpetual renewal, prohibit ICANN's governance processes from prescribing or

limiting the price of registry services, and authorize Verisign to raise wholesale prices by up to 7% annually in four of every six years without cost justification.

257. Defendants possess market power in the relevant antitrust market. Verisign is the sole operator of the .com registry, possessing a 100% share of the market for .com registry services. ICANN is a counterparty to the Agreement and derives substantial revenue from it, including per-transaction fees on every .com registration and renewal and additional payments from Verisign totaling $20 million.

258. The relevant product market is the market for .com domain name registry services and the relevant geographic market is worldwide.

259. The .com Registry Agreement has led to anticompetitive effects in the form of supracompetitive wholesale prices for .com registry services, the elimination of competitive bidding that would otherwise constrain those prices, and the foreclosure of potential competitors from the .com registry services market.

260. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for .com domain name renewals than they would have paid and will pay in the absence of the restraint.

261. There are no procompetitive justifications for the challenged provisions of the .com Registry Agreement, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means, including periodic competitive bidding with appropriate continuity safeguards.

262. Defendants' combination violates Section 1 of the Sherman Act under a full Rule of Reason analysis. These violations are continuing and will continue unless enjoined by this Court.

263. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Monopolization of the .Com Registry Services Market (On Behalf of the Nationwide Injunctive Relief Class) (Against Verisign)**

264. Plaintiff repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

265. The relevant product market is the market for .com domain name registry services. The relevant geographic market is worldwide.

266. At all relevant times, Verisign has possessed monopoly power in the market for .com registry services, with a market share of 100 percent. No other entity can provide .com registry services, and no registrar or registrant can obtain .com domains from any source other than Verisign.

267. As more fully alleged above, Verisign has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Verisign to unlawfully acquire, maintain, and enhance its monopoly in the .com registry services market and preventing rivals from competing for .com registry operations. In particular, Verisign engaged in a coercive campaign against ICANN to eliminate competitive bidding, secure a presumptive right of perpetual renewal, and replace cost-based pricing with open-ended authority to raise wholesale prices, and has maintained and entrenched its monopoly through the successive renewal and amendment of the .com Registry Agreement on anticompetitive terms, most recently through the November 2024 renewal that extended the agreement through 2030 without competitive bidding.

268. Verisign's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the .com registry services market through

anticompetitive conduct and not through a superior product, business acumen, or historic accident.

269. The direct, foreseeable, and proximate result of Verisign's anticompetitive conduct was to increase wholesale .com registry prices to supracompetitive levels, foreclose competition for the .com registry contract, and harm competition in the .com registry services market.

270. There is no legitimate procompetitive justification for Verisign's conduct, and even if there were, there would be less restrictive alternatives to achieve any such justification.

271. As a direct, material, and proximate result of Verisign's violation of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period because they have paid more for .com domain name renewals than they otherwise would have paid in the absence of Verisign's unlawful conduct.

272. These violations are continuing and will continue unless enjoined by this Court.

273. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Nationwide Class seek the issuance of an injunction against Verisign, preventing and restraining the violations alleged herein.

## THIRD CLAIM FOR RELIEF

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Conspiracy to Monopolize of the .Com Registry Services Market (On Behalf of the Nationwide Injunctive Relief Class) (Against Verisign and ICANN)**

274. Plaintiff repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

275. The relevant product market is the market for .com domain name registry services. The relevant geographic market is worldwide.

276. Verisign and ICANN are separate and independent entities with distinct and independent economic interests. Each is capable of conspiring with the other within the meaning of Section 2 of the Sherman Act.

277. Beginning no later than 2006 and continuing through the present, Verisign and ICANN entered into and engaged in a combination and conspiracy to monopolize the .com registry services market, with the purpose and effect of maintaining and entrenching Verisign's monopoly over .com registry services and foreclosing all actual and potential competition for operation of the .com registry.

278. The conspiracy is embodied in, and evidenced by, express written agreements between Verisign and ICANN, including the .com Registry Agreement and its successive renewals and amendments, most recently the November 2024 renewal extending Verisign's exclusive operation of the .com registry through November 30, 2030. Through these agreements, Verisign and ICANN agreed to: (a) award and repeatedly renew the .com registry contract to Verisign without competitive bidding; (b) grant Verisign a presumptive right of perpetual renewal that forecloses rival registry operators from ever competing for the contract; and (c) eliminate cost-based pricing constraints and authorize Verisign to charge supracompetitive wholesale prices for .com registrations.

279. Verisign entered into the conspiracy with the specific intent to maintain monopoly power in the .com registry services market through anticompetitive means and not through a superior product, business acumen, or historic accident.

280. ICANN knowingly joined the conspiracy and shared the specific intent to maintain Verisign's monopoly power in the .com registry services market. ICANN did not merely acquiesce in Verisign's conduct; it affirmatively agreed to the anticompetitive terms of the .com Registry Agreement and its renewals, and it had a direct financial motive to do so. ICANN receives fees for every .com domain name registered and renewed under the agreement, as well as additional payments from

Verisign as alleged above, such that ICANN shares directly in the monopoly profits generated by supracompetitive .com pricing. ICANN's revenues rise with the very registration fees the conspiracy inflates.

281. ICANN's participation in the conspiracy constitutes commercial activity, not regulatory or governmental action. ICANN is a private, non-governmental entity; no federal statute confers antitrust immunity on the .com Registry Agreement, and the agreements themselves disclaim any intent to confer such immunity. No governmental body clearly articulated a policy to displace competition for .com registry services or actively supervises the pricing and renewal terms that Verisign and ICANN agreed upon.

282. The direct, foreseeable, and proximate result of the conspiracy was to foreclose all competition for operation of the .com registry, eliminate competitive bidding that would have driven wholesale .com prices toward competitive levels, and raise the prices paid by Plaintiff and the Class to supracompetitive levels.

283. There is no legitimate procompetitive justification for the conspiracy, and even if there were, there would be less restrictive alternatives to achieve any such justification.

284. As a direct, material, and proximate result of Defendants' violation of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period because they have paid more for .com domain name renewals than they otherwise would have paid in the absence of Defendants' unlawful conspiracy.

285. These violations are continuing and will continue unless enjoined by this Court.

286. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Nationwide Class seek the issuance of an injunction against Verisign and ICANN, preventing and restraining the violations alleged herein.

## FOURTH CLAIM FOR RELIEF
**Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq. Restraint of Trade (On Behalf of the California Class) (Against Verisign and ICANN)**

287. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

288. As more fully alleged above, Defendants have entered into a continuing unlawful combination in restraint of trade and commerce in violation of Section 16720 of the California Business and Professions Code. The combination consists of the .com Registry Agreement, most recently renewed in November 2024.

289. The effect of this unlawful combination was to exclude competitors from the .com registry services market, foreclose competitive bidding, and cause the wholesale price of .com domain name renewals to rise to supracompetitive levels, which prices were passed through to Plaintiff and members of the California Class.

290. Plaintiff and other California Class members are “persons” within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

291. As a direct and proximate result of Defendants’ unlawful conduct, Plaintiff has been injured in their business and property in that they paid more for .com domain name renewals than they otherwise would have paid in the absence of Defendants’ unlawful conduct. Defendants’ violations are continuing and will continue unless enjoined by the Court. Plaintiff seeks treble damages and their cost of suit, including a reasonable attorney’s fee, pursuant to Section 16750(a) of the California Business and Professions Code.

## FIFTH CLAIM FOR RELIEF
**Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq. Conspiracy to Monopolize (On Behalf of the California Class) (Against Verisign and ICANN)**

292. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

293. Verisign and ICANN have entered into and maintained a combination for the purpose of preventing competition in and monopolizing trade and commerce in the market for .com domain name registry services, a substantial part of which occurred within California, in violation of Section 16720 of the California Business and Professions Code. The combination is embodied in, and evidenced by, the .com Registry Agreement and its successive renewals and amendments, most recently renewed in November 2024, as well as the escalating financial arrangements between Defendants described above.

294. The effect of this unlawful combination was to exclude competitors from the .com registry services market, foreclose competitive bidding, and cause the wholesale price of .com domain name renewals to rise to supracompetitive levels, which prices were passed through to Plaintiff and members of the California Class.

295. Plaintiff and other California Class members are “persons” within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

296. As a direct and proximate result of Defendants’ unlawful conduct, Plaintiff has been injured in their business and property in that they paid more for .com domain name renewals than they otherwise would have paid in the absence of Defendants’ unlawful conduct. Defendants’ violations are continuing and will continue unless enjoined by the Court. Plaintiff seeks treble damages and their cost of suit, including a reasonable attorney’s fee, pursuant to Section 16750(a) of the California Business and Professions Code.

## SIXTH CLAIM FOR RELIEF

**Violations of California’s Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. Restraint of Trade (On Behalf of the California Class) (Against Verisign and ICANN)**

297. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

298. As more fully alleged above, Defendants have committed acts of unfair competition, as defined by Section 17200, et seq., including violations of Section 1 of the Sherman Act and violations of the Cartwright Act as alleged in the Fourth Claim for Relief. Defendants' conduct is independently unfair and unlawful within the meaning of Section 17200, et seq.

299. Plaintiff and the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants as a result of such business acts and practices.

## SEVENTH CLAIM FOR RELIEF

**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. Monopolization (On Behalf of the California Class) (Against Verisign)**

300. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

301. As more fully alleged above, Verisign has committed acts of unfair competition, as defined by Section 17200, et seq., including violations of Section 2 of the Sherman Act. Verisign's conduct is independently unfair and unlawful within the meaning of Section 17200, et seq.

302. Plaintiff and the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Verisign as a result of such business acts and practices.

## EIGHTH CLAIM FOR RELIEF

**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. Conspiracy to Monopolize (On Behalf of the California Class) (Against Verisign and ICANN)**

303. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

304. As more fully alleged above, Defendants have committed acts of unfair competition, as defined by Section 17200, et seq., including violations of Section 2 of the Sherman Act as alleged in the Third Claim for Relief and violations of the

Cartwright Act as alleged in the Fifth Claim for Relief. Defendants' conduct is independently unfair and unlawful within the meaning of Section 17200, et seq.

305. Plaintiff and the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants as a result of such business acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:

a. The Court determine that this action may be maintained as a class action under Rule 23(a) (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

b. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

c. Plaintiff and the Classes recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of Plaintiff and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

d. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other

conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

e. Defendants be permanently enjoined from enforcing the provisions of the .com Registry Agreement that contractually bar ICANN from adopting any policy that prescribes, limits, or otherwise addresses the wholesale price of .com registry services or the terms on which such services are offered;

f. Plaintiff and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

g. Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

h. Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

DATED: September 4, 2026.

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By *__/s/ Christopher R. Pitoun__*

Christopher R. Pitoun (SBN 290235)
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

Steve W. Berman (*pro hac vice forthcoming*)
Ted Wojcik (*pro hac vice forthcoming*)
Moses Jehng (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: moses.jehng@hbsslaw.com

*Counsel for Plaintiff*